**MURPHY ORLANDO LLC**
Jason F. Orlando, Esq. (#016482000)
Debra R. Rydarowski, Esq. (#004582007)
494 Broad Street, 5th Floor
Newark, NJ 07102
(201) 451-5000
*Attorneys for Plaintiff, Loop HQ, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LOOP HQ, INC.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>JEREMIAH CHURCH and TRES COMMA COMPLIANCE INC.,<br><br>　　　　　Defendants. | Civil Action No. _____<br>JURY TRIAL DEMANDED<br><br>**VERIFIED COMPLAINT AND**<br>**JURY DEMAND** |

Plaintiff LOOP HQ, INC., at 2 Brighton Avenue, Suite 6, Passaic, New Jersey 07055, by way of Verified Complaint against Defendants JEREMIAH CHURCH, at 3974 Callow Lane, Ooltewah, Tennessee 37363 and TRES COMMA COMPLIANCE INC., at 2261 Market Street, Suite 22253, San Francisco, California 94114, says:

**Parties**

1.　　　　Plaintiff LOOP HQ, INC. ("Plaintiff" or "Loop") is a Delaware corporation with a place of business at 2 Brighton Avenue, Suite 6, Passaic, New Jersey 07055.

2.　　　　Defendant JEREMIAH CHURCH ("Church") is a natural person residing at, upon information and belief, 3974 Callow Lane, Ooltewah, Tennessee 37363, and is a shareholder and the former Chief Technology Officer of Loop and current owner of Defendant Tres Comma Compliance Inc.

1

3.      Defendant TRES COMMA COMPLIANCE INC. ("Defendant" or TCC"), upon information and belief, is a California out of state stock corporation with an address of 2261 Market Street, Suite 22253, San Francisco, California 94114.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. §1332(a)(1) because this action is brought between citizens of different states and the matter in controversy exceeds the sum or value of $75,000; and pursuant to 28 U.S.C. § 1331 because this action is brought under the Defend Trade Secrets Act of 2016, Pub. L. 114–153, 130 Stat. 376, codified at 18 U.S.C. § 1836 et seq. ("DTSA"), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and pursuant to Section 17 of an employment agreement entered into by the parties which states that "the state and federal courts of the State of New Jersey shall have exclusive jurisdiction with respect to any dispute arising under it, that each party consents to and submits to the jurisdiction of such courts and waives any right to contest the choice of such courts as inconvenient." [Exhibit 2, § 17].

## Facts Common To All Claims

6.      This Complaint seeks redress for Defendant Church's violation of the express terms of a non-compete provision in his employment agreement with Plaintiff as well as the theft and misappropriation of trade secrets and confidential information of Loop for Defendants' commercial advantage and private financial gain.

7.      Plaintiff also seeks redress for the actions of Church, its shareholder and former employee, in violation of his fiduciary duties to Loop and to his fellow shareholders.

2

*Church's Employment History With Loop*

8.      Loop is a software technology startup in the personal and business data management space led by a small, passionate team that has invested significant time, effort, and financial support from friends and family.

9.      In or about 2017 or 2018, Loop hired Church to assist Loop in developing a Consumer Product that aggregated different digital communications platforms, such as email and social media communications platforms, into one inbox.

10.      On or about March 3, 2021, Church signed an employment agreement with Loop which retained him as a full-time employee in the role of Lead Developer, commencing on February 8, 2021, for an initial three-month trial period. [Exhibit 1].

11.      On or about July 13, 2021, Church signed a subsequent employment agreement with Loop (the "Employment Agreement") which retained him as a full-time employee with Loop in the role of Lead Developer. [Exhibit 2].

12.      On January 5, 2023, the Board of Directors of Loop appointed Church an Officer of Loop with the title Vice President of Product Development.

13.      On April 18, 2024, the Board appointed Church the Chief Technology Officer of Loop.

14.      Sections 8(a)(i)-(iii) of the Employment Agreement require Church to adhere to a Duty of Loyalty that expressly prohibits Church from engaging in any transaction or becoming involved in any situation that might involve a conflict of interest for Loop; failing to protect Loop's property, including its intellectual property and other confidential and proprietary information; and making a profit at Loop's expense.

15.      Section 8(c) states that the provisions of Section 8 shall survive any termination of the Employment Agreement.

16.     Section 9(a)(i) of the Employment Agreement contains terms on Confidential and Proprietary Information wherein Church agreed to "keep strictly confidential and secret all Confidential Matters and not to use for Employee's own direct or indirect benefit or disclose any of them, or any portion of any of them, to any individual or entity… during or after the period in which Employee has performed services for Company."

17.     Section 9(b) of the Employment Agreement defines "Confidential Matters" broadly and specifically includes "intellectual property" which it defines as "all trade secrets, ideas, inventions, innovations, designs, developments, devices, software, algorithms, applications, tools, methods, processes and know-how (whether or not patented or unpatentable or reduced to practice) and all patents and patent applications related thereto; all trademarks and all registrations and applications for registration related thereto; all copyrights, copyrightable works and mask works and all registrations and applications for registration related thereto; and all other intellectual property or other proprietary rights."

18.     Section 9(b) then defines "Employee Created IP" as "Any Intellectual Property contributed to or conceived, created, designed or developed by Employee or anyone acting on behalf of Employee (whether alone or jointly with others) at any time prior to the date of this Agreement or after the date of this Agreement and prior to the termination of this Agreement that (i) relates to the past, present or proposed business, products or services of [Loop] or any of its subsidiaries; (ii) results from any services that Employee performs for [Loop] or any of its subsidiaries as an independent contractor, consultant, employee or otherwise; (iii) is conceived, created, designed or developed by Employee during normal business hours or using the equipment, supplies or facilities of [Loop] or any of its subsidiaries during the term of this Agreement; or (iv) is based on, derived from or incorporates any Confidential Matters[.]"

19.     Section 9(b) then states that Church "unconditionally waives any and all moral or

4

similar rights with respect to Employee Created IP."

20.       Section 9(c) states that "All Intellectual Property, including Employee Created IP, is, shall be and shall remain the exclusive property of [Loop] and Employee acknowledges and agrees that Employee has no license, right, title or other interest of any kind or nature in, to or under any thereof. Employee hereby unconditionally and irrevocably assigns, transfers and delivers to [Loop], without further consideration, all Employee Created IP and all right, title and interest in, to and under all Employee Created IP[.]"

21.       Section 9(f) states that the provisions of Section 9 shall survive any termination of the Employment Agreement.

22.       Section 10(c) states that during Church's employment and **for one year thereafter, he shall not** "Work for, own an interest in, operate, join, control, participate in or be connected, either directly or indirectly, as an officer, agent, employee, shareholder or principal of any **entity which competes directly or indirectly with [Loop][.]**" (emphasis added).

23.       Section 10(c) states that the provisions of Section 10 shall survive any termination of the Employment Agreement.

24.       Section 11 "acknowledges and agrees that [Loop] will suffer immediate and irreparable damage if Employee breaches any of the provisions of Section 8, Section 9 or Section 10 and that monetary damages would not be an adequate remedy for such breach. Accordingly, Employee hereby agrees that [Loop] shall be entitled **to obtain** specific performance, preliminary and permanent injunctive or other appropriate equitable relief to remedy, restrain or prevent any such breach or threatened breach **without posting any bond or other security and without proving that money damages would be an inadequate remedy**. Company's rights under this Section 11 shall be in addition to, and not in lieu of, other rights and remedies, including a remedy for money damages, to which Company may be entitled as a result of such breach." (emphasis added)

25.     Section 11 further "represents and warrants to [Loop] that Employee's experience and capabilities are such that Employee can obtain employment in business without breaching any of the provisions of Section 9 or Section 10 of this Agreement and that Employee's obligations under Sections 9 and 10 (and the enforcement thereof pursuant to this Section 11) will not prevent Employee from earning a livelihood."

26.     Section 17 states that the Employment Agreement shall be governed by and enforced in accordance with the laws of the State of New Jersey, that the state and federal courts of the State of New Jersey shall have exclusive jurisdiction with respect to any dispute arising under it, that each party consents to and submits to the jurisdiction of such courts and waives any right to contest the choice of such courts as inconvenient.

27.     During his employment with Loop, Church reported solely to Mr. Greg Fragin, Loop's President and Chief Executive Officer.

28.     Together with his family, Mr. Fragin is a controlling stockholder of Loop.

29.     For many years, Church was Loop's sole employee.

30.     Over time, Church recruited and built a team of developer consultants which he managed and oversaw.

31.     Church, together with the developers he managed, designed and built Loop's infrastructure and security.

32.     For a period of more than three years, Church—as the Lead Developer, Vice President of Product Development, and CTO—had total responsibility for every aspect of the development of Loop's products and all related intellectual property, and complete and unrestricted access to substantially all of Loop's Confidential Matters, including all intellectual property.

33.     On or about August 13, 2020, Church invested $10,000 in Loop. He also received shares of Loop stock in several grants over the course of his employment with Loop.

34.     Church executed and is subject to both Loop's shareholder's agreement dated as of March 2014 (the "Shareholder Agreement") [Exhibit 3] and a stock purchase agreement.

35.     As an employee and shareholder, Church was bound by fiduciary duties that included keeping Loop's trade secrets and confidential business material protected from disclosure and not using such secrets and material for any purpose other than his service to Loop.

36.     Section 10 of the Shareholder Agreement contains terms on Confidentiality, stating "Each Shareholder agrees that it shall at all times, and shall direct its Advisors (as defined below) to keep confidential and not use (for any purpose), divulge, furnish or make accessible to anyone any Confidential Information (as defined below), including, without limitation, any knowledge or data concerning or relating to the business or financial affairs of the Company."

37.     Section 10 then defines "Confidential Information" as "any past, present or future knowledge or data concerning or relating to the business or financial affairs of the Company or any of its affiliates, trade secret or confidential proprietary information (including, without limitation, any customer list, data, records, financial information, business strategies, sales techniques, personnel information or any other information, constituting a trade secret or business secret) or other proprietary information, whether or not reduced to writing, concerning or relating to the business or financial affairs of the Company or any of its affiliates."

38.     As a shareholder and CTO, Church enjoyed the particular trust of Loop, and handled, was responsible for, and participated personally and substantially in the most sensitive, confidential matters on behalf of Loop. Precisely because of the importance of Loop's intellectual property, Church was subject to the Employment Agreement and, as a shareholder, covenanted to ensure the security of Loop's business information.

*Loop Develops Its Compliance Product*

39.     In recent years, the Securities and Exchange Commission ("SEC") and the

Financial Industry Regulatory Authority ("FINRA") have more aggressively enforced the affirmative requirement that registered financial institutions capture and archive all business communications.

40.    SEC Rule 17a-4 under the Securities Exchange Act of 1934, as amended, requires that broker-dealers maintain communications records for at least six years, with the first two years requiring easy accessibility. This rule applies to any medium of communication, including emails, text messages, and social media posts and requires the records to be stored in such a way that the data remains tamper-proof.

41.    FINRA Rule 4511 reinforces SEC Rule 17a-4, requiring firms to make and preserve records that reflect the firm's operations and activities and generally requires firms to store records for at least six years in such a way that they remain tamper-proof.

42.    In recent years, due to the growth of social media and online platforms, the range of communications subject to archival has expanded dramatically to include "off-channel communications," which are business-related messages exchanged through platforms that aren't approved or monitored by a firm, and other communications not previously captured by any existing archival tool, such as emails and internal messaging systems, text messages and instant messaging apps, social media platforms, voice communications, video conferencing platform, collaboration tools, and file sharing services.

43.    Existing archival solutions do not pick up off-channel communications platforms and it is generally known that financial services employees hesitate to connect their personal accounts to such archival methods for fear of exposing their personal communications. Thus, existing solutions cause compliance issues for financial services companies because the companies are unable to locate in their archives all communications that are required to be retrieved and made available in compliance with FINRA Rule 4511 and SEC Rule 17a-4.

44.    In Summer 2023, Loop, including Church, presented its Consumer Product to a

group of banks and other financial institutions at a conference hosted by American Express.

45.    Loop had been aware of compliance issues in the financial services industry, but was struck by the amount of questions at the conference that centered on the firms' frustrations with current archival solutions of off-channel communications platforms, which required third party apps that slowed down devices and failed to capture messages directly from the native applications since employees refused to connect such applications, fearing their personal communications would also be collected and archived.

46.    While attending the conference, Loop realized that the concept underlying its consumer product could be further developed and expanded to fill the gaps in the off-channel communication compliance solutions available to financial institutions and began to redirect and purposely and strategically focus on its Compliance Product from that point forward, with the goal of being the first and only product to offer such a solution.

47.    Loop created its Compliance Product as a solution to aggregate all platforms, while separating personal and business communications. This made Loop's Compliance Product an exciting and innovative solution to two problems facing firms subject to regulation under FINRA Rule 4511 and SEC Rule 17a-4: Loop Compliance allows employees to feel more comfortable connecting their personal accounts and it allows regulated firms to retrieve and produce all archived business communications in compliance with FINRA Rule 4511 and SEC Rule 17a-4.

48.    Loop's Compliance Product is unique from all other archival solutions in that it:

    a.    Combines messages from all different platforms, including iMessage, WhatsApp, and other communications platforms;

    b.    Matches contacts across platforms to determine personal versus business contacts;

    c.    Connects the accounts at the account level rather than on the device;

    d.    Does not utilize a third-party app or app on the device, meaning no slowdown or

lost messages; and

e.  Archives communications to an object storage service, Amazon Simple Storage Service (Amazon S3 bucket), with the option to offload to other archiving solutions.

49.  Loop began marketing its Compliance Product while it was still in development, and the response was overwhelming from banks, hedge funds, and broker-dealers, all of which encouraged Loop to start building.

50.  By February 2024, Loop had its first customer, and by September 2024 Loop had engaged in substantive business discussions and provided proof of concept demonstrations to thirteen private equity funds with assets under management totaling over $500 billion.

51.  Loop also had indications of interest from some of the world's largest banks and had begun to receive referrals after the vetting of Loop's Compliance Product.

52.  As CTO and a key employee of Loop for many years, Church was instrumental in the development of Loop's Compliance Product.

53.  He also recruited and brought in a team of developer consultants, which he managed.

54.  As CTO, Church wrote, developed, had total responsibility for, and had complete and unrestricted access to, all inventions, innovations, designs, developments, devices, software (including source and object code), algorithms, applications, tools, methods, processes, know-how and all other technology of Loop incorporated in or relating to Loop Compliance.

55.  Church set up the cloud computing platform, Amazon Web Services (AWS), and other infrastructure that made up Loop's Compliance Product.

56.  Church also led the design of Loop's security, an integral part of its product, and in fact co-authored a Security White Paper that details Loop's security and access control policies company-wide from different fronts, including people, application security, authentication, network

security, physical security, data security, and vulnerability management; all of which made up Loop's Compliance Product.

*Loop Safeguards Its Confidential Information And Intellectual Property*

57.    Loop's competitive advantage and trade secrets include at a minimum its unique compliance product that fills a gap in current archiving products and its technical makeup, including its code, security and infrastructure, all of which function together in way distinctively and purposely designed and implemented by Loop; and the technological know-how, processes, design, and implementation of its consumer product.

58.    Because Loop's intellectual property derives its value from its non-public nature, the security of that intellectual property is paramount to the company's business success and Loop assiduously protects it, captured in its confidentiality policy [Exhibit 4] and white paper [Exhibit 5]:

59.    Access Control: Loop employs strict access control mechanisms to ensure that only authorized personnel have access to confidential information. Access to internal systems and sensitive data is governed by role-based permissions, limiting each employee's access to only the information necessary to perform their specific job functions. When employees or contractors leave the company or change roles, access rights are promptly reviewed and updated to reflect their current responsibilities.

60.    Authentication and Identity: All internal systems require multi-factor authentication (MFA), adding an additional layer of protection beyond standard username and password credentials. Where applicable, Loop utilizes Single Sign-On (SSO) solutions to centralize and further secure employee access to systems. These identity management practices reduce the risk of compromised credentials and unauthorized access.

61.    Encryption: Loop ensures that data is encrypted both in transit and at rest. All communications between systems are secured using industry-standard encryption protocols (such as

TLS/SSL). Data stored in Loop's databases and cloud storage solutions is encrypted at rest using secure encryption algorithms provided by leading cloud service providers.

62.     Confidentiality Agreements: All employees, contractors, and third-party vendors are required to sign confidentiality and non-disclosure agreements as a condition of their engagement with Loop. These agreements legally obligate all parties to maintain the confidentiality of Loop's proprietary information.

63.     Employee Offboarding Procedures: When an employee's or contractor's role changes or their engagement with Loop ends, Loop follows a structured offboarding process to ensure that access to confidential information is promptly and securely revoked so that former employees are not able to access Loop's systems or data after their departure. This includes,

   a.   Immediate deactivation of all company accounts and credentials.

   b.   Collection of company-owned devices, hardware, and physical access cards.

   c.   Review of any remaining access points (e.g., third-party systems, SaaS platforms).

   d.   Confirmation that the departing employee or contractor no longer retains any proprietary data or materials.

   e.   Final audit review by the IT and HR teams to ensure full closure of access.

64.     Physical Security of Trade Secret Materials: Loop maintains physical resources located in secured office space. These facilities are protected through multiple layers of physical security:

   f.   Controlled building access;

   g.   Locked office suites;

   h.   A separate, locked server room where sensitive equipment and backup storage are housed;

   i.   Physical access to the server room is limited to authorized personnel only; and

j.    Sensitive physical documentation is stored in locked cabinets, and secure disposal procedures are followed for any printed confidential materials.

65.    Monitoring and Audit Logging: Loop maintains audit logs that track system access and activity related to confidential information both in the cloud and locally. Security personnel monitor these logs and receive alerts for any suspicious or unauthorized activity, allowing for prompt investigation and remediation.

66.    Security Certifications: Loop has successfully completed and maintains SOC 2 compliance. This independent third-party audit evaluates and certifies that Loop's systems, policies, and procedures meet strict standards for security, confidentiality, and availability. SOC 2 compliance further demonstrates Loop's commitment to protecting confidential and proprietary information according to recognized industry standards.

67.    People: All Loop employees are required to understand and follow strict internal policies and standards. All employees are trained on security topics including but not limited to device security, preventing spyware/malware, physical security, data privacy, account management, and incident reporting. All employee devices must have strong passwords, encrypt data on disk, run anti-virus software, and lock automatically when idle. No data is stored on employee computers or servers in the office.

68.    Loop also protects its customers' information as outlined in the Security White Paper co-authored by Church mentioned previously.

*Church's Departure from Loop*

69.    At one point in Summer 2024, Church told Mr. Fragin that Loop did not want him looking around for other employment or leaving as it would be "very difficult" for Loop.

70.    On June 26, 2024, Church, as CTO, sent a letter to Loop's shareholders [Exhibit 6].

71.    In the letter, Church stated that he has never been more excited about any product

13

he has ever worked with. He then focused on how the Compliance Product is built upon Loop's prior developments, stating, "Compliance takes everything that we've built from all of our integrations and all of our tools and sits on top of it all. It takes a consumer product and flips the go-to-market on its head, giving us a compelling enterprise product without sacrificing what makes Loop so special."

72.      Church's letter next focused on the demand for Loop's Compliance Product, stating "The last three months of sales calls have been unbelievable. Every single time we get on a phone call with people we've never spoken with and show them what Loop can do for compliance, the next part of the conversation is always 'What are the next steps?'. There's been no sales process. Pricing is an afterthought."

73.      Church's letter to the shareholders then focused on the need to seize this opportunity quickly, **before anyone else does**, stating "We need to seize this massive opportunity quickly. My biggest fear is that someone else realizes the opportunity in this space… we need to seize the entire market and we need to do it now. Our product is incredibly well positioned and no one else seems to be able to offer what we're able to do right now."

74.      Finally, Church concluded his message by stating, "This isn't a smoke and mirrors interesting idea. We've put the work in, not just the creative concept. Loop Compliance works today[.]"

75.      Upon information and belief, at the end of July 2024, Church made a trip out West and was out-of-pocket for about four days. This was noticeable because Church usually spoke with Mr. Fragin daily.

76.      On or about September 9, 2024, Church resigned from Loop, stating that he had another opportunity with a "well-funded" company with a technical problem that was in his area of expertise.

*Church Misappropriates Loop's Confidential Matters and Trade Secrets*

*and Forms TCC In Direction Competition With Loop*

77.       After Church's departure, Church updated his LinkedIn profile to "TBD."

78.       In late Spring 2025, approximately eight months after Church left Loop, Fragin learned that Church had started a new company, Defendant Tres Comma Compliance, Inc., which was marketing the exact compliance product that Loop had been developing.

79.       Defendant TCC has a website, https://commacompliance.com. [Screen printouts at Exhibit 7].

80.       TCC advertises a product identical to Loop's Compliance Product, including all of the characteristics that made Loop unique.

81.       For example, TCC advertises on its website:

    a.   "Stay in control of your off-channel communications - before regs get involved."

    b.   "Archiving is non-negotiable. We flag language that violates internal policies or SEC and FINRA rules as it's sent, helping you stay audit-ready."

    c.   "Regulators are no longer waiting for violations to surface—they're actively auditing firms to find off-channel communications that aren't archived. If your firm isn't capturing modern messaging channels, you're already at risk."

    d.   "Capture iMessage, WhatsApp, LinkedIn, Gmail, Bloomberg, and more – without touching personal content or changing habits. SEC/FINRA compliant."

    e.   "Most compliance software tools archive everything, including personal messages. Comma Compliance filters business contacts, letting employees connect apps without privacy concerns."

    f.   "Despite policies banning iMessage and WhatsApp, employees use them to meet client expectations. Clunky apps and forced SMS make it difficult for your team to work, making it easier to miss key conversations. Firms need a compliance solution

that works with the tools clients and employees already communicate on."

82.     TCC's product fills the same gap in the market that Loop's Compliance Product uniquely did and is marketed to the same industry and users.

83.     TCC's product states that it solves the same two problems Loop's unique product solved: it allows employees to feel more comfortable connecting their personal accounts and it allows regulated firms to retrieve and produce all archived business communications in compliance with FINRA Rule 4511 and SEC Rule 17a-4.

84.     TCC's product also markets itself as a solution to aggregate all platforms, while separating personal and business communications.

85.     TCC's product also markets that it mimics Loop's Compliance Product's unique characteristics:

     a.     It combines messages from all different platforms, including iMessage, WhatsApp, and other communications platforms;

     b.     It matches contacts across platforms to determine personal versus business contacts;

     c.     It connects the accounts at the account level rather than on the device;

     d.     It does not utilize a third-party app or app on the device, meaning no slowdown or lost messages; and

     e.     It archives communications to an object storage service, Amazon Simple Storage Service (Amazon S3 bucket), with the option to offload to other archiving solutions.

86.     TCC's Security and Data Protection Policy, found on TCC's website [Exhibit 7], mirrors—sometimes word-for-word—the terms of use, privacy policy, roadmap and internal policies of Loop, all of which were in place, and often crafted by Church, during Church's tenure at Loop.

87.     TCC is impermissibly marketing its product in direct competition with Loop.

88.     Since discovering the existence of Tres Comma Compliance, Loop has reviewed the code authored by Church in the months prior to departure and has discovered a slow-down in the development of Loop's Compliance Product for at least the last seven months prior to Church's departure.

89.     As CTO, Church had been in control of designing and building Loop's products and had a direct role in the designing and building of Loop's products.

90.     Church also had control of and access to all of Loop's trade secrets and confidential information and was in fact the individual responsible for designing and implementing the security measures that protected it.

91.     Church's utilization of this information in the creation of his own company and product that is identical to Loop's constitutes misappropriation of Loop's highly confidential information and trade secrets by a person who agreed and was trusted to ensure its confidentiality and is in direct competition with Loop in violation of the Employment Agreement and duties owed by Church to Loop.

92.     In addition, by creating and marketing TCC, Church has blatantly violated the express terms of the non-compete clause in his Employment Agreement, which prohibits him from working for or owning a competitor to Loop.

*Loop Takes Immediate Action*

93.     Immediately upon learning of Church's unlawful actions, including the violation of his non-compete obligations, Loop obtained counsel and served Church and TCC with a Cease and Desist letter in order to protect itself and its trade secrets and confidential information and to enforce Loop's rights pursuant to the Shareholder Agreement; Employment Agreement, including its non-compete clause; and statutory and common law.

94.     Loop then initiated this Action.

95.     Loop has been and will continue to be damaged by Defendants' actions.


### Count I
**Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq. ("DTSA")**
**(Church and TCC)**

96.     Loop incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

97.     Loop is the owner of trade secrets related to a product and/or service used in and/or intended for use in interstate commerce.

98.     Loop took reasonable measures to keep its trade secrets secret.

99.     Loop's trade secrets derive their value from their non-public nature, as evidenced by the efforts expended by Loop to create the information and the procedures Loop put in place to protect it from disclosure.

100.    Upon information and belief, Church and TCC have willfully and maliciously misappropriated Loop's trade secrets and will continue to misappropriate Loop's trade secrets.

101.    TCC and Church acquired Loop's trade secrets, knowing they had been acquired by improper means.

102.    TCC and Church disclosed and/or used Loop's trade secrets without Loop's consent.

103.    TCC and Church used improper means to acquire knowledge of Loop's trade secrets.

104.    At the time of the disclosure and/or use, TCC and Church knew or had reason to know that the knowledge of Loop's trade secrets was derived or acquired through improper means.

105.    Loop has been and will continue to be damaged by Church's actions, for as long as he (or any third party to whom he has provided/forwarded any confidential information) remains in

possession of such.

106.    Loop has been damaged thereby and is entitled to exemplary damages and damages for actual loss and unjust enrichment.

107.    An injunction is also appropriate to prevent actual and future threatened misappropriation.

108.    Loop faces the prospect of irreparable harm warranting injunctive relief against Defendants to compel them to disclose and destroy all affected material and submit to such inspection and searches of his personal and business electronic devices (and cloud storage) as is necessary to ensure such disclosure and destruction.

109.    Church expressly agreed in Section 11 of the Employment Agreement that Loop shall be entitled to preliminary and permanent injunctive relief and other equitable relief to remedy, restrain or prevent any such breach or threatened breach.

110.    Loop is entitled to temporary, preliminary, and permanent restraints compelling Defendants to do so.

**Count II**
**Violation of New Jersey Trade Secrets Act, N.J.S.A. 56:15-1 et seq. ("NJTSA")**
**(Church and TCC)**

111.    Loop incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

112.    Loop's confidential information constituted trade secrets in that it derived independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.

113.    Loop used reasonable efforts under the circumstances to maintain the secrecy of its confidential information.

114.    TCC and Church acquired Loop's trade secrets, knowing they had been acquired

by improper means.

115.     TCC and Church disclosed and/or used Loop's trade secrets without Loop's consent.

116.     TCC and Church used improper means to acquire knowledge of Loop's trade secrets.

117.     At the time of the disclosure and/or use, TCC and Church knew or had reason to know that the knowledge of Loop's trade secrets was derived or acquired through improper means.

118.     TCC's and Church's misappropriation was willful and malicious, and made in bad faith.

119.     By reason of Defendants' acts and omissions as described herein, Loop is entitled to awards of damages, and of temporary, preliminary, and permanent injunctive relief, consistent with Defendants' actions and the remedies available under the NJTSA and the Employment Agreement.

## <u>Count III</u>
### Misappropriation of Confidential and Proprietary Information and Trade Secrets
### (Church and TCC)

120.     Loop incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

121.     The communication of Loop's confidential and proprietary information and trade secrets to Church was in confidence.

122.     Church disclosed Loop's confidential and proprietary information and trade secrets without consent and in breach of that confidence.

123.     Loop's confidential and proprietary information and trade secrets were acquired by TCC with knowledge of Church's breach of confidence.

124.     TCC has utilized Loop's confidential and proprietary information and trade secrets to Loop's detriment.

125.     Loop took precautions to maintain the secrecy of Loop's confidential and proprietary information and trade secrets.

126.     By reason of Defendants' acts and omissions as described herein, Loop is entitled to awards of damages, and of temporary, preliminary, and permanent injunctive relief, consistent with Defendants' actions and the remedies available under the NJTSA and the Employment Agreement.

**Count IV**
**Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA")**
**(Church and TCC)**

127.     Loop incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

128.     Church and TCC intentionally accessed a protected computer or computers used in interstate commerce that are connected to Loop's computer system without authorization or in a manner or with a purpose that exceeded his authorized access thereto.

129.     Defendants' actions were taken for commercial advantage or private financial gain, and in furtherance of commercial misconduct and tortious acts.

130.     Plaintiff was damaged thereby, in that Plaintiff suffered loss aggregating at least $5,000 in value.

**Count V**
**Breach of Fiduciary Duty**
**(Church)**

131.     Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

132.     During his employment with Loop, Church had access to the confidential information described herein, including without limitation Loop's intellectual property and confidential information.

133.     As the CTO and a shareholder of Loop, Church was in a position of trust and

confidence and had a duty to keep confidential all the Loop confidential information he learned and/or obtained during his employment.

134.     Church's duty of confidentiality survived his separation.

135.     Church is likely to continue to use and/or disclose the confidential information in breach of his fiduciary duty and, on information and belief, he has negligently or intentionally used and/or disclosed the confidential information.

136.     Church owed fiduciary duties to Loop and his fellow shareholders, including the requirement of good faith, loyalty, due care, and candor.

137.     By committing the acts and omissions described herein, including by taking Loop confidential information and competing with Loop, Church breached his fiduciary duty to Plaintiff and his fellow shareholders of Plaintiff, to the detriment of Plaintiff.

138.     As a direct and proximate result of Church's actions, Plaintiff has sustained and continues to sustain damages, in an amount as yet unascertained.

139.     Church acted willfully, maliciously, wantonly, intentionally, and egregiously, with reckless disregard for Loop's rights, and Plaintiff is thereby entitled to punitive or exemplary damages.

**Count VI**
**Breach of Contract**
**(Church)**

140.     Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

141.     Church and Loop entered into the Employment Agreement.

142.     Section 8 prohibited Church from engaging in any transaction or being involved in any situation that might involve a conflict of interest for Loop, failing to protect Loop's property, and making a profit at Loop's expense.

143.     Under Section 9, Church agreed to keep Confidential Matters strictly confidential

and secret and not to use them for his own direct or indirect benefit or to disclose any of them to any individual or entity during or after his employment.

144.    Section 9 also stated that all intellectual property, including employee created intellectual property, belongs to Loop.

145.    Section 10 prohibited Church from competing with Loop for a period of one year after the end of his employment.

146.    Sections 8, 9, and 10 expressly survived any termination of the Employment Agreement.

147.    In creating and operating TCC, a direct competitor of Loop, Church violated the terms of the Employment Agreement, and continues to do so, causing Loop to suffer damages.

**Count VII**
**Breach of Contract**
**(Church)**

148.    Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

149.    As a shareholder, Church is a party to the Shareholder Agreement.

150.    Section 10 states that each shareholder shall keep confidential and not use, divulge, furnish or make accessible any confidential information

151.    Church violated the terms of the Shareholder Agreement, and continues to do so, causing Loop to suffer damages.

**Count VIII**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Church)**

152.    Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

153.    Loop had a contractual relationship with Church.

154.     Loop at all times acted in good faith and has dealt fairly with Church in connection with the parties' mutual obligations under the Employment and Shareholder Agreements.

155.     In addition to the express terms of a contract, the law provides that every contract contains an implied covenant of good faith and fair dealing.

156.     Church has acted in bad faith, dishonestly, and with improper motive to destroy or injure Loop's right to receive the benefits or reasonable expectations of its contractual and economic relationship with Church.

157.     Loop has been damaged thereby.

**Count IX**
**Tortious Interference With Prospective Economic Advantage**
**(Church and TCC)**

158.     Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

159.     Loop had a reasonable expectation of economic advantage due to the uniqueness of its Compliance Product in the market.

160.     Church and TCC had knowledge of Loop's expectancy of economic advantage that the Compliance Product gave Loop.

161.     Church and TCC wrongfully, intentionally, and without justification interfered with Loop's expectancy of economic advantage or benefit by misappropriating Loop's confidential information and trade secrets and by marketing a product that is identical in all material respects in the same market in competition with Loop.

162.     In the absence of these wrongful acts, it is reasonably probable that Loop would have realized its economic advantage.

163.     Loop has sustained damages as a result of Church's and TCC's wrongful acts in the form of lost profits and lost business opportunities.

## Count X
### Violation of Computer System Act, N.J.S.A. 2A:38A-1 *et. seq*
### (Church and TCC)

164.     Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

165.     Church and TCC purposely and knowingly, without authorization, took from Loop its data, database, computer program, computer software or equipment, and/or computer system or network.

166.     Church and TCC purposely and knowingly accessed and recklessly obtained from Loop its data, data base, computer program, computer software or equipment, and/or computer system or network.

167.     Loop has been damaged in business and/or property as a result of these actions.

## Count XI
### Unfair Competition
### (Church and TCC)

168.     Plaintiff incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

169.     Loop's confidential information and trade secrets have commercial and pecuniary value.

170.     Defendants have misappropriated Loop's confidential information and trade secrets.

171.     By engaging in the conduct described, Defendants have unlawfully and without privilege engaged in unfair competition with and to the detriment of Loop.

172.     As a consequence of the foregoing, Loop has suffered and will continue to suffer

irreparable loss and harm.

**WHEREFORE**, Plaintiff Loop demands judgment against Defendants as to all Counts of the Complaint, for:

a.  compensatory damages;

b.  consequential damages;

c.  punitive damages;

d.  reasonable attorneys' fees and costs, pursuant to applicable statutes and the common law;

e.  prejudgment interest;

f.  temporary, preliminary, and permanent injunctive relief, in the form set forth in Plaintiff's proposed Order To Show Cause filed herewith, including relief compelling Defendants to immediately cease and desist from competing with Loop and disclose all Loop client information retained by him; temporarily, preliminarily, and permanently enjoining him to review, retain, disclose, or otherwise make any use of same; and enjoining him to submit all his electronic devices and cloud storage platforms for forensic examination and imaging in furtherance of the prevention of further and irreparable harm and the protection of Plaintiff's rights under applicable law; and

g.  such other and further relief as this Court deems reasonable and just.

### Jury Demand

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury of all issues so triable.

### Certification Pursuant to L. Civ. R. 11.2

The undersigned certifies, in accordance with L. Civ. R. 11.2, that to the best of her knowledge,

there are no other proceedings either pending or contemplated with respect to the matter in controversy

in this action and that, at this time, there are no other parties known who should be joined in this action.

> **MURPHY ORLANDO LLC**
> 494 Broad Street, 5th Floor
> Newark, New Jersey 07102
> (201) 451-5000
> jorlando@murphyorlando.com
> *Attorneys for Plaintiff*

Dated: July 1, 2025

Jason F. Orlando, Esq.

## **VERIFICATION**

I, Greg Fragin, verify and declare as follows:

I am the President and Chief Executive Officer of Loop and am authorized to make this Verification on behalf of Loop. I have read the Verified Complaint and know its contents.

I verify under penalty of perjury that the matters set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are made subject to the penalties of Title 28 U.S.C. § 1746.

Dated: June 30, 2025

# EXHIBIT 1



March 3, 2021

Jeremiah Church
3974 Callow Lane
Ooltewah, TN 37363

Re:    <u>Employment Agreement</u>

Dear Jeremiah:

This Letter Agreement (this "Agreement"), when countersigned by you, will confirm your employment as an "at-will" employee of Loop HQ, Inc., a Delaware corporation ("Company"), commencing on the February 8, 2021, subject to the terms and conditions set forth herein.

**1. Terms Governing Retention of Employee.** Company hereby retains you ("Employee" or "you") to loyally render full-time services to Company and its subsidiaries as Lead Developer**.** You shall devote your best efforts to the affairs of Company and shall perform such duties as are directed by Company. Your employment by Company is "at will" and nothing contained in this Agreement shall be construed to prevent Company from terminating your employment hereunder at any time with or without cause or prevent Employee from voluntarily terminating employment hereunder at any time with or without cause.

**2. Compensation.** Employee will receive base compensation of $200,000 per year as consideration for services rendered pursuant to this Agreement. Increases in your base compensation are at the sole discretion of Company. The base compensation set forth herein above shall be payable in accordance with the regular payroll practices of Company and does not commit or bind Company to retain Employee for a specific time period.

Employee will also be eligible for such bonus, if any, as Company, in its sole discretion, determines to award, if Employee is an employee in good standing with Company at such time, if any, that Company decides to award bonuses and remains an employee in good standing until the date such bonuses are paid.

Notwithstanding the foregoing, Employee and Company agree that the employment shall be for an initial three month trial period through May 9, 2021 and can be extended by mutual agreement and on such terms as are mutually agreeable to the parties.



**3. Expenses.**  Company shall pay or reimburse Employee for all necessary and reasonable expenses incurred or paid by Employee in connection with the performance of services under this Agreement, upon presentation of appropriate expense statements or vouchers or other supporting information evidencing the nature of such expense requested by Company, and, if appropriate, evidence of the payment thereof by Employee.

**4. Additional Benefits.**  Employee shall be entitled to participate in any term life insurance, hospitalization, medical health and accident, disability or similar insurance plan or program of Company now existing, or hereafter established, to the extent that Employee is eligible under the general provisions thereof.  Notwithstanding anything herein to the contrary, however, Company shall have the right to amend or terminate any such plans or programs without prior notice.

**5. Vacation Time.** Employee shall be entitled to a reasonable number of vacation, sick and personal time-off days, provided that the timing and amount of vacation and personal time shall be subject to the prior approval of Company's Chief Executive Officer, which approval will not be unreasonably withheld or delayed. Vacation, sick and personal time shall be accrued, starting with the first day of employment, in accordance with the policies of Company with respect thereto from time to time in effect.

**6. Representations and Warranties.**  Employee will make no representation, warranty, or commitment binding Company without Company's express prior written consent.

**7. Duty of Loyalty.**  (a)  You covenant and represent that you owe Company the highest duty of loyalty with respect to the duties to be performed by you hereunder. This means that you will, among other things, never (i) engage in any transaction or become involved in any situation that might involve a conflict of interest for Company; (ii) fail to protect Company's property; (iii) make profits at Company's expense; (iv) accept kickbacks or special favors from clients, suppliers or others doing business with Company; (v) not use drugs or alcohol while performing services for Company.

(b) Both during the term of employment hereunder and afterwards, you shall not communicate in any medium or by any method, directly or indirectly, with or without attribution, any disparaging, critical, false or negative information or comments to or for any person (other than the Company in accordance with its whistle blower policy), audience, business, media source, messaging service, chat room, "blog," website or otherwise concerning (i) Company's its directors, officers, employees or owners, (ii) the business, operations, financial condition or prospects, results of operations, products, services, Intellectual Property (as defined in Section 8(b) of this Agreement) or other property, strategies, activities, acts or omissions of or by Company, its directors, officers, employees or owners, or (iii) any of Company's customers, partners, clients, vendors, advisors, consultants or other commercial or trading partner of or affiliated with Company, its directors, officers, employees or owners.



**8. Confidential and Proprietary Information.**  (a) Employee acknowledges and agrees that Employee's prior work for the Company as a consultant through Company's outsourced development shop, Tanooki Suit, did bring and Employee's employment will bring, Employee into close contact with many Confidential Matters (as defined in Section 8(b)), and therefore Employee hereby covenants and agrees to:

(i)    keep strictly confidential and secret all Confidential Matters and not to use for Employee's own benefit or disclose any of them, or any portion of any of them, to any individual or entity employed or retained by Company, except on a need-to-know basis, or to any individual or entity outside of Company, in any case either during or after the period in which Employee has performed services for Company; and

(ii)    deliver promptly to Company, upon completion or termination of Employee's services to Company, or at any time Company may request, all memoranda, notes, records, reports, technical manuals and other documents (and all copies thereof), in whatever format, relating to Company's and its affiliates' businesses which may then be in the possession or under the control of Employee.

(b)  The term "Confidential Matters" means any and all information, whether provided, received or otherwise obtained in written, digital, oral or other form, or by observation, and whether received prior to or after the date of this Agreement, relating to the business, properties and assets and operations of Company and its subsidiaries, including, without limitation, any and all information and documents that contain information relating to their respective owners, directors, officers, employees and consultants; products and services; clients and potential clients and vendors; sales and marketing plans and forecasts; financial condition and prospects, including, without limitation, historical financial statements and information, budgets and forecasts, costs and pricing information; and Intellectual Property. The term "Intellectual Property" means all trade secrets, ideas, inventions, innovations, designs, developments, devices, software, algorithms, applications, tools, methods, processes and know-how (whether or not patented or unpatentable or reduced to practice) and all patents and patent applications related thereto; all trademarks and all registrations and applications for registration related thereto; all copyrights, copyrightable works and mask works and all registrations and applications for registration related thereto; and all other intellectual property or other proprietary rights. Any Intellectual Property contributed to or conceived, created, designed or developed by Employee or anyone acting on behalf of Employee (whether alone or jointly with others) at any time since the date of the Consulting Agreement and prior to the termination of this Agreement that (i) relates to the past, present or proposed business, products or services of Company or any of its subsidiaries; (ii) results from any services that Employee performs for Company or any of its subsidiaries; (iii) is conceived, created,



designed or developed by Employee  during normal business hours or using the equipment, supplies or facilities of Company or any of its subsidiaries; or (iv) is based on, derived from or incorporates any Confidential Matters is referred to in this Agreement as "Employee Created IP." For the avoidance of doubt, Employee Created IP does not include software and applications Employee developed or develops for Cabin Company, which provides Cabin Company, which provides architectural plans and services, 3D rendering, augmented reality rendering, housewares, and construction kits and other prior inventions of Employee unrelated to the business, products or services of Company and listed on Schedule A of this Agreement. Notwithstanding the foregoing, Confidential Matters shall not include any information that is known generally to the public without any violation by Employee of the provisions of this Agreement.  Employee unconditionally waives any and all moral or similar rights with respect to Employee Created IP.

(c)  All Intellectual Property, including, without limitation, Employee Created IP, is, shall be and shall remain the exclusive property of Company and Employee acknowledges and agrees that Employee has no license, right, title or interest of any kind or nature in, to or under any thereof. Employee hereby irrevocably assigns, transfers and delivers to Company, without further consideration, all Employee Created IP and all right, title and interest in, to and under all Employee Created IP; provided, however, that, when applicable, Company shall own the copyrights in all copyrightable works included in the Intellectual Property pursuant to the "work-made-for-hire" doctrine (as such term is defined in the 1976 Copyright Act), rather than by assignment. All Intellectual Property, including, without limitation, all Employee Created IP, shall be owned by Company irrespective of any copyright notices or confidentiality legends to the contrary which may be placed on such works by Employee or by others. Employee shall ensure that all copyright notices and confidentiality legends on all work product authored by Employee or anyone acting on behalf of Employees shall conform to Company's practices and shall specify Company as the owner of the work.

(d)   Employee hereby agrees without further consideration to execute and deliver all such further agreements, documents and instruments and to take all such further action as Company may reasonably request to implement the provisions and carry out the intent of Section 8(c) in order to vest in Company all right, title and interest in, to and under all Employee Created IP.

(e)  Employee hereby represents and warrants to, and agrees with, Company that (i) Employee is not a party to or bound by any agreement, commitment or other undertaking that prohibits Employee from entering into this Agreement or performing the services contemplated by this Agreement, and (ii) Employee will not use any Intellectual Property or other proprietary information or rights of any other individual or entity in performing such services for Company.

**9.  Non-Solicitation; Non-Competition.**  During the time of Employee's employment by Company, and for a period of one (1) year thereafter, Employee shall not, directly or indirectly, acting alone or in conjunction with others:

> (a)  Request any customer, supplier or other person then doing business with Company or any of its subsidiaries to curtail or cancel its relationship with Company or otherwise modify such relationship to the material detriment of Company; or

> (b)  (i) Induce or attempt to influence any employee of Company or any of its subsidiaries to terminate its relationship with Company or to enter into any employment or other business relationship with any other individual or entity (including Employee or any entity owned or controlled by Employee); (ii) hire himself or permit any entity owned or controlled by Employee to hire any  employee of Company; or (iii) induce or attempt to influence any consultant to Company or any of its subsidiaries to terminate its relationship with Company or to modify such relationship to the material detriment of Company; or

> (c)  Work for, own an interest in, operate, join, control, participate in or be connected, either directly or indirectly, as an officer, agent, employee, shareholder or principal of any entity which competes, directly or indirectly, with Company, except for the ownership of less than two percent (2%) of the outstanding shares of an actively traded public reporting company.

**10.  Right to Injunctive Relief.**  Employee acknowledges and agrees that Company will suffer immediate and irreparable damage if Employee breaches any of the provisions of Section 7, Section 8 or Section 9 of this Agreement and that monetary damages would not be an adequate remedy for such breach.  Accordingly, Employee hereby agrees that Company shall be entitled to obtain specific performance, preliminary and permanent injunctive or other appropriate equitable relief to remedy, restrain or prevent any such breach or threatened breach without posting any bond or other security and without proving that money damages would be an inadequate remedy.  Company's rights under this Section 10 shall be in addition to, and not in lieu of, other rights and remedies, including, without limitation, a remedy for money damages, to which Company may be entitled as a result of such breach. Employee represents and warrants to Company that Employee's experience and capabilities are such that Employee can obtain employment in business without breaching any of the provisions of Section 8 or Section 9 of this Agreement and that Employee's obligations under said Sections 8 and 9 (and the enforcement thereof by injunction or otherwise pursuant to this Section 10) will not prevent Employee from earning a livelihood.



**11.  Non-Affiliate.**  Nothing in this Agreement shall be construed to make Employee a partner, affiliate, joint-venturer, stockholder or member of Company or any subsidiary of Company, except pursuant to the last paragraph of  Section 2 of this Agreement.

**12.  Entire Agreement.**  This Agreement constitutes the entire understanding between the parties with respect to the "at-will" employment of Employee by Company and its subsidiaries and cancels and supersedes all prior statements, representations, undertakings, agreements and understandings between Company or any of its subsidiaries and Employee with respect thereto, whether written or oral.  For the avoidance of doubt, this Agreement does not supersede the provisions of the Consulting Agreement that by their terms survive the termination of the Consulting Agreement.

**13.  Assignment.**  Except as otherwise expressly provided in this Agreement, the benefits of this Agreement are and shall be personal to Employee, and none thereof shall inure to the benefit of Employee's heirs, personal representatives or assigns.   The obligations and duties of Employee hereunder shall be personal and not assignable or delegable by Employee in any manner whatsoever without the express prior written consent of Company.  This Agreement shall be binding upon and inure to the benefit of Company and its successors and assigns. Company may assign this Agreement to any entity which may acquire substantially all of the business and assets of Company, or with or into which Company may be merged, consolidated or otherwise combined.  Company shall give notice to you of any such merger, consolidation or combination.

**14.  Modifications.**  No change, amendment, addition to or modification of any provision of this Agreement shall be binding on or effective against either Company or you unless it is expressly set forth in a writing and signed by both Company and you. Employee shall not be excused from compliance with the provisions of this Agreement by the failure of Company to insist on compliance with any terms or conditions of this Agreement.

**15.  Waiver**.  No waiver of any provision of this Agreement or of any default under this Agreement shall be valid unless it is expressly set forth in a writing and signed by both Company and you.  No course of conduct by Company or between Company and Employee shall constitute a waiver of any provision of this Agreement or any default under this Agreement.  No waiver, even if signed by both Company and you, shall be deemed to be a continuing waiver unless expressly stated therein.

**16.  Enforceability; Waiver of Trial by Jury.**  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New Jersey applicable to contracts made and to be performed entirely in such State.  The state and federal courts of the State of New Jersey, sitting in Passaic County, shall have exclusive jurisdiction with respect to any controversy or other dispute arising out of or relating to this Agreement or the breach hereof, and Company and you each irrevocably consents and submits to such jurisdiction.  Each of Company and Employee hereby waives, and agrees not to assert in any forum, that any such court is an inconvenient forum, or that



there is a more convenient forum, for the resolution of any such controversy or dispute. Company and you each agrees that service of papers and other documents or other instruments relating to such controversy or dispute may be made in accordance with the provisions of Section 19 of this Agreement. EACH OF COMPANY AND EMPLOYEE HEREBY IRREVOCABLY WAIVES A RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY SUCH CONTROVERSY OR DISPUTE.

**18.  Severability.** The provisions of this Agreement are severable and if any provision of this Agreement, or any portion of any such provision, is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement, or the remainder of such provision, as the case may be, shall remain in full force and effect and shall be enforced in accordance with its terms. If any provision of this Agreement, or portion thereof, including, without limitation, any provision or portion of Section 7, Section 8 or Section 9 of this Agreement, is so determined to be invalid or unenforceable, the court making such determination shall be authorized to, and shall, reduce the scope, shorten any applicable time period or otherwise modify such provision or portion thereof to the minimum extent necessary in order to carry out the intent and purpose of such provision, or portion there, and make the same valid and enforceable under applicable law.

**19.  Notices.**  Until advised otherwise in writing, all notices, demands and other communications hereunder shall be deemed to have been duly given if sent by certified mail or e-mail to the respective addresses of Company and you set forth below at the end of this Agreement.

**20.  Representation**.  You hereby acknowledge that you have been advised in writing to consult with an attorney prior to executing this Agreement; that you have been represented by independent legal counsel of your own choice, or have voluntarily declined to do so; that you have carefully read this Agreement in its entirety; that you had the provisions of this Agreement explained to your satisfaction; that you fully understand its terms and significance; that you voluntarily assent to all of its terms and conditions; that you are signing this Agreement voluntarily; and that you will abide by all of its provisions.



**21. Counterparts.** This Agreement may be executed in counterparts, each of which shall be an original and all of which, taken together, shall constitute the same agreement. Any such counterpart may be delivered by facsimile or other form of electronic transmission and any such transmission shall be deemed to be the delivery of an original, manually signed counterpart for all purposes.

Sincerely yours,
Loop HQ, Inc..


By:_____
        Greg Fragin, President and CEO

Address:  2 Brighton Avenue, Suite 6
               Passaic, New Jersey 07055

e-mail: gfragin@loophq.com


ACCEPTED AND AGREED:

        EMPLOYEE:


*Jeremiah Church*
        Jeremiah Church

Address:
3974 Callow Lane
Ooltewah, TN 37363


E-mail: jchurch@loophq.com

# EXHIBIT

# 2



July 13, 2021

Jeremiah Church
3974 Callow Ln
Ooltewah, TN 37363

Re:    Employment Agreement

Dear Jeremiah:

This Letter Agreement (this "Agreement"), when countersigned by you, will confirm your employment as an "at-will" employee of Loop HQ, Inc., a Delaware corporation ("Company"), commencing on the date hereof, subject to the terms and conditions set forth herein.

**1. Terms Governing Retention of Employee.**  Company hereby retains you ("Employee" or "you") to loyally render full-time services to Company and its subsidiaries as Company's Lead Developer. You shall devote your best efforts to the affairs of Company and shall perform such duties as are directed by Company. Your employment by Company is "at will" and nothing contained in this Agreement shall be construed to prevent Company from terminating your employment hereunder at any time with or without cause or prevent you from voluntarily terminating your employment hereunder at any time with or without cause.

**2. Compensation.** Employee will receive base compensation of $200,000 per year as consideration for all services rendered pursuant to this Agreement, provided that all fees paid to Employee since February 8, 2021 under that certain Employment Agreement between Employee and Company dated March 3, 2021 (the "Previous Agreement") shall be credited ratably against Employee's compensation for the first twelve (12) months of the term of this Agreement.  Increases in Employee's base compensation are at the sole discretion of Company.  The base compensation set forth in this Section 2 shall be payable in accordance with the regular payroll practices of Company, subject to required withholdings, and does not commit or bind Company to retain Employee for a specific time period.

Employee will also be eligible for such bonus, if any, as Company, in its sole discretion, determines to award, if Employee is an employee in good standing with Company at such time, if any, that Company decides to award bonuses and remains an employee in good standing until the date such bonuses are paid.

**3. Option Grant.**    Subject to the approval of the Board of Directors of Company (the "Board"), Company will grant Employee a ten-year non-qualified option (the "Option") under Company's 2012 Stock Plan (the "Plan") to purchase an aggregate of 192,252 shares of Common Stock, no par value per share, of Company (the "Common Stock") at an exercise price per share equal to the fair market



value of one share of Common Stock on the date of grant of the Option by the Board and containing the following provisions:  [NTD:  THIS AGREEMENT IS NOT THE OPTION AGREEMENT; IT ONLY DESCRIBES THE TERMS OF THE OPTION TO BE PRESENTED TO THE BOARD IN CONSIDERING THE GRANT OF THE OPTION.  THE EXERCISE PRICE WILL BE SET FORTH IN THE OPTION AGREEMENT AND THE PLAN REQUIRES THAT IT BE THE FMV OF THE COMMON STOCK ON THE DATE OF GRANT.  THE OPTION AGREEMENT WILL BE EXECUTED AFTER THE BOARD GRANTS THE OPTION.  SINCE THAT SHOULD HAPPEN SHORTLY, THE FMV OF THE COMMON STOCK SHOULD NOT VARY FROM TODAY'S VALUE OF $2.70.]

(a)      The Option will vest as follows:

(i)      64,072 shares of Common Stock covered by the Option will vest in full on February 15, 2022; and

(i)      5,340 shares of Common Stock covered by the Option will vest in full on the 15th day of each of the next twenty-four (24) successive calendar months commencing on March 15, 2022 through and including, February 15, 2024,

provided that all shares of Common Stock covered by the Option shall vest in full upon (i) the merger or consolidation of Company with or into any other entity, unless Company's stockholders immediately prior to such merger or consolidation own a majority of the equity of such entity immediately after such merger or consolidation; or (ii) a sale of all or substantially all of Company's assets.

(b)      The Option may be exercised as follows:

(i)      If you voluntarily terminate your employment on or before August 15, 2022, you will be entitled to exercise the Option with respect to all shares of Common Stock that are fully vested on the date of termination for a period of ninety (90) days from the date of termination;

(ii)      If at any time Company terminates your employment without Cause, or if you voluntarily terminate your employment after August 15, 2022, you will be entitled to exercise the Option with respect to all shares of Common Stock that are fully vested on the date of termination for a period of six (6) months from the date of termination;

(iii)      The provisions of Section 6(h) of the Plan shall apply if your employment is terminated by reason of your death, disability or Cause; and



    (iv)     For purposes of the forgoing provisions of this Section 3(b), "Cause" shall mean any one of the following:

        (A) Employee fails to perform his duties as an employee of Company (or a Parent or Subsidiary) for more than ten (10) calendar days (other than any such failure that is caused by Employee's physical or mental incapacity) and does no fully cure such failure within ten (10) calendar days after receiving notice of such failure from the Chief Executive Officer of Company or the Board; or

        (B) any breach by Employee of any provision of Section 8, Section 9, Section 10 or any other material provision of this Agreement or of any other agreement between Employee and Company; or

        (C) any act of fraud, misappropriation, dishonesty, embezzlement, theft, or similar conduct by Employee against the Company (or a Parent or Subsidiary); or

        (D) Employee's conviction of a felony or any crime involving moral turpitude; or

        (E) any other action or omission by Employee that the Board, in its reasonable business judgment after due consideration, determines is, or is reasonably likely to be, materially detrimental to Company, its business, operations, products or services, reputation or prospects.

(c)     If Employee exercises all or part of the Option pursuant to Section 3(b)(ii), Company agrees to accept a promissory note in payment of the exercise price in accordance with Section 7(d) of the Plan (the "Exercise Price Note").  If you have voluntarily terminated your employment, the principal amount of the Exercise Price Note shall be amortized in three (3) approximately equal annual installments commencing on the first anniversary date of the Exercise Price Note and shall bear interest at the annual rate of five percent (5%). If your employment has been terminated by Company without Cause, the principal amount of the Exercise Note shall be payable in nine (9) approximately equal annual installments commencing on the first anniversary date of the Exercise Price Note and shall bear interest at the then applicable "minimum required rate" established by the Internal Revenue Service.



(d)    The grant of the Options shall not, by virtue of such grant, confer any rights on Employee as a stockholder of Company.  Upon the exercise of any of the Options, Employee will duly execute and deliver a counterpart of Company's Stockholders' Agreement.

(e) In the event that Company consummates a financing with one or more institutional investors, such as a venture capital or private equity fund, and such investor(s) (the "Purchaser") agrees to purchase shares of Common Stock from stockholders of Company in such financing, Company will use reasonable commercial efforts to permit Employee to sell a portion of any shares of Common Stock acquired upon the exercise of the Option to the Purchaser on the same terms and conditions, and for the same price per share, as other stockholders of Company  sell shares of Common Stock to the Purchaser in such financing. The number of shares of Common Stock that Employee may sell in such financing will be determined by Company in its reasonable discretion by reference to all relevant considerations, including the number of shares of Common Stock being sold by other stockholders in such financing, the percentage of their shares being sold and the length of time that such other stockholders have held their shares, subject in all respects to the approval of the Purchaser.

**4. Expenses.**  Company shall pay or reimburse Employee for all necessary and reasonable expenses incurred or paid by Employee in connection with the performance of services under this Agreement, upon presentation of appropriate expense statements or vouchers or other supporting information evidencing the nature of such expense requested by Company, and, if appropriate, evidence of the payment thereof by Employee.

**5. Additional Benefits.**  Employee shall be entitled to participate in any term life insurance, hospitalization, medical health and accident, disability or similar insurance plan or program of Company hereafter established, to the extent that Employee is eligible under the general provisions thereof.  Notwithstanding anything herein to the contrary, however, Company shall have the right at any time and from time to time to amend or terminate any such plans or programs without prior notice. Employee acknowledges that as of the date of this Agreement, Company has not instituted any such plan or program.

**6. Vacation Time.** Employee shall be entitled to a reasonable number of vacation, sick and personal time-off days, provided that the timing and amount of vacation and personal time shall be subject to the prior approval of Company's Chief Executive Officer, which approval will not be unreasonably withheld or delayed. Vacation, sick and personal time shall be accrued, starting on the date hereof, in accordance with the policies of Company with respect thereto from time to time in effect.

**7. Representations and Warranties.**  Employee will make no representation, warranty, or commitment binding Company without Company's express prior written consent.



**8. Duty of Loyalty and Non-Diparagement.**

 **(a)** You covenant and represent that you owe Company the highest duty of loyalty with respect to the duties to be performed by you hereunder.  In general, this means that you will, among other things, never:

 (i) engage in any transaction or become involved in any situation that might involve a conflict of interest for Company;

 (ii) fail to protect Company's property, including its intellectual property and other confidential and proprietary information;

 (iii) make any profit at Company's expense;

 (iv) accept kickbacks, remuneration in cash or property or special favors from clients, suppliers or others doing business with Company; or

 (v) use drugs or alcohol while performing services for Company.

 (b) Both during the term of employment hereunder and afterwards, you shall not communicate in any medium or by any method, directly or indirectly, with or without attribution, any disparaging, critical, negative, false or misleading information or comments to or for any person (other than Company in accordance with its whistle blower policy), audience, business, media source, messaging service, chat room, "blog," website or otherwise concerning (i) Company's directors, officers, employees or owners; (ii) the  business, operations, financial condition or prospects, results of operations, products, services, Intellectual Property (as defined in Section 9(b)) or other property, strategies (including marketing plans, budgets and strategies); (iii) the activities, acts or omissions of or by Company or its directors, officers, employees or owners; or (iv) any of Company's customers, partners, clients, vendors, advisors, consultants or any other commercial or trading partner of or affiliated with Company, its directors, officers, employees or owners.

 (c) The provisions of this Section 8 shall survive any termination of this Agreement.

**9. Confidential and Proprietary Information.**

 (a) Employee acknowledges and agrees that Employee's work for Company as an employee, a consultant and independent contractor prior to the date of this Agreement did bring, and his work for Company hereunder will bring, Employee into close contact with Confidential Matters (as defined in Section 9(b)), and therefore Employee hereby covenants and agrees to:

DocuSign Envelope ID: 98B71438-D75B-47E8-8878-F656E98C241B



(i)      keep strictly confidential and secret all Confidential Matters and not to use for Employee's own direct or indirect benefit or disclose any of them, or any portion of any of them, to any individual or entity employed or retained by Company, except on a need-to-know basis, or to any individual or entity outside of Company, in any case either during or after the period in which Employee has performed services for Company; and

(ii)     deliver promptly to Company, upon completion or termination of Employee's services to Company, or at any time Company may request, all memoranda, notes, records, reports, technical manuals and other documents (and all copies thereof), in whatever format, relating to Company's and its affiliates' businesses which may then be in the possession or under the control of Employee.

(b)   The term "Confidential Matters" means any and all information, whether provided, received or otherwise obtained in written, digital, oral or other form, or by observation, and whether received prior to or after the date of this Agreement, relating to the business, properties and assets and operations of Company and its subsidiaries, including any and all information and documents that contain information relating to Company's owners, directors, officers, employees and consultants; products and services; clients and potential clients and vendors; sales and marketing plans, budgets  and forecasts; financial condition and prospects, including historical financial statements and information, budgets and forecasts, costs and pricing information; and Intellectual Property.    As used in this Agreement, the term "Intellectual Property" means all trade secrets, ideas, inventions, innovations, designs, developments, devices, software, algorithms, applications, tools, methods, processes and know-how (whether or not patented or unpatentable or reduced to practice) and all patents and patent applications related thereto; all trademarks and all registrations and applications for registration related thereto; all copyrights, copyrightable works and mask works and all registrations and applications for registration related thereto; and all other intellectual property or other proprietary rights. Any Intellectual Property contributed to or conceived, created, designed or developed by Employee or anyone acting on behalf of Employee (whether alone or jointly with others) at any time prior to the date of this Agreement or after the date of this Agreement and prior to the termination of this Agreement that (i) relates to the past, present or proposed business, products or services of Company or any of its subsidiaries; (ii) results from any services that Employee performs for Company or any of its subsidiaries as an independent contractor, consultant, employee or otherwise; (iii) is conceived, created, designed or developed by Employee during normal business hours or using the equipment, supplies or facilities of Company or any of its subsidiaries during the term of this Agreement; or (iv) is based on, derived from or incorporates any Confidential Matters is referred to in this Agreement as "Employee Created IP."  Notwithstanding the foregoing, Confidential Matters shall not include any information that is known generally to the public without any violation



by Employee of the provisions of this Agreement. Employee unconditionally waives any and all moral or similar rights with respect to Employee Created IP.

(c)  All Intellectual Property, including Employee Created IP, is, shall be and shall remain the exclusive property of Company and Employee acknowledges and agrees that Employee has no license, right, title or other interest of any kind or nature in, to or under any thereof. Employee hereby unconditionally and irrevocably assigns, transfers and delivers to Company, without further consideration, all Employee Created IP and all right, title and interest in, to and under all Employee Created IP; provided, however, that, when applicable, Company shall own the copyrights in all copyrightable works included in the Intellectual Property pursuant to the "work-made-for-hire" doctrine (as such term is defined in the 1976 Copyright Act), rather than by assignment. All Intellectual Property, including all Employee Created IP, shall be owned by Company irrespective of any copyright notices or confidentiality legends to the contrary which may be placed on such works by Employee or by others. Employee shall ensure that all copyright notices and confidentiality legends on all work product authored by Employee or anyone acting on behalf of Employees shall conform to Company's practices and shall specify Company as the owner of the work.

(d)  Employee hereby agrees without further consideration to execute and deliver all such further agreements, documents and instruments and to take all such further action as Company may reasonably request to implement the provisions and carry out the intent of Section 9(c) in order to vest in Company all right, title and interest in, to and under all Employee Created IP.

(e)  Employee hereby represents and warrants to, and agrees with, Company that (i) Employee is not a party to or bound by any agreement, commitment or other undertaking that prohibits Employee from entering into this Agreement or performing the services contemplated by this Agreement, and (ii) Employee will not use any intellectual property or other proprietary information or rights of any other individual or entity in performing services for Company.

(f)      The provisions of this Section 9 shall survive any termination of this Agreement.

**10. Non-Solicitation; Non-Competition.**  During the time of Employee's employment by Company, and for a period of one (1) year thereafter, Employee shall not, directly or indirectly, acting alone or in conjunction with others:

(a)      Request any customer, supplier or other person then doing business with Company or any of its subsidiaries, or that has done business with Company or any of its subsidiaries in the prior six (6) months, to cancel its relationship with Company or otherwise modify such relationship to the material detriment of Company; or

DocuSign Envelope ID: 98B71433-D75B-47EB-8878-F656E98C241B



(b)      (i)  Induce or attempt to influence any employee of Company or any of its subsidiaries to terminate its relationship with Company or to enter into any employment or other business relationship with any other individual or entity (including Employee or any entity owned or controlled directly or indirectly by Employee); (ii) hire himself or permit any entity owned or controlled directly or indirectly by Employee to hire any  employee of Company; or (iii) induce or attempt to influence any consultant to Company or any of its subsidiaries to terminate its relationship with Company or to modify such relationship to the material detriment of Company; or

(c)      Work for, own an interest in, operate, join, control, participate in or be connected, either directly or indirectly, as an officer, agent, employee, shareholder or principal of any entity which competes directly or indirectly with Company, except for the passive ownership of less than two percent (2%) of the outstanding shares of an actively traded public reporting company.

(d)      The provisions of this Section 10 shall survive any termination of this Agreement.

**11.  Right to Injunctive Relief.**   Employee acknowledges and agrees that Company will suffer immediate and irreparable damage if Employee breaches any of the provisions of Section 8, Section 9 or Section 10 and that monetary damages would not be an adequate remedy for such breach. Accordingly, Employee hereby agrees that Company shall be entitled to obtain specific performance, preliminary and permanent injunctive or other appropriate equitable relief to remedy, restrain or prevent any such breach or threatened breach without posting any bond or other security and without proving that money damages would be an inadequate remedy.  Company's rights under this Section 11 shall be in addition to, and not in lieu of, other rights and remedies, including a remedy for money damages, to which Company may be entitled as a result of such breach.  Employee represents and warrants to Company that Employee's experience and capabilities are such that Employee can obtain employment in business without breaching any of the provisions of Section 9 or Section 10 of this Agreement and that Employee's obligations under Sections 9 and 10 (and the enforcement thereof pursuant to this Section 11) will not prevent Employee from earning a livelihood.

**12.  Non-Affiliate.**  Nothing in this Agreement shall be construed to make Employee a partner, affiliate, joint-venturer, stockholder or member of Company or any subsidiary of Company, except that Employee shall become a stockholder of Company upon the due exercise of the Option and the payment of the exercise price.

**13.  Entire Agreement.**  This Agreement constitutes the entire understanding between the parties with respect to the employment of Employee by Company and cancels and supersedes all prior statements, representations, undertakings, agreements and understandings between Company or any of its subsidiaries and Employee with respect thereto, whether written or oral, provided that this



Agreement does not supersede the provisions of the Previous Agreement that by its terms survive the termination of the Previous Agreement.

**14. Assignment.**  Except as otherwise expressly provided in this Agreement (or in the Plan with respect to the Option), the benefits of this Agreement are and shall be personal to Employee, and none thereof shall inure to the benefit of Employee's heirs, personal representatives or assigns.  The obligations and duties of Employee hereunder are personal and not assignable or delegable by Employee in any manner whatsoever without the express prior written consent of Company.  This Agreement shall be binding upon and inure to the benefit of Company and its successors and assigns. Company may assign this Agreement to any entity which acquires substantially all of the business and assets of Company, or with or into which Company may be merged, consolidated or otherwise combined.  Company shall give notice to you of any such merger, consolidation or combination.

**15. Modifications.**  No change, amendment, addition to or other modification of any provision of this Agreement shall be binding on or effective against either Company or you unless it is expressly set forth in a writing that is signed by both Company and you.

**16. Waiver**.  No waiver of any provision of this Agreement or of any breach or default under this Agreement shall be valid unless it is expressly set forth in a writing and signed by both Company and you.  No conduct or course of conduct by Company or between Company and Employee shall constitute a waiver or any modification of any provision of this Agreement or a waiver of any breach or default under this Agreement.  No waiver, even if signed by both Company and you, shall be deemed to be a continuing waiver unless expressly stated therein.

**17. Enforceability; Waiver of Trial by Jury.**  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New Jersey applicable to contracts made and to be performed entirely in such State, without reference to the principles of conflict of laws of such State.  The state and federal courts of the State of New Jersey, sitting in Passaic County, shall have exclusive jurisdiction with respect to any controversy or other dispute arising out of or relating to this Agreement or any breach of default hereunder, and Company and you each irrevocably consents and submits to such jurisdiction.  Each of Company and Employee hereby waives and agrees not to assert in any forum that any such court is an inconvenient forum, or that there is a more convenient forum, for the resolution of any such controversy or dispute.  Company and you each agrees that service of process and other documents or other instruments relating to such controversy or dispute may be made in accordance with the provisions of Section 20.  EACH OF COMPANY AND EMPLOYEE, KNOWINGLY AND UNCONDITIONALLY, HEREBY IRREVOCABLY WAIVES A RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY SUCH CONTROVERSY OR DISPUTE.

**19. Severability.** The provisions of this Agreement are severable and if any provision of this Agreement, or any portion of any such provision, is determined by a court of competent jurisdiction

DocuSign Envelope ID: 98B71433-D75B-47EB-8878-F656E98C241B



to be invalid or unenforceable, the remainder of the Agreement, or the remainder of such provision, as the case may be, shall remain in full force and effect and shall be enforced in accordance with its terms. If any provision of this Agreement, or portion thereof, including any provision or portion of Section 8, Section 9 or Section 10, is so determined to be invalid or unenforceable, the court making such determination shall be authorized to, and shall, reduce the scope, shorten any applicable time period or otherwise modify such provision or portion thereof to the minimum extent necessary in order to carry out the intent and purpose of such provision, or portion thereof, in accordance with the mutual intent of the parties and make the same valid and enforceable under applicable law.

**20. Notices.** Until advised otherwise in writing in accordance with this Section 20, all notices, demands and other communications hereunder shall be deemed to have been duly given if sent by certified mail or e-mail to the respective addresses of Company and you set forth below at the end of this Agreement. All such communications shall be deemed given upon receipt, provided that if a communication is received on a day that is not a business day in New Jersey or Tennessee, or is received after normal business hours on any such day, the communication shall be deemed given at the opening of business on the succeeding business day.

**21. Representation**. You hereby acknowledge that you have been advised in writing to consult with an attorney prior to executing this Agreement; that you have been represented by independent legal counsel of your own choice, or have voluntarily declined to do so; that you have carefully read this Agreement in its entirety; that you had the provisions of this Agreement explained to your satisfaction; that you fully understand its terms and significance; that you voluntarily assent to all of its terms and conditions; that you are signing this Agreement voluntarily; and that you will abide by all of its provisions.

**22. Headings; Construction.** The headings to the various provisions of this Agreement have been inserted for convenience of reference only and shall not modify or otherwise affect the meaning or interpretation of any provision of this Agreement. This Agreement has been negotiated and drafted by the parties, jointly, and represents their mutual intent. Therefore, no rule of "strict construction" shall be applied in construing or interpreting any provision of this Agreement, including any such rule that provides for the interpretation of an ambiguous provision against the party that drafted such provision. References in this Agreement to a "Section" mean a section of this Agreement, unless otherwise expressly stated; the words "hereof," "herein," "hereunder," "hereto" and words of similar import refer to this Agreement as a whole and not to a particular provision of this Agreement, unless otherwise expressly stated; the words "including" and "include" shall be read as "including without limitation" or "include without limitation," as applicable; the use of any pronoun shall include a reference to any other pronoun; and the singular shall refer to the plural, and vice versa.

**23. Counterparts; Electronic Delivery.** This Agreement may be executed in counterparts, each of which shall be an original and all of which, taken together, shall constitute the same agreement. Any





such counterpart may be delivered by facsimile or other form of electronic transmission and any such transmission shall be deemed to be the delivery of an original, manually signed counterpart for all purposes.

Sincerely yours,
Loop HQ, Inc.

By: _____      7/13/2021
DocuSigned by:
*Gregory Fragin*
72B2EF7E356A4CA...
Greg Fragin, President and CEO

Address:  2 Brighton Avenue, Suite 6
             Passaic, New Jersey 07055

e-mail: gfragin@loophq.com

ACCEPTED AND AGREED:

        EMPLOYEE:

_____      7/13/2021
DocuSigned by:
*Jeremiah Church*
9F35D2F3EDB0475...
Jeremiah Church

Address: 3974 Callow Ln
             Ooltewah, TN 37363
             Phone: 503-701-7030

E-mail: jeremiahchurch@gmail.com

DS
JC

# EXHIBIT 3

EXECUTION COPY

## CONVENE, INC.
## SHAREHOLDERS AGREEMENT

This Shareholders Agreement (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is made and entered into as of March __, 2014, by and among Convene, Inc., a Delaware corporation (the "Company"), the existing shareholders of the Company and others whose signatures appear on the signature pages of this Agreement under the caption "Shareholders" or which become parties to this Agreement after the date hereof (each individually a "Shareholder" and collectively the "Shareholders").

In consideration of the mutual covenants and promises stated in this Agreement, the Company and the Shareholders agree as follows:

1.      **Certain Definitions**.  As used in this Agreement:

"Accounts" or "Accounts Receivable" shall mean, in addition to the definition of the term "account" contained in the UCC, any and all obligations of any kind at any time due and/or owing to the Company (including any such obligation that might be characterized or classified under the UCC as accounts, contract rights, chattel paper, general intangibles or otherwise), and all rights of the Company to receive payment or any other consideration whether arising from goods sold or leased by the Company or services rendered or otherwise, whether or not such right has been earned by performance, whether secured or unsecured, including without limitation, invoices, contract rights, accounts receivable, notes, drafts, acceptances, instruments, refunds, in whatever form owing to the Company from any Person.

"Account Debtor" shall mean a Person obligated on an Account, chattel paper or a general intangible.

"Adoption Agreement" has the meaning given in Section 7.1(a).

"Advisor" or "Advisors" has the meaning given in Section 10.

"Affiliate" of a Shareholder means: (a) any member of the immediate family of an individual Shareholder, including parents, siblings, spouse and children (including those by adoption); the parents, siblings, spouse and children (including those by adoption) of such immediate family member; and in any such case any trust whose primary beneficiary is such individual Shareholder or one or more members of such immediate family and/or such Shareholder's lineal descendants; (b) the legal representative or guardian of such individual Shareholder or of any such immediate family members in the event such individual Shareholder or any such immediate family members becomes mentally incompetent; and (c) any person, corporation or other entity controlling, controlled by or under common control with a Shareholder.  As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with", mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a person, corporation, partnership, limited liability company or other entity.

"Agreement" has the meaning given in the Preamble hereof.

"Annual Budget" has the meaning given in Section 9.1.

"Board" means the Board of Directors of the Company.

"Board Determination Notice" has the meaning given in Section 3.3(a).

"Board-Determined Fair Market Value" has the meaning given in Section 3.3(a).

"Charter" means the Articles of Incorporation of the Company, as amended, restated, supplemented or otherwise modified from time to time.

"Common Stock" means all shares of the common stock, with no par value, of the Company issued and outstanding from time to time.

"Company" has the meaning given in the Preamble hereof.

"Company ROFR Period" has the meaning given in Section 2.2(b).

"Confidential Information" has the meaning given in Section 10.

"Drag-Along Transaction" has the meaning given in Section 6.1.

"Electing Party" and "Electing Parties" has the meaning given in Section 2.4(a).

"Election Notice" has the meaning given in Sections 2.2(b).

"Eligible Accounts Receivable" shall mean those Accounts or Accounts Receivable which (i) are due and payable within 90 days from the date of the invoice, and (ii) do not remain unpaid for more than 90 days from the date such payable is due. Eligible Accounts Receivable shall not include the following: (a) Accounts with respect to which the Account Debtor is a subsidiary or an affiliate of the Company; (b) Accounts with respect to which the Account Debtor has disputed any liability (but only to the extent of the amount actually in dispute), or the Account Debtor has made any claim with respect to any other Account due to the Borrower (but only to the extent of the actual amount of the claim), or the Account is otherwise subject to any valid right of setoff, deduction, breach of warranty or other defense, dispute or counterclaim by the Account Debtor (but only to the extent of the actual asserted (in writing) amount of the setoff, deduction or other such liability); (c) Accounts with respect to which the Account Debtor is an officer, director, employee, or agent of the Company or an affiliate of the Company; (d) that portion of any Accounts representing late fees, service charges or interest, but only to the extent of such portion; or (e) Accounts owed by any Account Debtor that is the subject of an insolvency proceeding.

"Eligible Shareholders" has the meaning given in Section 3.3(a).

"Equity Financing" means investment in the Company by one or more investors, in one transaction or in a series of related transactions following the date of this Agreement, for shares of Common Stock, Preferred Stock or any other capital stock in the Company or debt convertible into shares of Common Stock, Preferred Stock or other capital stock of the Company.

2

"Fair Market Value" of any Offered Shares means the per share fair market value of the issued and outstanding Stock of the Company, for each share of Stock included in Offered Shares, determined without regard to any minority discounts.

"Family Controlled" means, with respect to any Shareholder that is not an individual, an entity that is owned, controlled or under the common control of of the same family, including parents, siblings, spouses and children (including those by adoption) and the parents, siblings, spouses and children (including those by adoption) of such family members, or in which the ownership of such entity is generally restricted to the descendents of a particular individual.

"Indebtedness" means all indebtedness of the Company for borrowed money.

"Initiating Shareholders" has the meaning given in Section 6.1.

"Majority Purchasing Shareholders" has the meaning given in Section 3.3(f).

"Material Agreement" has the meaning given in Section 5.1.

"Non-Transferring Shareholders" has the meaning given in Section 2.2(a).

"Notice of Disagreement" has the meaning given in Section 3.3(f).

"Offer" has the meaning given in Sections 3.1 or 3.2, as applicable.

"Offer Notice" has the meaning given in Section 3.3(a).

"Offered Shares", for purposes of an Offer made under Sections 3.1 or 3.2, as applicable, has the meaning given in such applicable Section.

"Offeror" means, with respect to any Offer of Offered Shares under either Section 3.1 or 3.2, as applicable, the Shareholder or other party named as the Offeror of such Offered Shares in such applicable Section.

"Permitted Indebtedness" means any Indebtedness related to the business of the Company, including, without limitation, any Indebtedness arising as a result of any working capital line of credit or credit cards; *provided, however,* that the outstanding amount of such Indebtedness shall at no time exceed fifty percent (50%) of Eligible Accounts Receivable.

"Permitted Transfer" has the meaning given in Section 2.5.

"Purchase Price" of any Offered Shares shall mean the Fair Market Value of such Offered Shares.

"Required Voting Percentage" means with respect to an amendment of any provision or section of this Agreement, a majority of the voting power of the issued and outstanding shares of Stock, voting together as a single class on an as-converted basis.

3

"Shareholder" and "Shareholders" have the meanings given in the Preamble hereof.

"Shareholder ROFR Period" has the meaning given in Section 2.2(c).

"Stock" means the Company's Common Stock.

"Transfer" means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition, of Stock or any interest therein or right thereto or of all or part of the voting power (other than the granting of a revocable proxy or a power of attorney as contemplated by Section 4.4(b) associated with the Stock or any interest therein whatsoever, or any other transfer of beneficial ownership of Stock, whether voluntary or involuntary, including, without limitation (a) as a part of any liquidation of a Shareholder's assets or (b) as a part of any reorganization of a Shareholder pursuant to the United States or other bankruptcy law or other similar debtor relief laws.

"Transfer Proposal" has the meaning given in Section 2.2(a).

"Transfer Proposal Notice" has the meaning given in Section 2.2(a).

"Transferring Shareholder" or "Transferring Shareholders" has the meaning given in Sections 2.2(a) or 4.1, as applicable.

"Transfer Shares" has the meaning given in Section 2.2(a).

2.     **Restrictions on Transfer; Right of First Refusal**.

2.1     General Prohibition of Transfers. No Shareholder shall make any Transfer of Stock held by it except as permitted by this Agreement.

2.2     Right of First Refusal.

(a)     Subject to Sections 2.5 and 5.2, if any Shareholder receives a bona fide cash proposal (a "Transfer Proposal") from a third party for the Transfer to such third party of Stock held by such Shareholder entirely for cash (the "Transfer Shares") and wishes to accept such Transfer Proposal, such Shareholder (for purposes of this Section 2, the "Transferring Shareholder") first shall give to the Company and the other Shareholders (the "Non-Transferring Shareholders") notice of the Transfer Proposal (a "Transfer Proposal Notice"). Each Transfer Proposal Notice shall state the amount and type of consideration for and the number and class of Transfer Shares and include a description of and a copy of the Transfer Proposal. In addition, the Transferring Shareholder shall provide to the Company and the Non-Transferring Shareholders all other information with respect to the Transfer Proposal and the proposed transferee reasonably requested by the Company or the Non-Transferring Shareholders.

(b)     The Company shall have the right for thirty days following its receipt of the applicable Transfer Proposal Notice (the "Company ROFR Period") to elect to purchase all or any portion of the Transfer Shares on the same terms and conditions as those stated in the Transfer Proposal. Such election shall be made by written notice (for purposes of

4

this Section 2, an "Election Notice") given by the Company to the Transferring Shareholder and the Non-Transferring Shareholders within the Company ROFR Period.

(c)     If the Company does not elect to exercise its right under Section 2.2(b) with respect to some or all of the Transfer Shares within the Company ROFR Period, the Non-Transferring Shareholders shall have the right, for thirty days immediately following the end of the Company ROFR Period (the "Shareholder ROFR Period"), to elect to purchase all (but not less than all) of the Transfer Shares with respect to which the Company did not exercise such rights, in such proportions as they mutually agree or, if they are unable to agree, pro rata in proportion to the number of shares of Stock held by them, on the same terms and conditions as those stated in the Transfer Proposal.  Such election shall be made by an Election Notice or written notices given by the electing Non-Transferring Shareholder or Shareholders to the Company and the Transferring Shareholder within the Shareholder ROFR Period.

2.3     Effect of Non-Exercise – Tag-Along Rights.

(a)     If the Company and/or the Non-Transferring Shareholders do not elect to purchase all of the Transfer Shares within the Company ROFR Period or Shareholder ROFR Period, as applicable, the Transferring Shareholder, subject to the provisions of Section 2.3(b) below, shall be permitted, subject to Section 5, to effect the Transfer of all (but not less than all) of the Transfer Shares identified in the Transfer Proposal, on the terms and conditions stated in the applicable Transfer Proposal Notice, provided that such Transfer is consummated within ninety days following the end of the Shareholder ROFR Period.

(b)     Tag-Along Right. (i) if the Company ROFR Period and the Shareholder ROFR Period expire unexercised, or the Company and the non-transfering Shareholders waive their respective rights of first refusal, the Company shall so notify such non-transfering Shareholders and if any of them wish to participate in such Transfer Proposal (the "Tag-Along Right"), such non-transfering Shareholders may notify the Transferring Shareholder by written notice (the "Tag-Along Notice"), on or before the fifteenth (15th) Business Day following the expiration date of the rights of first refusal (or notification of the waiver of such rights as applicable), that such non-transfering Shareholders desire to Transfer to the proposed party or parties identified in the Transfer Proposal the same percentage of its Stock (the "Tag-Along Amount") as is equal to the percentage of the Transfer Shares vis-à-vis the Transferring Shareholder's Stock, and specified in the Transfer Proposal, on the same terms and conditions set forth in the Transfer Proposal.  If the non-transfering Shareholders do not provide the Transferring Shareholder with a Tag-Along Notice within the period specified above in this Section 2.3(b), the terms of Section 2.3(a) shall apply. If the non-transfering Shareholders elect to participate, the Transferring Shareholder may not effect such Transfer unless the party or parties identified in the Transfer Proposal shall have purchased the Tag-Along Amount from the non-transfering Shareholders who so elect on the same terms and conditions set forth in the Transfer Proposal.

(c)     The provisions of this Section 2.3 shall not apply to transfer by a Shareholder pursuant to Section 6 in which such Shareholder exercises the Drag-Along Right.

(d)     Notwithstanding any provision of this Section 2.3, in no event may

the Transferring Shareholder transfer its Stock to a competitive enterprise unless all of the non-transfering Shareholders have duly exercised their Tag-Along Right.

(e)    If the Transferring Shareholder fails for any reason to effect the Transfer in accordance with Section 2.3(a), the Transfer Shares again shall be subject to the terms of this Section 2.

2.4    Closing.

(a)    If the Company and/or some or all of the Non-Transferring Shareholders have elected to purchase all of the Transfer Shares in accordance with the terms of the applicable Transfer Proposal Notice in accordance with Section 2.2 (the Company or each of the Non-Transferring Shareholders electing to make such purchase, as applicable, the "Electing Party" or "Electing Parties"), the closing of such purchase of the Transfer Shares shall be consummated within thirty days following the date of delivery of the last applicable Election Notice given.

(b)    The purchase of the Transfer Shares by the Electing Party or Electing Parties shall be consummated at a closing held at the principal offices of the Company (unless otherwise mutually agreed), at which time the Electing Party or Electing Parties shall deliver the purchase price (if cash, in the form of a cashier's check or by wire transfer of immediately available funds to an account designated by the Transferring Shareholder) to the Transferring Shareholder, and the Transferring Shareholder shall deliver to the Electing Party or Electing Parties the share certificates representing the Transfer Shares, duly endorsed for transfer or accompanied by duly executed stock powers, and evidence of good title to the Transfer Shares and the absence of liens, encumbrances and adverse claims with respect thereto and such other matters as are deemed necessary by the Company for the proper Transfer of the Transfer Shares to the Electing Party or Electing Parties on the books of the Company.

(c)    The purchase price of all of the Transfer Shares shall be on the same terms as are contemplated by the Transfer Proposal.

2.5    Permitted Transfers.  Notwithstanding anything in this Section 2 to the contrary, the following Transfers (each, a "Permitted Transfer") shall be permitted without compliance with the provisions of Sections 2.1 through 2.4:

(a)    by any individual Shareholder during his or her lifetime to: (i) an *inter vivos* trust the sole trustee of which is the Shareholder, with the sole power to revoke such trust; (ii) the spouse of such Shareholder during marriage and not incident to divorce; or (iii) the children of such Shareholder; and

(b)    upon the death of any Shareholder, to the estate, heirs, beneficiaries or legatees of such Shareholder (subject, however, to Section 3.2);

*provided, however,* that (i) as a condition to any such Permitted Transfer, any person or entity (other than the Company) so acquiring such Stock shall be required to subject the Stock acquired by such person or entity to the provisions of this Agreement by executing an Adoption Agreement, and thereafter any such person or entity shall be deemed a "Shareholder" for the

purposes of this Agreement; and (ii) any such Permitted Transfer shall be subject to Sections 5 and 7.

3.      **Other Rights to Purchase Shares of Stock.**

3.1     Bankruptcy.  If any of the following events occurs:

(a)     any Shareholder shall voluntarily be adjudicated as bankrupt or insolvent; consent to or not contest to the appointment of a receiver or trustee for itself or for all or any part of its property; file a petition seeking relief under the bankruptcy, rearrangement, reorganization or other debtor relief laws of the United States or any state or any other competent jurisdiction; or make a general assignment for the benefit of its creditors; or

(b)     a petition is filed against a Shareholder seeking relief under the bankruptcy, rearrangement, reorganization or other debtor relief laws of the United States or any state or other competent jurisdiction; or a court of competent jurisdiction enters an order, judgment or decree appointing a receiver or trustee for a Shareholder, or for any part of its property, and such petition, order, judgment or decree shall not be and remain discharged or stayed within a period of sixty days after its entry;

then any such event shall be deemed an irrevocable offer to sell all of the shares of Stock of such Shareholder (for purposes of this Section 3, the "Offered Shares") to the Company and the other Shareholders in accordance with Section 3.2 for the applicable Purchase Price (for purposes of this Section 3.1, the "Offer") and such Shareholder shall promptly notify the Company of such event.  The date of such Offer shall be deemed to be the date such written notice of the Offer is so delivered to the Company.

3.2     Purchase Procedures.

(a)     The Company shall (i) promptly give written notice of any Offer pursuant to Section 3.1 (an "Offer Notice") to the Shareholders other than the Shareholder (or his or her estate) making the Offer (the "Eligible Shareholders"), and (ii) as soon as practicable give written notice to the Offeror and the Eligible Shareholders (the "Board Determination Notice") of the Board's determination of the Fair Market Value of the Offered Shares (the "Board-Determined Fair Market Value").  The Eligible Shareholders shall have the right, for sixty days following the receipt of the applicable Offer Notice, to accept the applicable Offer as to all or any of the applicable Offered Shares in such proportions as they mutually agree, or if they are unable to agree, pro rata in proportion to the number of shares of Stock held by them (on an as-converted basis).

(b)     If the Eligible Shareholders do not accept an Offer with respect to all of the Offered Shares within the sixty day period provided in Section 3.2(a), the Company shall have the right, for thirty days following the expiration of such sixty day period, to accept such Offer as to all or any portion of the Offered Shares with respect to which the Eligible Shareholders have not accepted the Offer.

(c)     Eligible Shareholders that accept an Offer as to all or any portion of the Offered Shares shall evidence their acceptance by delivering to the Company and the

7

Offeror a written notice of intent to purchase such Offered Shares. The Company shall evidence its acceptance of an Offer as to any Offered Shares by delivering written notice thereof to the Offeror. The closing of the purchase of Offered Shares by the Company and/or Eligible Shareholders that have accepted an Offer shall be consummated within thirty days following the later of (i) date of delivery of the last of such notices and (ii) the date on which the Fair Market Value is finally determined in accordance with Section 3.2(f).

(d)    All acquisitions of Offered Shares by the Company or any Eligible Shareholders shall be consummated at a closing held at the principal offices of the Company (unless otherwise mutually agreed), at which time the Company and/or each Eligible Shareholder accepting the Offer, as may be the case, shall pay the Purchase Price for the Offered Shares being purchased by it or them (if cash, in the form of a cashier's check or by wire transfer of immediately available funds to an account designated by the Offeror) to the Offeror, and the Offeror shall deliver to the Company or Eligible Shareholders, as may be the case, the certificates representing the Offered Shares purchased by it or them, duly endorsed for transfer or accompanied by duly executed stock powers, and evidence of good title to the Offered Shares so purchased and the absence of liens, encumbrances and adverse claims with respect thereto and such other matters as are deemed necessary by the Company for the proper Transfer of the Offered Shares on the books of the Company.

(e)    The Purchase Price for all Offered Shares pursuant to an Offer made under Sections 3.1 shall be paid in cash; *provided, however,* that if the purchaser is the Company, at the option of the Company exercisable in its sole discretion, with respect to any Offered Shares being purchased by the Company, the Purchase Price may be paid (i) in cash at closing, in the amount of at least twenty percent of the Purchase Price, (ii) by the delivery of a promissory note in the principal amount of the remaining percentage of the Purchase Price, made by the Company payable to the order of the Offeror, bearing interest at the prime rate as announced from time to time by the Wall Street Journal Western Edition, and payable over a term of five years in annual installments of equal principal and all accrued and unpaid interest, and (iii) by the delivery of a pledge agreement, pledging the Offered Shares to the Offeror to secure repayment of such promissory note.

(f)    If the Offeror disagrees with the Board-Determined Fair Market Value, the Offeror must give the Board written notice of such disagreement (a "Notice of Disagreement") within ten days following receipt of the applicable Board Determination Notice. If the Offeror fails to timely give a Notice of Disagreement, the Fair Market Value of the Offered Shares shall be deemed conclusively to be the Board-Determined Fair Market Value. If the Offeror timely gives a Notice of Disagreement, the Fair Market Value of the Offered Shares shall be (i) the amount agreed upon by the Offeror and the Company (subject, if the Company is not the purchaser of a majority of the Offered Shares being purchased, to the approval of the Eligible Shareholders that have accepted the Offer with respect to a majority of all Offered Shares for which Eligible Shareholders have accepted the Offer (the "Majority Purchasing Shareholders")), or (ii) in the absence of such an agreement within thirty days following the date of delivery to the Company of the applicable Notice of Disagreement, (A) the amount determined by the agreement of two qualified third parties, one of which is selected by the Offeror and the other of which is selected by the Company and approved by the Board (and, if the Company is not the purchaser of a majority of the Offered Shares being purchased, by the Majority Purchasing

Shareholders), or (B) if those two qualified third parties are unable to agree on the Fair Market Value, the amount determined by a third qualified third party selected by the mutual agreement of the first two qualified third parties. The fees and expenses of each qualified third party described in clause (ii)(A) above shall be borne by the party appointing it, and the fees and expenses of the qualified third party described in clause (ii)(B) above shall be borne equally by the Company and the Offeror; *provided, however,* that if the Company is not a purchaser, or is a purchaser but not the sole purchaser, of the Offered Shares, the fees and expenses allocated to the Company in the immediately preceding clause shall be borne by all of the purchasers of the Offered Shares on a pro rata basis in accordance with the number of Offered Shares purchased by each of them.

4.      **Voting Rights.**

4.1      Generally.  Voting rights per share of Stock shall be determined in accordance with the terms of the Charter. Except as expressly provided otherwise in this Agreement or in the Charter, or as otherwise required by law, the holders of all issued and outstanding shares shall vote together as a single class.

4.2      Election of Directors.

(a)      The Board shall not exceed seven persons.

(b)      Key Man Insurance.  The Company shall purchase and maintain key man life insurance coverage on the life of such of the Company's officers as the Board of Directors shall reasonably determine.

(c)      Director Liability Insurance.  The Company shall use commercially reasonable efforts to purchase and maintain director and officer liability insurance that covers all members of the Board of Directors at commercially appropriate levels of coverage.

4.3      Removal; Vacancies on the Board.  Each director elected to the Board shall hold office until his or her successor is duly appointed or elected and qualified, or until his or her earlier death, resignation or removal. Subject to, and as limited by the provisions of this Agreement, any director may be removed from office at any time, with or without cause, by the affirmative vote of the holders of a majority of the voting power of the shares of Stock entitled to elect such director, and the vacancy or vacancies in the Board caused by any such removal shall similarly be filled pursuant to this Agreement. Each Shareholder shall exercise its, his or her best efforts and take all actions necessary to call, or cause the Company and the appropriate officers and directors of the Company to call, a special or annual meeting of Shareholders and shall vote all shares of Stock owned or held of record by the Shareholders at any such special or annual meeting in favor of, or take all actions by written consent in lieu of any such meetings necessary to cause, the election of the individual so designated.

4.4      Equity Financings.

(a)     Each Shareholder acknowledges that, in its, his or her capacity as a Shareholder, such Shareholder does not have the right to approve any secured or unsecured debt financing of the Company, whether or not secured by assets of the Company.

4.5     Agreement to Cooperate.  Subject to the terms of the Charter, in order to effectuate the provisions of this Section 4, when any action or vote is required to be taken by any Shareholder pursuant to this Section 4, each Shareholder shall (a) use such Shareholder's best efforts and take all actions necessary to call, or cause the Company and the appropriate officers and directors of the Company to call, a special or annual meeting of Shareholders of the Company, or execute or cause to be executed a consent in writing in lieu of any such meeting pursuant to the Delaware General Corporation Law or any other then governing law, to effectuate such Shareholder action; and (b) vote such Shareholder's shares of Stock to take whatever action is required to be taken pursuant to this Agreement.

5.     **Loan and Other Agreements; Certain Transfer Restrictions.**

5.1     Notwithstanding anything in this Agreement to the contrary, no Shareholder shall make any Transfer (including but not limited to a Permitted Transfer) that, in the Company's judgment (as evidenced by a resolution of the Board), would cause a breach or default or acceleration of payments under any loan agreement, note, indenture or other agreement or instrument to which the Company and/or its affiliates are a party (each, a "Material Agreement").  Accordingly, each Shareholder desiring or required to make a Transfer shall, prior to attempting to effect any such Transfer, (a) give written notice to the Company describing the proposed Transfer and the proposed transferee in sufficient detail, setting forth the number and class of shares of Stock as to which such Shareholder desires to make a Transfer; and (b) provide such other information concerning the Transfer as the Company reasonably requests.

5.2     If, in the Company's reasonable judgment, a proposed Transfer would cause a breach or default or acceleration of payments under any Material Agreement, then the Company shall provide the applicable Shareholder notice thereof within thirty days of the Company's receipt of the notice referenced in Section 5.1 and such Transfer may not be made, and any such attempted Transfer shall be null and void.  If the Company approves such Transfer (which approval shall be deemed given if no notification is given by the Company in accordance with the immediately preceding sentence within thirty days after the Company's receipt of such notice) and any shares of Stock with respect to which approval has been given are not actually transferred within the relevant time period provided in the applicable provisions of this Agreement, then all of the provisions of this Agreement shall apply to any subsequent transaction affecting such Stock or any interest therein (except as expressly excluded by the other terms of this Agreement).  Additionally, all shares of Stock transferred (whether to a third party or any Shareholder) pursuant to a Transfer complying with the terms of this Section 6 shall remain subject to this Agreement.

6.     **Drag-Along Rights.**

6.1     If at any time the holders of a majority of the combined voting power of the issued and outstanding shares of the Company (the "Initiating Shareholders"), propose that all of the Shareholders effect a Transfer of all shares of issued and outstanding Stock (whether by

10

sale of stock or by merger, consolidation or otherwise) or that the Company sell substantially all of its assets to a third party that is not an Affiliate of any Shareholder (each such transaction being a "Drag-Along Transaction"), then all of the other Shareholders shall, upon written notice from the Initiating Shareholders or the Company, upon the request of the Initiating Shareholders, be obligated to (and shall agree to) Transfer all of their respective shares of Stock in the Drag-Along Transaction and take all other actions that are necessary to consummate the Drag-Along Transaction (including, but not limited to, voting in favor of such Drag-Along Transaction and waiving all dissenters' appraisal or similar rights and executing any required documents including but not limited to any amended, revised or superseding Shareholder Agreement) and shall not take any actions that would stop or otherwise prevent such Drag-Along Transaction, provided that the terms of the Drag-Along Transaction provide for payment of the aggregate consideration in the Drag-Along Transaction in the manner provided in the Charter upon liquidation of the Company, and provided further that all indemnification obligations of the Shareholder in connection with such sale, if any, shall be on a several and not joint basis. Notwithstanding any other provision herein, as part of any Drag-Along Transaction, the other Shareholders shall be entitled to receive their same pro rata consideration as the Initiating Shareholder and the other Shareholders shall be under no obligation to provide any representations or any indemnity other than to represent their ownership of their Stock.

6.2     Section 2.2 above shall not apply to a Drag-Along Transaction.

7.     **Conditions; Additional Parties.**

7.1     <u>Conditions to Permitted Transfers</u>.  As a condition to the Company's obligation to effect a Transfer permitted by this Agreement:

(a)     any transferee of Stock shall be required to become a party to this Agreement, and shall have all of the rights and obligations of a Shareholder hereunder, by executing an Adoption Agreement substantially in the form of <u>Exhibit A</u> attached hereto or in such other form as is satisfactory to the Company (an "<u>Adoption Agreement</u>"); and

(b)     if requested by the Company, the transferor shall deliver an opinion of counsel reasonably acceptable to the Company, addressed to the Company, that such Transfer may be effected without registration of the transferred shares under the Securities Act of 1933, as amended, and the rules and regulations thereunder.

7.2     <u>Issuance of New Stock</u>.  The Company shall not issue any shares of Stock to any person or entity unless, as a condition to such issuance, such person or entity executes an Adoption Agreement.

8.     **Endorsement of Stock Certificates.**  All certificates of Stock now owned or that may hereafter be acquired by any Shareholder or transferee (which transferee is subject to the terms of this Agreement) shall be endorsed on the reverse side thereof substantially as follows:

BY THE TERMS OF A SHAREHOLDERS AGREEMENT, CERTAIN RESTRICTIONS HAVE BEEN PLACED UPON THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE AND SUCH SHARES ARE SUBJECT TO CERTAIN VOTING AGREEMENTS.  THE COMPANY

11

WILL FURNISH A COPY OF SUCH AGREEMENT TO THE HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATES SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE OFFERED FOR SALE, TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE ENCUMBERED OR DISPOSED OF (A "TRANSFER") EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND UNDER ANY APPLICABLE STATE SECURITIES OR BLUE SKY LAWS OR (B) UPON RECEIPT BY THE ISSUER OF AN OPINION OR COUNSEL, REASONABLY SATISFACTORY TO THE ISSUER, THAT SUCH TRANSFER IS EXEMPT FROM REGISTRATION UNDER THE ACT PURSUANT TO REGULATIONS PROMULGATED THEREUNDER AND UNDER ANY APPLICABLE STATE SECURITIES OR BLUE SKY LAWS.

The foregoing legends shall be in addition to any and all other legends required by applicable law or contract to be placed on certificates representing Stock.

9.      **Financial Statements and Other Reports.**

9.1      Annual Budget.  On or before January 15th of each fiscal year, the Company shall prepare and deliver to the Board for its approval a reasonably detailed business plan and operating budget for such fiscal year (the "Annual Budget").

9.2      Monthly Financials.  The Company will deliver to the Board, within thirty days following the expiration of each fiscal month, a balance sheet of the Company as of the end of each fiscal month and the related statements of income and cash flows for each such month, and for the period from the beginning of the then current fiscal year of the Company to the end of such fiscal month, together with comparisons to the corresponding periods in the preceding year and comparisons to the Annual Budget and such other reports and financial information that the Board may reasonable request.

9.3      Year-End Financials.  The Company will deliver to the Board, within one hundred twenty days following the expiration of each fiscal year, a balance sheet of the Company as of the end of each fiscal year and the related statements of income and cash flows for each such year, together with comparisons to the preceding year and comparisons to the Annual Budget and such other reports and financial information that the Board may reasonable request.

10.      **Confidentiality.**  Each Shareholder agrees that it shall at all times, and shall direct its Advisors (as defined below) to keep confidential and not use (for any purpose), divulge, furnish or make accessible to anyone any Confidential Information (as defined below), including,

without limitation, any knowledge or data concerning or relating to the business or financial affairs of the Company. Notwithstanding the foregoing, (a) such Shareholder may disclose such Confidential Information to any partner, subsidiary, parent, employee, advisor or Affiliate (each, an "Advisor" and collectively, "Advisors") of such Shareholder for the purpose of evaluating its investment in the Company as long as such Advisor is advised of the confidentiality provisions of this Section 13 and agrees in writing to be bound thereby or is bound by a comparable obligation of confidentiality or as required or requested by the National Association of Insurance Commissioners and the Securities Valuation Office thereof and (b) such Shareholder or Advisor may disclose such Confidential Information: (i) at such time as it enters the public domain through no fault of such Shareholder or its Advisors; (ii) that was or becomes available to such Shareholder on a non-confidential basis from a source other than the Company, any Shareholder, or any of their respective Affiliates or Advisors, provided that, insofar as is reasonably known to such Shareholder, the disclosure by such source does not violate any confidentiality agreement between such source and the Company; or (iii) that is developed either by such Shareholder or its agents, or by such Advisor, in each case, independently of and without any reference to any Confidential Information communicated by the Company or any of its Subsidiaries. For purposes of this Agreement, the term "Confidential Information" shall include any past, present or future knowledge or data concerning or relating to the business or financial affairs of the Company or any of its affiliates, trade secret or confidential proprietary information (including, without limitation, any customer list, data, records, financial information, business strategies, sales techniques, personnel information or any other information, constituting a trade secret or business secret) or other proprietary information, whether or not reduced to writing, concerning or relating to the business or financial affairs of the Company or any of its affiliates. In the event that any Shareholder receives a request or is required (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, such Shareholder shall (A) immediately notify the Company, unless prohibited by applicable law, of the existence, terms and circumstances surrounding such request or requirement, (B) consult with the Company on the advisability of the Company's taking legally available steps to resist or narrow such request, at the Company's sole cost and expense, and (C) assist the Company in seeking a protective order or other appropriate remedy, at the Company's sole cost and expense. In the event that such protective order or other remedy is not obtained or that the Company waives compliance with the provisions hereof, such Shareholder may disclose to any tribunal only that portion of such Confidential Information which such Shareholder is advised by counsel is legally required to be disclosed, and shall exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information.

11.    **Notices.**  In the event a notice or other document is required to be sent under this Agreement to the Company or to any Shareholder or legal representative of a Shareholder, such notice or other document shall be sent, if sent by mail, by registered mail, return receipt requested (and by air mail in the event the addressee is not in the continental United States), by recognized overnight courier service with the ability to track parcels, by personal delivery, by electronic mail or by facsimile transmission to the party entitled to receive such notice or other document at: (i) in the case of the Company, _____; (ii) in the case of any Shareholder and its legal representatives, at the address(es) shown on the stock transfer records of the Company for such Shareholder; or (iii) at such other address as any such party shall request with respect to such party in a written notice sent to the Company. Any such notice shall

be effective when received.   The Company or any Shareholder or their respective legal representatives may effect a change of address for purposes of this Agreement by giving notice of such change to the Company, and the Company shall, upon the request of any party hereto, notify such party of such change in the manner provided herein.   Until such notice of change of address is properly given, the addresses set forth herein shall be effective for all purposes.

12.    **Miscellaneous Provisions.**

12.1    Governing Law.  This Agreement shall be subject to and governed by the laws of the State of Delaware, without reference to its conflicts of law principles.

12.2    Gender and Number.   Whenever the context requires, the gender of all words used herein shall include the masculine, feminine and neuter, and the number of all words shall include the singular and plural.

12.3    Binding Effect.  This Agreement shall be binding upon the Company, the Shareholders, and their respective heirs, executors, administrators and permitted successors and assigns.

12.4    Amendments.  This Agreement may be amended or waived from time to time by an instrument in writing signed by Shareholders holding shares of Stock representing the Required Voting Percentage, and such instrument shall be designated on its face as an "Amendment" to this Agreement; *provided, however,* that this Agreement may be amended by the Company without the consent of any Shareholder to cure any ambiguity or to cure, correct or supplement any defective provisions contained herein, so long as the amendment (a) treats all Shareholders equally and such action does not adversely affect the interest of any Shareholder. To the extent that said proposed Amendment does adversely affect the interest of a Shareholder, the consent of the adversely affected Shareholder shall be required.

12.5    Termination.  This Agreement shall terminate automatically upon (a) the dissolution of the Company; (b) the occurrence of any event which reduces the number of Shareholders to one in accordance with the terms hereof; (c) the written approval of Shareholders holding shares of Stock representing the Required Voting Percentage; or (d) the closing of a Qualified IPO (as defined in the Charter).

12.6    Effect of Disposal of Shares.  Any Shareholder who disposes of all of its shares of Stock in conformity with the terms of this Agreement shall cease to be a party to this Agreement and shall have no further rights hereunder.

12.7    Transfer in Violation.  Any Transfer or attempted Transfer in breach of this Agreement shall be void and of no effect.  In connection with any attempted Transfer in breach of this Agreement, the Company may hold and refuse to Transfer any Stock or any certificate therefor tendered to it for Transfer, in addition to and without prejudice to any and all other rights or remedies which may be available to it or the Shareholders.  Each party to this Agreement acknowledges that a remedy at law for any breach or attempted breach of this Agreement will be inadequate, agrees that each other party shall be entitled to specific performance and injunctive and other equitable relief in case of any such breach or attempted

14

breach and further agrees to waive (to the extent legally permissible) any legal conditions required to be met for the obtaining of any such injunctive or other equitable relief.

12.8    <u>Company as Attorney-in-Fact</u>.    Each individual Shareholder hereby appoints the Company as its agent and attorney-in-fact to make the Offers required and take all actions necessary under Sections 3.1 and 3.2 and Section 7 on its behalf and to execute any required Adoption Agreement on its behalf, and expressly bind itself to such Offers and to the Company's execution of any such Adoption Agreement without further action on its part, and all such powers of attorney are deemed to be coupled with an interest in the Stock and shall survive the death, disability, bankruptcy or dissolution of such Shareholder.

12.9    <u>Counterparts; Facsimile Signatures</u>.    This Agreement may be executed in multiple counterparts, any one of which need not contain the signature of more than one party, but all of which counterparts taken together shall constitute one and the same instrument. Facsimile and electronic signatures shall have the same force and effect as originals for all purposes hereunder.

12.10    <u>Integration</u>.    This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto, whether written, oral or otherwise.

12.11    <u>No Third Party Beneficiaries</u>.    No person or entity not a party to this Agreement, as a third party beneficiary or otherwise, shall be entitled to enforce any rights or remedies under this Agreement.

12.12    <u>Stock Splits, Etc.</u>    If, and as often as, there are any changes in the Stock by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Stock as so changed.

12.13    <u>Spousal Consent</u>.    If an individual Shareholder is married on the date of this Agreement, such Shareholder shall deliver to the Company a consent of such Shareholder's spouse in the form attached hereto as <u>Exhibit B</u> (the "<u>Consent of Spouse</u>"), effective on the date hereof. If any individual Shareholder should marry or remarry subsequent to the date of this Agreement, such Shareholder shall, within thirty days thereafter, deliver to the Company a Consent of Spouse duly executed by such Shareholder's spouse.

* * * * *

This Shareholders Agreement is executed by the Company and by each Shareholder to be effective as of the date first above written.

COMPANY:

**Convene, Inc.**, a Delaware corporation

By: _____

Name:  Steven Berlin_

Title:   CEO

*[Shareholder Signature Pages to Follow]*

SHAREHOLDERS:

**[NTD: use if Shareholder is an entity.]**

_____RH Realty LLC_____.
(printed name of entity)

By: _____

Name: _____Ralph Herzka_____.

Title: _____Managing Member_____.


**[NTD: use if Shareholder is an individual.]**

_____
(signature)


_____
(printed name)


*[Required Shareholder Consent Signature Pages to Follow]*

**[Signature Page to Second Amended and Restated Shareholders Agreement]**

**THE PURCHASER:**

**[NTD: use if Purchaser is an entity.]**

_____

(printed name of entity)

By: _____

Name: _____

Title: _____


**[NTD: use if Purchaser is an individual.]**

_Jeremiah Church_
_____

(signature)

Jeremiah Church
_____

(printed name)

119 Rainbow Dr #1991
_____

Address

Livingston TX, 77399
_____

City, State & Zip Code

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
_____

FEIN / SSN

3,704
_____

Number of Shares

$10,000.80
_____

Aggregate Purchase Price

SHAREHOLDERS:

**[NTD: use if Shareholder is an entity.]**

_____
(printed name of entity)

By:      _____
Name:   _____
Title:    _____


**[NTD: use if Shareholder is an individual.]**

*Jeremiah Church*
_____
(signature)

Jeremiah Church
_____
(printed name)


*[Required Shareholder Consent Signature Pages to Follow]*

<u>EXHIBIT A</u>

to
Shareholders Agreement
of
Convene, Inc.

ADOPTION AGREEMENT (form)

This Adoption Agreement (this "<u>Adoption</u>") is executed pursuant to the terms of the Shareholders Agreement of Convene, Inc. dated as of _____, 2014, a copy of which is attached hereto (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Shareholders Agreement</u>"), by the transferee ("<u>Transferee</u>") executing this Adoption.  By the execution of this Adoption, Transferee agrees as follows:

1.     <u>Acknowledgment</u>.  Transferee acknowledges that Transferee is acquiring certain shares of Stock of Convene, Inc., a Delaware corporation (the "<u>Company</u>"), subject to the terms and conditions of the Shareholders Agreement.  Capitalized terms used herein without definition have the meanings given in the Shareholders Agreement.

2.     <u>Agreement</u>.  Transferee: (i) agrees that shares of Stock of the Company acquired by Transferee, and all shares of Stock that may be acquired by Transferee in the future, shall be bound by and subject to the terms of the Shareholders Agreement, including any updates, amendments or modifications thereof, pursuant to the terms thereof, and (ii) adopts the Shareholders Agreement with the same force and effect as if Transferee originally were a party thereto.

3.     <u>Notice</u>.  Any notice required as permitted by the Shareholders Agreement shall be given to Transferee at the address listed beside Transferee's signature below, or such other address as Transferee may specify from time to time in accordance with Section 9 of the Shareholders Agreement.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

**[Signature Page to Second Amended and Restated Shareholders Agreement]**

This Adoption is executed by Transferee to be effective as of **[_____ __, 20[__]]**.

TRANSFEREE

[_____]

By: _____
    Name: _____
    Title: _____

<u>EXHIBIT B</u>
to
Shareholders Agreement
of
Convene, Inc.

CONSENT OF SPOUSE (form)

I, _____, spouse of _____, who is a shareholder of Convene, Inc., a Delaware corporation (the "<u>Company</u>"), have read and approve the Shareholders Agreement, as the same may be amended, restated and modified in the future (the "<u>Agreement</u>").   In consideration of the terms and conditions as set forth in the Agreement, I agree to be bound by the provisions of the Agreement insofar as I may have any rights in the Company, the Agreement or any interests issued by the Company pursuant thereto under the laws of the State of _____ including, but not limited to, the laws relating to marital property in effect in the State of _____ as of the date hereof.


_____
(Signature)


_____
(Printed Name)

Address: _____
          _____

Date:    _____

# EXHIBIT 4



Loop is committed to protecting its confidential information, proprietary technology, and trade secrets. To that end, the company has implemented reasonable and comprehensive security controls consistent with recognized SaaS industry standards. These measures safeguard proprietary information from unauthorized access, use, or disclosure, and demonstrate Loop's deliberate efforts to protect its intellectual property.

## Access Control

Loop employs strict access control mechanisms to ensure that only authorized personnel have access to confidential information. Access to internal systems and sensitive data is governed by role-based permissions, limiting each employee's access to only the information necessary to perform their specific job functions. When employees leave the company or change roles, access rights are promptly reviewed and updated to reflect their current responsibilities.

## Authentication and Identity

All internal systems require multi-factor authentication (MFA), adding an additional layer of protection beyond standard username and password credentials. Where applicable, Loop utilizes Single Sign-On (SSO) solutions to centralize and further secure employee access to systems. These identity management practices reduce the risk of compromised credentials and unauthorized access.

## Encryption

Loop ensures that data is encrypted both in transit and at rest. All communications between systems are secured using industry-standard encryption protocols (such as TLS/SSL). Data stored in Loop's databases and cloud storage solutions is encrypted at rest using secure encryption algorithms provided by leading cloud service providers.

## Confidentiality Agreements

All employees, contractors, and third-party vendors are required to sign confidentiality and non-disclosure agreements as a condition of their engagement with Loop. These agreements legally obligate all parties to maintain the confidentiality of Loop's proprietary information.

## Employee Offboarding Procedures

When an employee's role changes or their employment ends, Loop follows a structured offboarding process to ensure that access to confidential information is promptly and securely revoked. This includes:

- Immediate deactivation of all company accounts and credentials.

- Collection of company-owned devices, hardware, and physical access cards.

- Review of any remaining access points (e.g., third-party systems, SaaS platforms).

- Confirmation that the departing employee no longer retains any proprietary data or materials.

- Final audit review by the IT and HR teams to ensure full closure of access.

These offboarding checklists ensure that former employees are not able to access Loop's systems or data after their departure.

## Physical Security of Trade Secret Materials

Loop maintains physical resources located in secured office space. These facilities are protected through multiple layers of physical security:

- Controlled building access.

- Locked office suites.

- A separate, locked server room where sensitive equipment and backup storage are housed.

- Physical access to the server room is limited to authorized personnel only.

In addition, any sensitive physical documentation is stored in locked cabinets, and secure disposal procedures are followed for any printed confidential materials.

## Monitoring and Audit Logging

Loop maintains audit logs that track system access and activity related to confidential information both in the cloud and locally. Security personnel monitor these logs and receive alerts for any suspicious or unauthorized activity, allowing for prompt investigation and remediation.

## Security Certifications

Loop has successfully completed and maintains SOC 2 compliance. This independent third-party audit evaluates and certifies that Loop's systems, policies, and procedures meet strict standards for security, confidentiality, and availability. SOC 2 compliance further demonstrates Loop's commitment to protecting confidential and proprietary information according to recognized industry standards.

# EXHIBIT 5



# Loop Security White Paper

*People Security*
*Application Security*
*Authentication*
*Network Security*
    *Encryption in transit*
    *Network Isolation*
*Physical Security*
    *Data center security*
    *Office security*
*Data Security*
    *Data We Collect*
    *Data Sharing*
    *Data Access*
    *Data Removal*
    *Server hardening*
*Vulnerability Management*
    *Compliance*

Loop takes the security and privacy of your data very seriously, with robust policies, controls, and systems in place to keep your information safe and secure.

Loop has multiple integration options for organizations, including on-premise and Loop's cloud platform (using Amazon Web Services). The below security and privacy whitepaper describes an integration with Loop's cloud platform.

## *People Security*

All Loop employees are required to understand and follow strict internal policies and standards. All employees are trained on security topics including but not limited to device security, preventing spyware/malware, physical security, data privacy, account management, and incident reporting.

## *Application Security*

The Loop development team follows security best practices. All code is version controlled and goes through peer review and continuous integration tests to screen for potential security issues. Changes to the production environment are logged and the development team is notified of each release.

## *Authentication*

Loop users connect to third party applications (e.g. Google, Office365, Slack, Asana, Trello, Dropbox) using OAuth 2.0, an industry standard for authorizing secure access to external apps. Loop does not receive or store user passwords at any time. Users may revoke Loop access at any time and also are able to request their data be deleted.

## *Network Security*

### *Encryption in transit*

All data in transit between users, Loop, and third party services is encrypted using 256-bit SSL/TLS. These protocols are revised as new threats and vulnerabilities are identified.

### *Network Isolation*

Loop divides its systems into separate networks using logically isolated Virtual Containers in Amazon Web Services data centers. Systems supporting testing and development activities are hosted in a separate network from systems supporting Loop's production services. Customer data only exists and is only permitted to exist in Loop's production network. Network access to Loop's production environment is restricted. Only network protocols essential for delivery of Loop's service to its users are open at Loop's perimeter. All network access between production hosts is restricted using firewalls to only allow authorized services to interact in the production network.

## *Physical Security*

### *Data center security*

Loop's infrastructure is built on top of Amazon Web Services, and is housed in data centers operated by Amazon. Amazon has strict policies for physical security, including 24-hour video surveillance and strict access restrictions which are described in detail here: https://d0.awsstatic.com/whitepapers/Security/AWS_Security_Whitepaper.pdf

### Office security

All employee devices must meet our security standards. These standards require all computers to have strong passwords, encrypt data on disk, run anti-virus software, and lock automatically when idle. No data is stored on employee computers or servers in the office.

## Data Security

### Data We Collect

Upon authorization by each individual user, Loop collects both metadata and content of messages and events in their connected third party application accounts.

The content of events and messages may be retained for one year from their dates, but metadata including the registration details, people involved, and length of the message may be retained for the entire time the user has authorized Loop. Additionally, we may store the output of classification algorithms run on individual messages indefinitely, however these algorithms contain no personally identifiable information.

Lastly, any cookies or other online identifiers including unique IDs, IP addresses, device information and PII derived therefrom shall be retained for up to 90 days.

When Loop removes data according the above retention policy, PII will be removed from the running database by deleting the affected rows. All database backups are securely deleted after 30 days.

Loop strives for lean analysis of data, and only collects data that is necessary for processing purposes. Loop reviews our data collection processes on a quarterly basis to ensure we only collect data that is necessary to provide the services to the user. In addition, Loop's Data Protection Officer reviews all products and services with respect to data collection during the design phase. All data must be

processed in accordance with authorized purposes which are documented in Loop's records of processing. Loop's records of processing are only updated by Loop's Chief Technical Officer.

An individual can request confirmation of whether or not personal information has been collected or held about the requesting individual by sending an email to help@loophq.com. Loop will respond to all such requests and provide confirmation within 30 days.

## Data Sharing

We do not share or transfer personal identifiable information or the content of any user's messages with any party, including the user's employers, except as required by law or as needed for the purposes of collection or related to providing the Service to users.

## Data Access

To the extent possible, Loop automates access to customer data and strictly limits viewing by humans. Only Loop's Chief Technology Officer may request permission to access customer data for essential job functions for a limited amount of time in a secure environment. All requests to access customer data must be reviewed and approved by the executive team and must have a clear technical justification. Loop reviews access and security audit logs on a regular basis.

## Data Removal

At any time, a user may stop using the Service and request for a full removal of their data (via an e-mail to help@loophq.com). Within a period of 30 days, all of the user's third party application content and PII will be removed from the running database by deleting the affected rows. All database backups are securely deleted after 7 days.

## Server hardening

Production servers are hardened, with the minimally required set of services allowed to run. A custom based server image which has been reviewed for security is used to run all production services.

## *Vulnerability Management*

Loop uses third party services to run automated vulnerability tests on the production environment. Engineers are always on call to immediately address any issues.

## *Compliance*

Loop is hosted in Amazon Web Services (AWS) data centers, which are certified to meet compliance requirements of SOC2 and ISO27001. Details can be found at https://aws.amazon.com/compliance/.

At any time, a user may submit a Privacy Shield related complaint or question by sending an email to help@loophq.com. All Privacy Shield related complaints or questions will be responded to within a period of 30 days.

# EXHIBIT 6

# June 26, 2024

## A Message from Our CTO

Loop has always been an exceptionally difficult technical problem. Interfacing with so many different 3rd parties and normalizing diverse data at scale. Its time you hear a more seasoned technical perspective on the technical challenges we face and the promise we are delivering on.  I give you our CTO, Jeremiah Church.

I bought Loop shares 4 years ago because I believed in Greg's vision. Now 70% of my comp is Loop equity, here's why I've never been more excited for the future.

I've been working with startups since I was 16 years old—starting in education, then banking, plumbing SaaS, and back to banking. I've taken products to scale and am a founder with exits on my resume.  I've never been more excited about any product I've worked on [or the market opportunity in front of a company I worked for] than I have been with Loop in the last five months.

I've been with Loop for about three and a half years now. When I joined, Greg had an amazing idea with a product that needed *a lot* of work. Three years later, after many late nights and a lot of great work from the team, we've built a product that works pretty darn well and delivers on Greg's amazing idea. I'm impressed with the scale that we run at now. 22 million content pieces and interactions a day that we parse through. And that's growing every day.

Compliance takes everything that we've built from all of our integrations and all of our tools and sits on top of it all. It takes a consumer product and flips the go-to-market on its head, giving us a compelling enterprise product without sacrificing what makes Loop so special.

The last three months of sales calls have been unbelievable. Every single time we get on a phone call with people we've never spoken with and show them what Loop can do for compliance, the next part of the conversation is always "What are the next steps?". There's been no sales process. Pricing is an afterthought.

The large incumbents in this space - Global Relay & Smarsh - have spent massive marketing budgets telling people that what *we're doing* is impossible.

But we're doing it. And achieving the impossible is just the beginning for us. We're working on a self-onboarding process that will allow company compliance personnel to get their staff using Loop Compliance in the period of hours to days. Competitors' processes? They require numerous people, multiple meetings, and take weeks to months to implement.

We need to seize this massive opportunity quickly. My biggest fear is that someone else realizes the opportunity in this space. Yes, we need to continue refining our product and add some new features. That's always the backbone of great software, though - refinements and advancements. But more than anything, we need to seize the entire market and we need to do it now.

Our product is incredibly well positioned and no one else seems to be able to offer what we're able to do right now. We can demonstrate it! Hop on a phone call and show it right now. This isn't a smoke and mirrors interesting idea. We've put the work in, not just the creative concept. Loop Compliance works today, Loop Compliance works well, and we need to put Loop Compliance in front of absolutely everyone in the space tomorrow. Or, better yet, today.

# EXHIBIT 7

**Comma Compliance**          Home     Product     Pricing

Book Demo

# Most Compliance Software was built for Email.

# We built ours for 2025.

Capture iMessage, WhatsApp, LinkedIn, Gmail, Bloomberg, and more —
without touching personal content or changing habits. SEC/FINRA

compliant.

Book Demo    Learn More

# Message Analysis Dashboard
Detailed message analysis and risk assessment

| Total Messages | High-Risk Flagged | Time Saved | Compliance Score |
|---|---|---|---|
| 5,432 +12% | 10 -5% | 15h +2h | 98% +2% |

## Message Analysis

Today's Analysis

| Messages Processed | 1,234 |
| Risk Detected | 23 |
| Time Saved Today | 2.5h |

## Quick Actions

- Review Flagged Messages
- Generate Report
- Archive Selected

All Platforms ✓   All Contacts   All Risk Levels   Search messages...

iMessage
WhatsApp

### Message Archive

john.smith@company.com   Business   ⚠ High Risk
Can you confirm the timeline for the SEC report?
iMessage   9:28:43 PM   **View Details**

Mom   Personal
Don't forget to pick up the cake! 🎂
WhatsApp   9:14:43 PM   **View Details**

### Risk Distribution

| High Risk | 25% |
| Medium Risk | 50% |
| Low Risk | 25% |

### Platform Distribution

| iMessage | 40% |
| WhatsApp | 60% |

### Active Alerts

⚠ 3 High-Risk Messages Pending Review
Response Time Above Threshold

🚨 Stay in control of your off-channel communications - before regs get involved.





### Personal vs. Business AI Contact Filtering

Most compliance software tools archive **everything**, including personal messages. Comma Compliance **filters business contacts**, letting employees connect apps **without privacy concerns**.

### Real-Time Security, Not Just Records

<u>Archiving is non-negotiable.</u> We flag language that violates <u>internal policies</u> or **SEC** and **FINRA** rules as it's sent, helping you stay audit-ready.

### No Retrofits. No Workarounds.

Our compliance management software supports **hard-to-capture** channels like <u>WhatsApp</u>, iMessage, Bloomberg Chat, and LinkedIn Messaging. Your risk lives where **real** conversations happen.



# 🛡️ Why Solving App Compliance for Modern Messaging Can't Wait.



## 💥 Regulators Are Issuing _Record Fines._

The SEC and FINRA have issued **over $2 billion in fines** since 2021 for unarchived communications <u>on iMessage</u>, <u>WhatsApp,</u> **and LinkedIn**. These corrective actions aren't just fines: they're your firms reputation. These penalties are becoming **routine** across firms of **all sizes**.



**Twenty-Six Firms to Pay More Than $390 Million Combined to Settle SEC's Charges for Widespread Recordkeeping Failures**

Three firms received credit for self-reporting and will pay reduced civil penalties

FOR IMMEDIATE RELEASE | 2024-98

Washington D.C., Aug. 14, 2024 — The Securities and Exchange Commission today announced charges against 26 broker-dealers, investment advisers, and dually-registered broker-dealers and investment advisers for widespread and longstanding failures by the firms and their personnel to maintain and preserve electronic communications.

The firms admitted the facts set forth in their respective SEC orders, acknowledged that their conduct violated recordkeeping provisions of the federal securities laws, agreed to pay combined civil penalties of $392.75 million, as outlined below, and have begun implementing improvements to their compliance policies and procedures to address these violations. Three of the firms, as noted below, self-reported their violations and, as a result, will pay significantly lower civil penalties than they would have otherwise.

- Ameriprise Financial Services, LLC agreed to pay a $50 million penalty
- Edward D. Jones & Co., L.P. agreed to pay a $50 million penalty
- LPL Financial LLC agreed to pay a $50 million penalty

## 🔵 The SEC is Now

## 🔍 The SEC is Now Proactively Auditing.

Regulators are no longer waiting for violations to surface—they're **actively auditing firms** to find **off-channel communications** that aren't archived. If your firm isn't capturing **modern messaging channels, you're already at risk.**

**Active Alerts**

⚠ 3 High-Risk Messages Pending Review

🕐 Response Time Above Threshold

## 📱 iMessage and WhatsApp are quick, convenient, and preferred by clients.

Despite policies banning iMessage and WhatsApp,



Despite policies banning iMessage and WhatsApp, **employees use them to meet client expectations** - creating blind spots in your risk management strategy. Clunky apps and forced SMS make it difficult for your team to work, making it easier to miss key conversations.

Firms need a compliance solution that works with the tools clients and employees **already communicate** on.

# Testimonials

"We've been needing a solution for our team having multiple devices and Comma actually did what we needed.



**Erica M.**
VP Legal & Compliance, Hudson Asset Management

"They got back to me so quickly on additional features we requested. Happy to recommend them."



**Mark R.**
Director of Compliance, 581 Group

"Getting setup took far less than 5 minutes of my time. Maybe like 15 seconds."



**Michael W.**
Chief Compliance Officer, Marina Ventures

**Comma** **Compliance**    Home    Product    Pricing    Book Demo

# Messaging App
# Communication
# Archiving for
# Financial Firms

Case 2:25-cv-12562     Document 1     Filed 07/01/25     Page 95 of 174 PageID: 95

We offer a next-gen communication archiving solution, backed by Comma Compliance's powerful AI technology. It seamlessly distinguishes between personal and business contacts, enabling teams to use modern messaging apps for business purposes confidently.

With our compliance management software, you can rest assured that everything you need to securely archive will be captured, without infringing on privacy.



# 1. Personal vs. Business Contact Filtering

We **automatically distinguishe** between personal and business contacts. This empowers teams to feel secure in connecting their personal accounts as **only business-related communications are archived**.

> **Key Differentiator:** Existing tools archive **all** content from personal apps, making users uncomfortable connecting their own devices. Our state-of-the-art filtering feature is one of the primary reasons why customers choose Comma.

# 2. Lower iMessage Costs

Traditionally, iMessage archiving required expensive hardware due to Apple's heavy restrictions, with no more than five accounts per Mac.

> **Comma Compliance has launched the first solution on macOS 15** with nested Apple accounts in virtual machines to **reduce per-user costs by over 3x**, making iMessage archiving more affordable.

# 3. Platform Support for Hard-to-Interact Platforms

CC's platform archives messages from hard-to-access platforms like **iMessage**, **WhatsApp**, **Signal**, and **LinkedIn Messaging.**

> We utilize **known and proven methods** to interact with these platforms that lack public APIs for archiving purposes.

# 4. Self-Onboarding Process

Unlike legacy compliance tools that require lengthy enterprise sales cycles, we offer self-onboarding with transparent pricing and a simple setup process. Our goal is to be the most hassle-free platform to work with. If you would like some extra hand-holding, we've also got a team for that!

# 5. Lower Hosting & Data Retention Costs

We utilize modern, low-cost, highly reliable hosting solutions. This allows us to pass savings to our customers and be a fraction of the cost of other compliance tools.

Customers can send archived messages to their existing archive solutions or use our secure, low-cost storage option.

# How it Works



### User Onboarding

Our platform automatically filters and archives **business-related communications**.

• Users receive an invite from their employer.
• They log in, connect their personal communication apps (e.g., iMessage and WhatsApp).



### Compliance Officer Experience

Admins have access to an **archive dashboard** to easily:

• View archived messages.
• Manage user accounts.
• Review business contacts and communications.
• Open cases directly from message threads.



### 24/7 Support

Get customized features to suit your team's needs -- without the weeks of delay.



**Comma Compliance**          Home      Product      Pricing                    Book Demo

# You've seen the iMessage compliance gaps.

## You just haven't seen a better option.

Comma Compliance gives your team full iMessage functionality **without disabling features or compromising compliance.**

Our purpose-built iMessage archiving captures every relevant business message in real time, **without draining devices, invading privacy, or relying on Apple cloud storage.**



# Why Comma Compliance's iMessage Archiving Is Different

# Legacy tools treat iMessage like it's still 2010. Your compliance strategy deserves better.



## What We Secure:

- Business-related iMessages sent or received on employee devices.
- Timestamps, contact details, attachments, and full conversation threads
- Archived directly from macOS, not dependent on device activity or user settings



**Others disable iMessage. We don't.**

Legacy compliance tools treat iMessage as SMS or block it entirely.

We **connect directly to iMessage**, and there are no clunky SMS-only limitations.



**No content gaps. Ever.**

# What we Don't:

- Personal chats from friends, family, or non-business contacts.

  We filter business contacts directly, so no concern of privacy invasions.

We store message data independently of iCloud, so if something gets deleted or missed by Apple's storage, **we still have it**.

Nothing slips past us, or you.

 **No battery hit. No workarounds.**

TCC doesn't run on the device, and doesn't need to be online.

Archiving happens in real time, **without draining batteries** or depending on active connections.

---

# Designed for Regulatory Peace of Mind

SEC and FINRA expect firms to retain relevant messages, but **most solutions can't handle iMessage well.**

Comma Compliance uses **macOS virtualization** and AI-powered contact filtering to separate business from personal content at the point of capture.

# Scalable. Private. Compliant.

Whether you're a five-person firm or a global team, CC helps you meet your record-keeping obligations without sacrificing privacy or performance.

- **Audit-ready archives**
- **Employee privacy protected**
- **Works with the tools your team already uses**

# See how Comma Compliance simplifies audit prep. <u>Book a demo</u> today.

**Comma Compliance**     Home     Product     Pricing

Book Demo

# Security and Data Protection at Comma Compliance

At Comma Compliance (CC, Comma), your data security and privacy are our highest priorities.We protect your communications with industry-standard controls, trusted cloud infrastructure, and strict access governance, all designed to meet the expectations of SEC, FINRA, and global regulatory bodies.

You trust us to protect sensitive business communications. We take that trust seriously.

# Platform Security Overview

## Encryption at Every Stage

- All communications are encrypted in transit using TLS 1.2+ protocols and encrypted at rest with AES-256 encryption.

- We use cloud-native key management through AWS KMS and Azure Key Vault to control encryption keys securely

# Authentication and Access Management

- Access to your data is protected by single sign-on (SSO) integrations, multi-factor authentication (MFA), and strict role-based access controls (RBAC).
- All user activity and administrative actions are logged in immutable audit logs.

# Continuous Monitoring and Testing

- CC conducts daily vulnerability scans, regular independent penetration tests, and proactive threat detection across all systems.
- Our platform is continuously monitored for unauthorized access attempts or suspicious behavior.

# External Certifications

- SOC 2 Type I audit completed
- SOC 2 Type II certification underway
- Google OAuth CASA assessment passed for Gmail and Workspace integrations

# Infrastructure and Data Storage

Comma Compliance is hosted across Amazon Web Services (AWS) and Microsoft Azure cloud environments, leveraging world-class security, compliance, and resiliency standards.

By default, client data is stored within the United States. Optional data residency is available in the EU or Asia-Pacific regions for clients with specific regulatory needs.

# Our infrastructure Includes:

- Multi-AZ clustering and automatic failover
- Encrypted backups every six hours with 35-day retention
- Service uptime target of 99.9%
- Recovery Point Objective (RPO) of 15 minutes
- Recovery Time Objective (RTO) of under 4 hours

All archived messages are stored immutably using Write-Once-Read-Many (WORM) retention policies, ensuring compliance with SEC Rule 17a-4(f).

Additionally, all client data benefits from highly durable storage architecture, designed to provide 99.999999999% durability and 99.99% availability of objects over a given year, aligning with AWS's highest standards for enterprise-grade data protection.

## Data Ownership and Privacy

You retain full ownership of your data.

Comma acts as a secure custodian of your communications, using your information strictly to deliver archiving, compliance, and risk analysis services.

We never sell, rent, or share client data outside of authorized sub-processors directly involved in service delivery.

Privacy is protected at the point of capture. Our system automatically separates business-related communications from personal content, minimizing data exposure and respecting employee privacy rights.

## AI-Driven Compliance Monitoring

CC's AI engine scans more than 95% of archived content for potential policy violations in real time.

Messages flagged for review are always subject to human validation before escalation.

```
Key Principles:
```

- AI assists but does not replace human oversight.
- Every flag includes a clear reason and reference to relevant policy.
- Clients can adjust, refine, and contribute feedback to improve detection models.
- No client-specific data is used for system-wide training without explicit consent.

```
Our automation enhances compliance efficiency while maintaining full
transparency.
```

## Regulatory Alignment

Comma Compliance's platform is built to meet core requirements under:

- SEC Rule 17a-4
- FINRA Rule 4511
- GDPR and other applicable privacy regulations

We provide flexible retention periods, support for legal holds, full-text search, exportable archives (PDF, EML, JSON), and tamper-proof record integrity validated by cryptographic hash chains.

You stay audit-ready without extra manual overhead.

## Contact and Security Reporting

For questions or concerns related to security, or to report a potential vulnerability, please contact:

support@commacompliance.com

For more information on specific key security terms, you can find <u>our compliance glossary here</u>.

**Comma** Compliance      Home     Product     Pricing         Book Demo

# Compliance Archive Integrations | Secure Business Communications

| All Categories ⌄ |
| --- |

Our platform supports archiving across 30+ communication channels. From Social Media, to Email, to Chats and Collaboration Tools, we make sure you remain audit-ready, and compliant.

You can find more information on key compliance terms here.





## WhatsApp

Your business conversations happen over WhatsApp even after you've labeled them off-channel, so make it compliance-friendly. We quietly capture your business threads and attachments into audit-ready storage, so you save what matters and leave your employees' personal chats out of the record.

## iMessage

Your deals aren't happening in Outlook anymore- they're over iMessage. Capture every client chat, media attachment, and timestamp right from Comma's managed solution, so you're compliant without forcing your team into a new app.



## Signal

Securely archive Signal 1:1 and group messages—on mobile and desktop—without altering the user experience or storing local data. Messages, metadata, and attachments are encrypted in transit and stored in immutable, audit-grade archives. End-to-end encryption.



## Google Drive

Capture all Google Drive content from individual and shared drives, version updates, inline comments, replies, views, downloads, and ownership or permission changes, showing granular user activity across your company domain. All file versions and metadata remain in WORM-compliant preservation with real-time risk detection.



## Google Workspace

With our archive you can preserve everything Google Workspace oriented, from Gmail and Chat to Docs, Sheets, Slides, and Meet recordings, in its original format, complete with version history, comments & sharing permissions.
We enforce Data Loss Prevention (DLP) and Context-Aware Access, & offer endpoint management and LDAP integration to keep you compliant. Every change, from edits to deletions, is enriched with user, device, and location metadata with operation logs and edit histories.



## Gmail

Store every inbound and outbound Gmail conversation, as well as CCs, BCCs, attachments, and full threads. Your messages are preserved in their original format with timestamped details and easy legal-hold controls, so you can quickly surface issues and demonstrate audit readiness under global regulations.



## Microsoft 365



## Microsoft O365 Exchange

Ingest every Microsoft O365 Exchange message—including sent, received, CC, and BCC—in its native state, complete

Retain all Microsoft 365 business content: email including CC, BCC, attachments and full threads, Teams chats, files, calendar events, in native format with full metadata, attachments, and message direction. Direct-source ingestion ensures encrypted, searchable, and immutable archiving that meets SEC, FINRA, and compliance requirements.

with attachments and conversation threading. Retain every Microsoft O365 Exchange email in native format, including metadata, attachments, and message direction. Direct-source ingestion ensures full adherence to SEC, FINRA, & global requirements. Encrypted, searchable, and immutable archiving. Whether you're hosting in your private data center or using a shared cloud service, we have you covered.



### Microsoft OneDrive

Complete capture of all MS OneDrive activity. Retain folder structure and native file formats (Office docs, PDFs, images, videos, etc.), version history, sharing links & permission changes, comments, and collaborative edits. Archive file operations (create, modify, move, delete), external shares, and access logs, enriched with user-, device- and



### Microsoft Teams

Preserve all Teams communications. Group and private chats, voice and video calls, file sharing, and meeting content. Messages, edits, deletes, reactions, hand raises, attachments, and timestamps are retained in full conversational context. Screen shares, emojis, stickers, and interactive actions are stored in source format.

location-metadata.



## LinkedIn

Securely maintain all business
LinkedIn communications: InMail,
direct messages, Sales Navigator
activity, business profile changes,
comments, and posts. Format is
preserved to support regulatory
oversight.



## LinkedIn Sales Navigator

Capture LinkedIn Sales Navigator
communication with Comma's secure
archiving.



## Reddit

Preserve all your organization's
Reddit activity—from posts and
threaded comments to Modmail
interactions and shared media - in its
original form. Everything stays



## X (formerly Twitter)

Record tweets, quote-tweets, replies,
and DMs (1-to-1 or group), as well as
likes, follows, and other social
interactions for a complete audit
trail, while AI-powered NLP flags

searchable and linked. You never lose
context.

high-risk interactions for faster
review.



## Telegram Messenger

Record messages in their original form
—complete with sender details,
timestamps, and device info—to
maintain a safe, unbroken audit trail.



## Bluesky

Seamless capture all Bluesky content:
posts, threaded replies, pinned posts,
priority notifications, follows, likes
& DMs, preserving native formatting,
media and thread structure via direct
API. Each record is enriched with
user- and device-metadata and
immutably stored under AWS KMS—managed
keys with SHA-256 integrity
verification.



## TikTok



## ChatGPT Enterprise

Collect ChatGPT Enterprise
interactions: user prompts, AI
responses, uploaded files (images,

Protect all TikTok business contact communications: posts, comments, replies, duets, Stitch clips, videos, and DMs in their original state with full metadata via API-driven integration for efficient search and auto-flagged alerts, helping you meet FINRA, SEC, and other reg compliance mandates.

source code, documents), and full metadata via direct API integration in their native format. This immutable, chain-of-custody-preservation leverages AI-driven NLP analysis for comprehensive supervision, streamlining case management workflows to meet SEC Rule 17a-4, FINRA 4511, and other regulatory requirements.



## Twilio

Securely archive all Twilio cloud communications, including phone calls, text messages, and SMS. Whether you're using Twilio directly, or leveraging any tool that builds on top of Twilio, we can ensure you stay compliant.



## Instant Bloomberg

Instant Blooming (Bloomberg Chat) is your second CRM, so treat it that way. We archive every trader ping, analyst insight, and file share in its original format, giving you a full audit trail without forcing you to change how you work.



## Facebook

Complete recording of all Facebook activity: preserving links, media, questions/polls, Events (and RSVPs), editable Docs/Notes, Timeline posts & threaded comments (personal & business Pages), 1:1 Messenger chats & private Group Messages, Business Page inbox interactions, Marketplace listings & buyer-seller chats, plus Live videos & Stories. Every item (including link-rich posts, Event pages, Docs and Questions) is stored with full metadata (timestamps, author/edit history, device info, location tags), immutable storage.



## Zoom

Record every Zoom session—meetings, webinars, and phone calls alike. Index all chats, video and audio files, survey results, and full-text transcripts.



### Zoom Phone

Store Zoom Phone activity. Call recordings, SMS/MMS messages,



### Zoom Video Communications

Retain Zoom Meeting and Webinar content, including chat messages,

voicemail, and transcription. All data is archived to support SEC & Finra regs.

audio/video recordings, polls, and transcriptions.



## Salesforce

Collect and store Salesforce Sales Cloud, Marketing Cloud, Pardot, and Chatter content in native format, capturing messages, attachments, comments, polls, and posts. Data is encrypted, searchable, and archived with full metadata.



## Slack

Preserve all conversations across Slack. Slack connect, direct messages, private groups, and public channels, along with edits, deletions, and file shares. Everything is stored in context-rich threads, so you never lose important details and can satisfy oversight requirements in minutes.



## Websites and Blogs



## Apple Business Chat

Capture iMessage business communications in real time -directly from macOS- without impacting devices,

Preserve dynamic website, RSS feeds, and blog content by securely storing HTML, text, files, images, videos, and page changes with full version history and audit-ready formatting.

user privacy, or relying on iCloud. Messages, media, and metadata are archived in full conversational context for audit trails and secure compliance.



### Instagram

Preserve photos, likes, comments, stories, profile updates, direct messages, and <u>dark posts </u>in original formatting with full contextual metadata. No third-party dependencies, ensuring data integrity.



### Youtube

Collect YouTube channel activity—including video uploads, associated metadata (thumbnail, title, description, link), comments, replies, and user interactions—in structured format.



### Substack

Comma stores your Substack posts, emails, comments, and formatting in their native HTML/Markdown, then



### Threads (Meta)

Archive Threads by Meta posts, replies, and reposts -images, videos,

encrypts everything at rest with AES-256 and locks it down with WORM retention on AWS/Azure. Each item is stored immutably. You get a fully audit-ready archive that meets industry regulations.

and user metadata. All activity is collected directly from the source and retained with full message threading and interaction context to meet FINRA, SEC, and MiFID II compliance standards.



### SMS and Text

Discretely secure SMS and MMS, text messages, file attachments, photos, and voice notes in native format via direct carrier and BYOD integrations. We capture messages and threads from business contacts, not personal contacts.



### Voice Calls

Archive inbound and outbound voice calls of business contacts: PSTN, VoIP, and soft-phone sessions. Caller ID, timestamps, and duration for secure, chain-of-custody compliance.



### Confluence (Atlassian)



### Jira (Atlassian)

Archive Confluence knowledge assets such as wiki pages, blog posts, comments with complete version history, and file attachments. Securely store all content in a WORM-compliant database with customizable retention periods.

Capture Jira Cloud data: project descriptions, comments, attachments, and full issue details. Securely store all content in a WORM-compliant archive.



### Webex Meetings by Cisco

Securely archive video and transcript, meeting chat log, and metadata and context of all WebEx meetings.



### Webex Messages by Cisco

Collect conversations, including text exchanges (direct & channel), files, GIFS, and whiteboards. Additionally, store all metadata and context, including channel and topic context, edits, and deletes, as well as reactions and read receipts, to ensure regulatory compliance and secure audit trails.

## To learn more about our security and data

**protection, click <u>here</u>.**

**Comma Compliance**     Home     Product     Pricing                    Book Demo

Comma Compliance Pricing

# Catch Compliance Risks Before They Become Headlines.

Archive business communications across multiple off-channel platforms —
while flagging risky messages in real time and keeping **private** content **private**.

Ready to protect your
business - and your
reputation?

Get a custom quote designed around
your compliance goals and regulatory

7-Year Business
Communication Retention

Real-Time Compliance
Message Monitoring

requirements.

Book A Demo

Automated Flagging of Risky
Content

Audit-Ready Message
Archiving

Built-in Case Management

Privacy-First Data Capture
(No Personal Contacts)

SEC & FINRA Compliance
Support

Easy Onboarding with
Messaging Platforms you
already Use



⊕ Is my data encrypted with Comma Compliance?

⊕ Do I retain ownership of my data?

⊕ Can iMessages be archived for SEC or FINRA compliance?

⊕ Do you archive deleted messages?

⊕ Which messaging platforms does Comma Compliance support?

⊕ Is CC compliant with SEC and FINRA regulations?

⊕ Will this slow down our team's communications?

⊕ Will using Comma Compliance affect device performance or battery life?

⊕ How long are communications retained?

**Comma Compliance**      Home      Product      Pricing          Book Demo

# That message wasn't flagged.
## But it should have been.

TCC's Policy Matching scans iMessage, WhatsApp, LinkedIn, Gmail,
Microsoft 360, and Bloomberg Chat in real time, flagging messages
that cross the line before they become compliance liabilities.

6/20/25, 2:49 PM

Case 2:25-cv-12562 Document 1 What We're Building / Messaging for Regulatory Compliance Filed 07/01/25 Page 128 of 174 PageID: 128



# Policy Matching at Work

TCC continuously monitors your key communication channels using our standard policies, including SEC and FINRA compliance. Want to bring your own rules? You can easily integrate your custom policies alongside ours.

Every message is automatically evaluated against these policies. If anything looks off, it's flagged in real time. We also run spot checks on other content to ensure you're meeting review requirements, while constantly refining your custom matching algorithm.

Instead of spending time manually reviewing everything, your team focuses only on what matters: the flagged items. No more overlooked violations. Just streamlined, smart compliance.

# Risky messages don't wait for manual reviews.

**Because "we didn't know" doesn't hold up in an audit.**

When an unflagged message slips through, it's not just a communication error.

It's a potential SEC or FINRA compliance violation under rules like 17a-4 and 3110.

TCC helps compliance teams protect what matters: your reputation and your ability to serve clients without fear of audit fallout.



Whether it's an over-confident earnings claim or a seemingly harmless message about a "guaranteed return," if it's on your watchlist, we'll surface it.

Your team moves fast.

# Your team moves fast.
# So do regulators.

TCC's Policy Matching scans business communications in real time, catching messages that violate policy before they turn into regulatory trouble.

## We support monitoring across:

- WhatsApp
- LinkedIn
- Gmail & Microsoft 365
- iMessage
- Bloomberg Chat



**Internal Policy Violations:**
*"I can get this approved faster if we just backdate the request."*



**Regulatory red flags:**
*"I promise you'll see a bump in Q3."*



**Conflicts between policy and practice:**
*"If you go with it by Friday, I get a bonus, but honestly, I'd recommend it either way."*

## Policy Matching at Work

TCC continuously monitors your key communication channels using our standard policies, including SEC and FINRA compliance. Want to bring your own rules? You can easily integrate your custom policies alongside ours.

Every message is automatically evaluated against these policies. If anything looks off, it's flagged in real time. We also run spot checks on other content to ensure you're meeting review requirements, while constantly refining your custom matching algorithm.

Instead of spending time manually reviewing everything, your team focuses only on what matters: the flagged items. No more overlooked violations. Just streamlined, smart compliance.



# Privacy Comes First

We only flag content tied to real policy.
Your team's private messages stay private.

Comma **Compliance**      Home      Product      Pricing                    Book Demo

# Regulatory risk. Shadow messaging. Privacy concerns. Workflow disruption. And that's *before* the audit anxiety kicks in.

Comma solves the core challenge that compliance teams face every day: how to reliably archive modern business communication without invading employee privacy or disrupting workflows.

| Total Messages | High-Risk Flagged Messages | Time Saved | Employee Score | Compliance Score |
|---|---|---|---|---|
| 1470 | 87 | 59.5h | 94% | 92% |

# Capture the conversations that matter *without*

# capturing the ones that don't.

Archiving business communications isn't optional—it's a regulatory expectation.

We simplify this by capturing key platforms and respecting employee privacy from the start:



**iMessage, WhatsApp, LinkedIn Messaging, Gmail, Microsoft 365, Bloomberg Chat, and Signal (Beta)**

We cover the platforms your team actually uses. Yes, even those without public APIs.



**Smart Contact Filters= Serious Privacy.**

Our contact filtering ensures personal chats stay personal. Business communications are captured and



archived automatically, every time.

No more overstepping the awkward private-business line of capturing info.

 **All content is fully searchable**

Timestamps, contact data, full message threads: all indexed. You can search and review every message, with timestamps and full threads included.

See how Comma Compliance
simplifies audit prep. <u>Book a demo</u>
today.

timestamps and full threads included.

# Quiet until the audit hits.

We capture messages the moment they're sent and keep them securely stored, no gaps, no lag. Your firm stays ahead of evolving messaging rules without daily manual reviews or workarounds.

- **SEC and FINRA Expect It**
  From 17a-4 to Reg S-P, firms are expected to preserve business communications.

  Our retention framework ensures those records are stored in accordance with SEC and FINRA requirements.

- **Audits Are Getting Proactive**
  Regulators aren't waiting for violations anymore. With CC, your archive is always audit-ready.

- **Compliance Without the Creepiness:** Employees shouldn't have to choose between following policy and keeping their personal lives private.

  With Comma Compliance, they don't need to choose.

- **Audits and policy enforcement go hand in hand.**
  Your firm stays ahead of evolving messaging rules without daily manual reviews or workarounds.

  Learn how our **Policy Matching** ensures accurate retention with zero guesswork.

---

## See how Comma Compliance simplifies audit prep. Book a demo

**Comma Compliance**

Home    Product    Pricing

Book Demo

# Regulatory risk.
# Off-channel messaging.
# Cue: Audit Panic.

Comma Compliance gives compliance teams the structure &
visibility you need.
No spreadsheets required.

---

# Scattered Screenshots *Aren't* a Strategy



Managing compliance cases through screenshots and shared spreadsheets is slow, risky, and hard to defend during audits.

CC replaces the chaos with a single, review-ready record.

# One Click.
# One Record.

# Total Control.

## Built for the Work You Actually Do

As a compliance officer, you're managing internal reviews, external audits, and real-time risk — all at once.

Comma helps you move from scattered evidence to a structured response.



## Open Cases

Cases let you track compliance issues and record actions taken.

All Users ▾    🔍 Search Open Cases...

| TITLE | STATUS | RESOLUTION | OWNER | ADDED | |
|-------|--------|-----------|-------|-------|--|
| March 13th Policy Violation — SEC notified | Pending | Formal Notice | Jeremiah Paisley | April 28 at 1:22 PM | Edit Delete |
| Policy Breached | Open | No Resolution | Rianne Mono | April 30 at 10:48 AM | Edit Delete |

**Start New Case**

## Closed Cases

Resolved cases are archived and can no longer be edited.

All Users ▾    🔍 Search Closed Cases...

| TITLE | STATUS | RESOLUTION | OWNER | ADDED |
|-------|--------|-----------|-------|-------|
| Potential Regulatory Violation (Guarantees) | Resolved | Policy Change | Sasha Munich | April 21 at 3:13 PM |
| Anti money laundry case | Resolved | No Resolution | Rianne Mono | April 29 at 7:23 PM |

Case 2:25-cv-12562    Document 1    Filed 07/01/25    Page 144 of 174 PageID: 144

# Every Case Includes:

- Complete Message Retention
- Linked timeline and evidence
- Context for internal or external review
- A final resolution log, from policy update to training notice

Managing compliance cases through screenshots and shared spreadsheets is slow, risky, and hard to defend during audits.

We replace the chaos with a single, review-ready record.

# Always Audit-Ready

Whether you're briefing your GC or responding to FINRA or the SEC, Comma Compliance delivers the full case file—complete with timestamps, message history, review notes, and a resolution trail.

Everything you need, ready when it matters.

**No scrambling. No formatting. Just one clean, exportable record.**



# See how Comma Compliance simplifies audit prep. <u>Book a demo</u> today.

**Comma** Compliance        Home    Product    Pricing

Book Demo

# You're Officially WhatsApp Panicked.

You've read the headlines; you know SEC and FINRA
are cracking down on off-channel messaging.

And your team? They're still using WhatsApp for
client chats.

And honestly, it makes sense - clients use it.
But compliance is non-negotiable.

Comma Compliance has you covered.

Get Started

# Real Archiving.
# No Micromanaging.

Comma simplifies compliance
for your team, allowing them
to continue using WhatsApp
for business without putting
your firm at risk.

We capture business messages
in full detail, without
touching personal content,
enforcing invasive policies,
or requiring new apps.

And because we don't run on
the device, there's no
battery drain either.



# What We Capture

## *...and how we stay out of the way*

## WhatsApp Business Messages from WhatsApp



- ○ 1:1 and group chats — no matter the device
- ○ Works with personal or corporate WhatsApp accounts
- ○ What we don't store: messages from personal contacts.

## Message Details, Fully Preserved



- ○ Timestamps and contact data included
- ○ Attachments (images, PDFs, audio) auto-captured
- ○ Thread structure and message order retained for clarity

## Cross-Device Compliance, Built In



- ○ Conversations from phones, desktops, and web versions
- ○ Auto-archived to tamper-proof, audit-ready storage
- ○ SEC/FINRA retention requirements fully supported



## Message Thread Details ⧉

**Download PDF**

**John Bauer**
+1-(237)-384-0306

Let me know if you need any stats for the meeting.

Add to Case ▾

May 5 at 10:05 AM

**Julia Haynes**
+1-(245)-708-3432

Thanks John, I think we're all set to go for the sales call

Add to Case ▾

May 5 at 11:06 AM

**John Bauer**
+1-(237)-384-0306

Really appreciate you taking the time

Add to Case ▾



# Compliance That Works in Real Life

From SEC Rule 17a-4 to FINRA
Reg S-P, regulators expect
you to capture and retain
off-channel communications.

CC provides real archiving
solutions, without manual
workarounds or shadow IT.



# Why Comma Compliance Works

**Built for compliance. Designed for real-world use.**

✅ **Smart Filtering with AI**
Our compliance management software automatically separates business and
personal messages, so only the right conversations are archived. No over-
capture, no overreach.

✅ **No IT Burden**

Your team uses WhatsApp as usual. No new tools, no new training, no new app installations on devices.

✅ **Instant Audit Visibility**
Get real-time insights into message capture, flagged risks, and platform activity — all from one dashboard.

✅ **Independent + Reliable Storage**
Messages are captured directly, not synced from user backups, and stored in secure, audit-ready archives.

✅ **Zero Device Footprint**
CC doesn't run on the employee's phone. No battery drain. No compliance excuses.

WhatsApp Compliance Software

# Connect in Minutes.
# Be Audit-Ready for Years.

See how Comma Compliance simplifies audit prep. <u>Book a demo</u> today.

# Compliance Software
# Shouldn't Require a 60-Day

Whatsapp Compliance Software

# Rollout

Connect quickly.
Avoid IT tickets.
Prevent employee pushback.

Ready to See How It Works? Let us show you how.

# Encrypted Messaging Meets Real Compliance

You trust Signal for its privacy.
Regulators still expect message retention.
And your team?

They're using Signal for **real** business
conversations.

That's why Comma Compliance exists.

Full Signal functionality. No workarounds.

Get Started

# Real-time Archiving.
# Full Encryption.
# No Interference.

We capture Signal messages as they're sent, without altering the
experience, draining the phone battery, or requiring clunky third-party
tools.



**We work the way Signal works:**

✅No decrypted local data

✅No invasive device software

✅No changes to how your team communicates.

✅Your employees keep Signal.

**Best of all? All it takes is your employee scanning a QR code.**

---

# See how easy it is to connect Comma Compliance with Signal.

# Just scan and go.

Case 2:25-cv-12562    Document 1    Filed 07/01/25    Page 161 of 174 PageID: 161

Signal Website for Comma Compliance



# What We Capture

*...and what we don't touch*

# Business Messages on Signal



- 1:1 and group chats — across iOS, Android, and desktops
- Captured securely via Signal's encrypted flow
- Supports personal or corporate Signal accounts

# Message Context, Fully Preserved



- Timestamps, participant details, and media attachments
- Messages retained in conversation order
- Audit-ready formats

# What We Don't Store



- Messages from personal contacts
- Local data on the employee's device



# No message left behind.
# No compliance excuses.

When an employee sends a Signal message, it's delivered securely — just like any normal conversation.

At the same time, CC operates invisibly within your Signal environment, receiving the message automatically. Without disrupting the user experience, the message is instantly encrypted and archived into tamper-proof, audit-grade storage.

The result: seamless, secure communication for your team.

Complete compliance for you.

---

# Why Comma Works for Signal

**Built for compliance. Designed for secure messaging.**

✅ **True-to-Signal Experience**
We don't block, intercept, or degrade Signal functionality. Your team uses it as intended.

## ✅ **Independent + Encrypted Archiving**

Comma Compliance captures messages simultaneously from the Signal network. No unencrypted data on phones. No saved private keys. No unprotected credentials stored on the device. No archived content sent from your users devices.

## ✅ **No Local Footprint**

Our compliance management software doesn't run on your employees' phones. That means zero battery drain and no privacy concerns.

## ✅ **Offline Resilience**

Even if a phone is offline, CC still syncs and archives. Nothing slips through.

## ✅ **Regulator-Ready Storage**

Messages go directly to audit-grade, immutable archives that support SEC Rule 17a-4, FINRA Reg S-P, and more. No deleting of the archived threads.

# Signal doesn't prevent compliance.

## It just requires a smarter solution.

See how Comma Compliance simplifies audit prep. <u>Book a demo</u> today.

**Comma Compliance**    Home    Product    Pricing    Book Demo

# Explore Our Latest Compliance Insights and Industry Updates

At Comma Compliance, we're here to help you stay ahead. Our Insights hub brings you expert articles, real-world best practices, and the latest regulatory updates, all focused on making compliance simpler and smarter.

Explore topics like messaging app compliance for WhatsApp, iMessage, Signal, LinkedIn, Bloomberg Chat, Google Suite, Microsoft, and more. We're constantly sharing new ideas and strategies to help you protect your communications, manage digital risk, and keep pace with a rapidly changing regulatory landscape.

Have a compliance question or a topic you'd like us to explore? <u>Get in touch</u>! We'd love to hear from you.

For an explanation of key compliance and security terms, you can find <u>our compliance glossary here.</u>

See how Comma Compliance simplifies audit prep. <u>Book a demo</u> today.







Business

## House WhatsApp Ban: FOIA Risk & Compliance Fixes

The U.S. House bans WhatsApp, citing FOIA record-keeping gaps. Learn why end-to-end encryption alone fails compliance and how to archive WhatsApp securely.

 **Jeremiah**
June 23, 2025 • 2 min read

Business

## SEC Withdraws 14 Regulatory Proposals

The SEC has withdrawn 14 proposed rules aimed at AI oversight, ESG disclosures, cybersecurity, and more, marking a major policy shift under new leadership. Here's what it means for compliance teams and the future of regulation.

 **Jeremiah**
June 23, 2025 • 4 min read

Productivity

## FINRA Rule 2210 Guide for Startups

Practical guide for startup broker-dealers on FINRA Rule 2210: learn pre-filing requirements, build a lightweight compliance workflow, avoid costly marketing mistakes.

 **Sasha**
June 23, 2025 • 14 min read











Business

## FINRA Messaging Crackdown Costs Firm $400K – May 2025

In May 2025, FINRA fined Network 1 Financial for surveillance failures tied to off-channel messaging. Learn what went wrong and how firms can strengthen compliance to avoid similar penalties.


**Sasha**
June 23, 2025 • 2 min read



Business

## FINRA 25-07: Rethinking Communication Oversight

DMs, apps, remote work... are your compliance tools keeping up? FINRA's 25-07 says it's time to modernize.


**Sasha**
June 12, 2025 • 9 min read



Business

## The TeleMessage/Signal Clone Scandal Timeline

A timeline of the TM SGNL breach, showing how a Signal clone used by U.S. officials was hacked in minutes, with new details from WIRED's May 18 investigation.


**Sasha**
June 12, 2025 • 3 min read



Productivity



Business



Business







**Productivity**

### Business Messaging Compliance: Retaining what matters

Learn how to meet FINRA's communication archiving rules without capturing personal conversations. Compliance does not require overcollection. It requires smarter filtering.

 **Jeremiah**
June 12, 2025 • 3 min read

**Business**

### How to Comply with FINRA Rule 3110 Without Losing Your Mind

Learn exactly what FINRA Rule 3110 requires - from written supervisory procedures to branch inspections, and how to build a rock-solid compliance system

 **Jeremiah**
June 23, 2025 • 5 min read

**Business**

### The Growing Compliance Struggle: Why Off-Channel Communications Are a Ticking Time Bomb

Off-channel messaging apps like iMessage and WhatsApp are a growing compliance risk, with regulators ramping up enforcement. With $2B+ in fines since 2021, firms need better tools to avoid rising SEC and FINRA penalties while ensuring compliance without banning the apps employees rely on.

 **Jeremiah**
June 8, 2025 • 7 min read













Business

## Why Messaging Compliance is Critical for Financial Firms

Financial firms must prioritize messaging compliance to avoid fines, build trust, and future-proof their business in the face of increasing regulatory scrutiny.

 **Sasha**
June 12, 2025 • 3 min read

## 3 Ways we Reduce Compliance Costs for Financial Firms

From cost-effective solutions like virtualized Apple accounts on macOS 15 and scalable S3 storage, Comma Compliance cuts messaging compliance costs by over 3x.

 **Sasha**
June 12, 2025 • 4 min read

## Messaging Compliance is a Mess. Fund Managers should Pay Attention.

Messaging compliance is a growing risk for fund managers–especially in the alt space. Regulators are cracking down, but there are practical steps firms can take now.

 **Jeremiah**
June 23, 2025 • 4 min read





### The Future of AI in Compliance: Opportunities and Risks

AI offers financial firms unparalleled compliance efficiency and scalability while requiring careful management of data security, biases, and human oversight.



**Jeremiah**
June 2, 2025 • 5 min read

*We prioritize depth over frequency, focusing on well-researched, high-value content that helps you navigate compliance challenges with clarity. While we do have a natural bias toward our own solutions, we're committed to providing thoughtful, balanced insights you can trust. If there's a topic you'd like us to explore, let us know—we're always open to covering what matters most to our readers.*

See how Comma Compliance simplifies audit prep. <u>Book a demo</u> today.

