MURPHY ORLANDO LLC
*Attorneys at Law*

494 BROAD STREET • 5TH FLOOR • NEWARK, NJ 07102
*tel* 201.451.5000 • *fax* 201.451.5000
WWW.MURPHYORLANDO.COM

abaker@murphyorlando.com

AMANDA K. BAKER
*ASSOCIATE*

August 13, 2026

***Via CM/ECF***
Hon. Cari Fais, U.S.M.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street Room 4015
Newark, NJ 07101

**Re: Loop HQ, Inc. v. Jeremiah Church and Tres Comma Compliance, Inc.**
**Docket No. 2:25-cv-12562-JKS-CF**

Your Honor:

As the Court knows, this firm represents Plaintiff Loop HQ, Inc. ("Loop") in the above-referenced action. The parties submit this joint letter regarding outstanding issues between the parties with respect to search terms as referenced in the Court's Order. [Dkt. 80]. The parties present their positions below and thank the Court for its attention to this matter.

**I. Discovery Dispute**

Defendants' have requested that Plaintiff run the search term "Church" from September 1, 2024 through present. Plaintiff has agreed to run the term through October 14, 2025, but has objected to running it beyond that date.

**II. Efforts to Resolve**

The parties have been negotiating search terms for months through emails and meet and confers and have resolved all disputes save for this one remaining dispute which accordingly requires Court intervention.

**III. Plaintiff's Position**

On March 9, 2026, the parties in this matter entered into an ESI protocol. [Dkt. 56]. In that protocol, it is clearly stated that "Except as **limited** below with respect to certain search terms, Plaintiff shall collect ESI for the following time period: January 1, 2020 to October 14, 2025[.]" [Id. at 2 ¶ 6 (emphasis added)]. The October 14, 2025, end date—approximately three and a half months after the litigation was commenced—was the subject of negotiation by the parties and was already extended well-beyond Plaintiff's initial proposal to resolve a dispute without Court intervention. This limited time period is further recognized by the following section the ESI protocol, which expressly states that the parties, who were still negotiating search terms, "shall meet and confer to negotiate in good faith the **narrowing** of any such search that yields a large set of data." [Id. at 9

¶ 8(a) (emphasis added)]. **Nowhere** does the ESI protocol anticipate **expanding** the agreed upon time period.

In complete disregard of the mutually agreed upon time period outlined in the ESI protocol, Defendants now seek to expand that time period by demanding that Plaintiff run the term "Church" against all custodians through the present and baselessly claim is it is **Plaintiff's** burden to object. This demand is not only inconsistent with the protocol that the parties previously agreed to and have been thus far been acting pursuant to, but its sole purpose—as admitted by Defendants—is to seek privileged information: Defendants seek internal communications by Loop's agents and employees **made during the course of this litigation** about Church's access to Loop's systems, which are directly connected to allegations in the Verified Complaint. Discovery of this information is expressly prohibited by the Federal Rules, which prohibit a party from discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. Pro. 26(b)(3)(A). The documents Defendants seek and those that will be returned from searching "Church" for a period that encompasses thirteen months of this litigation, none of which Church was actually employed at Loop, will result primarily in the return of such protected material, including material also protected by attorney-client[1] and work product privilege.

Not only is this information privileged, but it is a needlessly harassing and duplicative request, because the term itself is designed to pick up way more than Defendants' claimed purpose of the term (why use the term "Church" if you only want to pick up unauthorized access?) and because Plaintiff is already producing any and all evidence of access to its systems. Defendants' supposed purpose for this term is also based upon the unsupported premise that Plaintiff is purposefully withholding evidence of Church's access. Courts in this District have held that mere skepticism is not sufficient to warrant intrusive examination of ESI. See, e.g., Par Pharm., Inc. v. QuVa Pharma, Inc., CV 17-6115 (BRM), 2019 WL 959700 (D.N.J. Feb. 27, 2019) ("[M]ere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures"); Parker v. Atl. City Bd. of Educ., Civ. No. 15-8712, 2017 WL 662979, at *3 (D.N.J. Feb. 17, 2017) (declining to "police" the parties' document production where "no party has given the Court reason to believe they will not produce relevant and non-privileged responsive documents"). Plaintiff has produced and continues to produce any and all evidence of Church's unauthorized access to its systems despite Defendants' unsupported claims to the contrary.

Furthermore, the burden this expanded search places on Plaintiff is threefold. First, Plaintiff's first date of collection for ESI was in January 2026, such that Plaintiff would have to determine the load dates for each custodian and do a second round of collection from all custodians to extend the time period.[2] Second, it likely will require the review of thousands of additional documents. Running the term "Church", excluding the murphyorlando domain, from October 15, 2025 through the data currently loaded (approximately January 2026) results in 1,203 hits, and 1,697 hits with

---

[1] Even if the murphyorlando domain is excluded, many communications involve Loop's in-house counsel, Peter Kolevzon, Esq.

[2] This also raises the question of how many more times will Defendants seek to again expand this unwarranted search?

family. It is unknown how many more hits there will be from January through present but given the number of hits in that three-month period and the seven months that has passed since, we anticipate thousands more. Third, because this production will be run during the course of litigation, the resultant review will need to be substantively thorough to exclude all privileged documents, and will require Plaintiff create a lengthy privilege log, as the ESI protocol's logging exception is quite narrow.

Finally, the relief Defendants seek—reneging on other resolved search term disputes—is baseless. Contrary to Defendants' position, there was no "package resolution" whereby Defendants agreed to eliminate certain search terms in exchange for some concession by Plaintiff. The parties negotiated in good faith to avoid Court intervention, and both parties made concessions. Plaintiff supported its objections to the terms Defendants now seek to add back in, Defendants agreed to withdraw them, and they now seek to add them back in simply because Plaintiff refused to concede on its final objection.

Defendants irrelevantly argue of the burden placed upon them given their concessions, but this assertion is disingenuous: as the Court knows from the last case management conference, Defendants are collecting documents, running search terms, and producing, in essence, a "data dump." Consequently, as recognized on the record, the burden of the parties' production, regardless of how many documents each side produces, will primarily fall upon Plaintiff.

For all of these reasons, Defendants' request to modify the ESI protocol should be denied.

## IV. Defendants' Position

Defendants are unfortunately before the Court to present a dispute concerning the search terms Defendants have proposed for Plaintiff's ESI – a dispute Defendants made every effort to avoid and that comes only after months of delay and protracted negotiation.

As the Court may recall, Defendants initially proposed search terms for Plaintiff's ESI in December 2025. Under the ESI Protocol entered by this Court (Dkt. 56), the parties agreed to "provide search term reports run on the parties' eDiscovery platforms to support any of their objections to proposed search terms" and to "meet and confer to negotiate in good faith the narrowing of any such search that yields a large set of data." Exhibits A & B, ¶ 8(a). The burden of justifying an objection thus falls on the objecting party – here, Plaintiff. It took Plaintiff more than four months – until April 27, 2026 – to provide its initial search term reports, and those reports were incomplete and required further supplementation. Even after the reports were provided, Plaintiff was slow to engage on Defendants' proposals, and negotiations extended through the summer. Throughout, Defendants persevered and made concession after concession to bring the process to resolution.

The result is that the parties resolved or narrowed nearly every search term dispute, and they did so overwhelmingly on the strength of Defendants' concessions. Plaintiff retained the benefit of each of those concessions while pressing the single item on which it declined to compromise. The primary remaining issue is Defendants' request that Plaintiff run the term "Church," from September 1, 2024 – days before Church's resignation – to the present. That term matters because Plaintiff has made, and continues to make, serious allegations in its filings to this

Court that Church accessed Loop's systems without authorization after his resignation, including allegations of access events as late as November 2025 and new access-related allegations in Plaintiff's July 2026 filings. Defendants have repeatedly asked Plaintiff to produce the underlying access logs from Loop's systems that would directly address these allegations. Defendants have gone so far as to provide Plaintiff with a video demonstrating how to access the logs and to offer to have Church meet with Plaintiff's current head of IT to explain the process of retrieving them. Plaintiff has declined every one of these proposals, representing that it is unable to produce the logs. If Plaintiff would produce the logs – or withdraw or limit its access allegations – this dispute would not exist. But absent the logs, Defendants need the contemporaneous internal and system-notification communications that the "Church" term is designed to capture.

Plaintiff attempts to craft this dispute as an effort by Defendants to modify the ESI Protocol. Not so. The ESI Protocol expressly contemplates that, with respect to certain search terms, the parties not apply the October 14, 2025 date limitation that applied to most other search terms. "Church" is the only such term, and Plaintiff has known since the ESI Protocol was negotiated and finalized that Defendants sought documents containing the word "Church" beyond October 14, 2025. If Plaintiff is not required to collect past October 14, 2025 with respect to the "Church" search term, the language of Paragraph 6 to Exhibit A is a nullity. Moreover, Plaintiff has greatly expanded the scope of its access allegations since the ESI Protocol was finalized.

As set forth below, Plaintiff has not met its burden under the ESI Protocol (Dkt. 56, Exs. A & B, ¶ 8(a)) to justify its objection to this term.

**A. The Negotiation Record**

The negotiation record is important because it demonstrates both the good faith and reasonableness of Defendants' approach to search terms throughout this process. At every turn, Defendants prioritized resolution over dispute, accepting terms and absorbing volumes far beyond what proportionality requires in order to avoid burdening the Court. The record also underscores how one-sided Plaintiff's refusal to accept a single remaining term truly is.

*Concessions on Defendants' own production.* Over the course of several months, Defendants accepted approximately 200 of Plaintiff's proposed search terms. Many of those terms are broad, standalone words – such as "App," "AI," "Log," "Google," and "Security" – that, in a technology company's mailbox, capture enormous volumes of routine internal communications having nothing to do with this litigation (software deployment updates, security-alert digests, application-monitoring summaries, and the like). Defendants nonetheless accepted them all, and agreed to produce every pre-September 10, 2024 hit without a responsiveness screen, subject only to a limited review for privilege and for documents concerning confidential, unrelated business ventures (and with Defendants providing a log of all excluded documents).

Defendants also proposed common-sense exclusions to reduce plainly irrelevant material, and Plaintiff blocked them. Defendants proposed excluding more than 2,500 machine-generated monitoring notifications from services such as Sentry, Heroku, and New Relic – automated, machine-to-machine alerts with no substantive human content. Plaintiff refused, and Defendants absorbed them. The parties had also previously agreed to exclude emails to and from five automated email addresses used by Defendants' separate, unrelated business projects (e.g., ops-doppled@tanookilabs.com, ops-forebuy@tanookilabs.com), which generate only automated

operational notifications having nothing to do with this litigation. Plaintiff withdrew that agreement, adding 6,852 unique documents to Defendants' review population. Defendants absorbed that as well. And when just this week Plaintiff added entirely new terms after the parties' initial agreement – including "Dopl," the name of one of those unrelated projects – Defendants again accepted them without objection.

*Concessions on Defendants' terms for Plaintiff's ESI.* The asymmetry here is particularly notable in light of Plaintiff's response to the terms Defendants proposed to search Plaintiff's own ESI. Plaintiff objected to Defendants' proposed terms targeting notifications from Plaintiff's software-infrastructure platforms – including Sentry (an error-tracking and application-monitoring tool), Cloudflare (a web-security and content-delivery service), Heroku (a cloud application-hosting platform), New Relic (a system-performance monitoring tool), Datadog (a systems-monitoring service), Semaphore (a build-and-deployment service), and Matrix, Synapse, Element, and Secureframe (Plaintiff's internal messaging and compliance-monitoring systems). Defendants proposed these terms because the automated access logs, account-lifecycle notifications, and permission-change records generated by these platforms are central to Plaintiff's allegations that Church accessed Loop's systems without authorization after his resignation. These automated notification emails are the contemporaneous email record of the very events Plaintiff alleges – the email in lieu of the native logs Plaintiff says it cannot produce. In response to Plaintiff's objections, Defendants withdrew "Sentry" as a standalone term entirely, accepted Plaintiff's restrictive "AND (access OR permission)" limiter on the remaining platform terms, accepted proximity restrictions narrowing Defendants' own "log" and "code" terms (even though "Log" runs as a standalone term without restriction against Defendants), and accepted date cutoffs on Defendants' technical terms proposed for Plaintiff's ESI at June 10, 2025 – well before the period covered by Plaintiff's own most recent access allegations in its July 2026 filings.

The resulting review burden on Defendants is approximately 60,000 unique documents across email and files, drawn from more than 120,000 raw email term hits.[3] By comparison, Plaintiff's own April 27, 2026 search term reports – which have since been significantly narrowed – reflect a total of approximately 46,000 documents (including families), but before deduplication across its three separately reported search term sets. Against this record of concessions, Plaintiff's refusal to accept a single term generating 1203 hits – while Defendants absorb a review set of 60,000 documents without complaint – is difficult to credit.

### B. The Remaining Disputes

The primary remaining dispute concerns one term – "Church" – which Plaintiff has agreed to run ***only*** for the period of September 1, 2024 through October 14, 2025. Defendants request that the search be extended through the present, to cover the full period of Plaintiff's access allegations.

---

[3] Plaintiff's characterization of Defendants' production as a "data dump" is, to put it mildly, disingenuous, as the review and production conducted by Defendants is ***exactly*** what Plaintiff insisted upon – namely that every pre-September 10, 2024 hit be produced without any responsiveness screen. The production Plaintiff now describes as a burden is the production Plaintiff designed.

Specifically, Plaintiff has alleged post-Complaint access events into at least November 2025 and made new access allegations in its July 2026 filings, while simultaneously resisting discovery into the contemporaneous record of those same events. Plaintiff's counsel has acknowledged in correspondence that "nothing else is being run" for the post-October 14, 2025 time period. If Plaintiff's review and collection ends at October 14, 2025 for all terms, then no search Plaintiff runs today can measure the disputed period at all. Put simply, Plaintiff cannot continue to make new access allegations while cutting off all of its own discovery at October 14, 2025.

According to Plaintiff, the difference between Plaintiff's proposal and Defendants' proposal is a total of 1,203 hits, and 1,697 hits with family (for the period October 15, 2025 through some unspecified date in January 2026). Under the proportionality standard of Fed. R. Civ. P. 26(b)(1), this term and the requested extension are eminently reasonable. The reported 1203-hit figure is roughly one-fifth the volume of the single withdrawn exclusion that Plaintiff required Defendants to absorb (*i.e.*, emails to and from ops-doppled@tanookilabs.com, ops-forebuy@tanookilabs.com). The term is directly relevant to the claims and defenses at issue: Plaintiff's unauthorized-access allegations are central to its case, and the term is designed to capture the contemporaneous record of the very access events Plaintiff itself alleges – system notifications, administrator actions, and what Plaintiff's personnel observed in real time regarding Church's post-resignation access to Loop's systems. The importance of this discovery in resolving the issues is high, given that Plaintiff has produced only screenshots and hand-selected excerpts of its logs – not the native logs themselves – and represents that it cannot produce them.

Plaintiff represents in this letter that it will produce all evidence in support of its claims of Defendants access, but that simply does not resolve this issue. First, as stated above, Plaintiff has repeatedly represented that it is unable or unwilling to provide the complete underlying information that would address these claims – namely, complete, native versions of the access logs of Loop's various applications. Those representations are inconsistent with its SOC 2 Type II examination report – which certifies Plaintiff's ability to comply with extensive logging capabilities. And as Plaintiff continues to delay, those logs are overwritten, leaving Defendants to respond to unverifiable screenshots. Second, Defendants are not just entitled to evidence of what Plaintiff claims to be Church's access to its systems; they are entitled to evidence that would show that Church has not improperly accessed its systems as Plaintiff suggests.

Notably, the alleged burden is minimal: 1203 hits is a fraction of what both parties are already reviewing, and the parties' relative access to the information favors production, as this evidence resides exclusively in Plaintiff's systems. Those records either exist or they do not, independent of any litigation. And while Plaintiff asserts some unspecified burden with refreshing its collection to bring the collection through present (even though Plaintiff continues to raise new access allegations arising after the January 2026 collection), Plaintiff has failed to identify with any specificity exactly what that alleged burden would be in terms of cost or volume. Defendants are amenable to the Court setting a reasonable through present date for any refreshed collection and for present purposes suggest July 31, 2026. But Plaintiff should not be surprised or cry foul with respect to Defendants' insistence that it comply with its obligation to collect and produce new responsive information as it becomes available during the course of the litigation. *See Faiella v. Sunbelt Rentals, Inc.*, 341 F.R.D. 553, 563 (D.N.J. 2022) (explaining that "supplementation" for the purposes of Rule 26(e), which requires parties to supplement discovery responses throughout

the discovery period, "means correcting inaccuracies, or filling the interstices of an incomplete [response] *based upon information that was not available* at the time of the initial disclosure" (alteration and emphasis in original) (quotation omitted)).

Defendants made every reasonable effort to avoid bringing this dispute to the Court.[4] In response to Plaintiff's objection that the proposed term run over the requested time period would result in numerous privileged communications, Defendants suggested that Plaintiff exclude its outside counsel's domain from the search results. And Defendants repeatedly asked Plaintiff to propose additional limitations – other than eliminating the term altogether for the time period in question (October 14, 2025 to present) – that would address Plaintiff's concerns, expressly noting that it was not worth the time or expense for either party to bring a dispute over fewer than 2,000 documents to the Court. Plaintiff refused to engage with any of these proposals and declined to offer any counter-proposal of its own to address Defendants' need for the term. Instead, Plaintiff simply maintained its blanket objection.

The authorities Plaintiff cites do not hold otherwise: they concern "drastic electronic discovery measures" such as compelled forensic examination – the very relief Plaintiff separately seeks against Defendants' devices[5] – not a single search term run on a party's own review platform against data already collected and loaded. *See Par Pharm., Inc. v. QuVa Pharma, Inc.*, 2019 WL 959700 (D.N.J. Feb. 27, 2019) (denying plaintiff's request for forensic imaging of defendant's devices in a trade secret litigation); *see also Parker v. Atl. City Bd. of Educ.*, 2017 WL 662979

[4] Defendants withdrew or narrowed their own search terms solely as part of a package resolution of all terms, and offered to keep the entire subject out of Court. That resolution did not conclude the matter. Now that search terms are before the Court, Defendants respectfully request that the Court consider the searches that Defendants agreed to forgo to avoid this dispute – namely: *(Sentry OR Matrix OR Synapse OR Element OR Secureframe OR "New Relic" OR NewRelic OR Datadog OR Semaphore OR Heroku) /25 (access* OR log* OR account* OR credential* OR permi* OR audit* OR token*)* – for 1/1/2020 through 6/10/2025.

By way of background, Defendants originally proposed these platform terms as standalone terms because the automated notifications these services generate are the contemporaneous email record of the access and account-lifecycle events at issue. Plaintiff objected on the basis of hit volume. For "Sentry," Defendants proposed a proximity limiter of this shape to narrow the results to access- and account-related notifications; Plaintiff still refused, and as part of the package resolution – which Plaintiff has rejected – Defendants offered to withdraw "Sentry" entirely and to accept Plaintiff's restrictive "AND (access OR permission)" limiter on the remaining platform terms. Absent the cohesive resolution proposed by Defendants in an effort to avoid burdening the Court, Defendants respectfully submit that these terms should be included so that Defendants receive all relevant documents bearing upon Plaintiff's notification claims.

Notably, Plaintiff has failed to demonstrate any inappropriate burden that would justify eliminating Sentry. Plaintiff's search term reports show Sentry alone at 2,788 total hits – but because Plaintiff reported its three search term sets in isolation, that count does not reflect deduplication against the other sets, and the actual unique volume is unknown and expected to be significantly lower.

[5] Plaintiff has represented that it intends to present its demand for forensic imaging of all of Defendants' devices (at Defendants' expense) to the Court in the near term, even though it nonetheless insisted on robust and voluminous search terms for Defendants' ESI.

(D.N.J. Feb. 17, 2017) (declining to require plaintiff to provide a log of documents it had not produced where defendant offered no basis to believe that plaintiff had not complied with prior discovery orders of the court).

**C. The Claimed Privilege Burden Is Addressed by the Protocol**

Plaintiff has not met its burden under the ESI Protocol (Dkt. 56, Exs. A & B, ¶ 8(a)) to justify its objection to this term. Plaintiff's objection rests on its October 14, 2025 cutoff date for the term, an asserted review burden, and privilege – and none of the three withstands scrutiny.

First, the ESI Protocol already eliminates much of the privilege burden Plaintiff invokes. Pursuant to Section IV(A) of the Protocol, neither party is required to log documents exchanged between a party and its in-house or retained counsel on or after the date of filing of the initial Complaint, provided the entirety of the chain is between the party and its counsel with no third parties present. Plaintiff's outside counsel's domain is already excluded from the count. For any remaining qualifying post-Complaint communications with counsel (including Loop's general counsel Peter Kolevzon), the Protocol eliminates the privilege-logging burden Plaintiff cites.

Second, Plaintiff has not squarely addressed Defendants' core concern: the "Church" term will capture not only internal human-authored emails, but also automated system-notification emails – alerts generated by Loop's software platforms when, for example, a user logs in, permissions are changed, or an account is modified. These machine-generated notifications are not communications made in confidence for the purpose of obtaining legal advice. They are not privileged under any theory, and they bear directly on the access allegations at the heart of this case. Nor are they work product: these notifications are generated by Loop's platforms in the ordinary course of operations. They are not "prepared in anticipation of litigation" by or for any party or its representative, and Rule 26(b)(3) does not reach them or the underlying facts of the access events themselves.

Third, as to the internal human-authored emails that may also be captured, Plaintiff now invokes the common-interest doctrine to treat its internal communications as privileged if made "in furtherance of the litigation," regardless of whether any attorney was involved. That doctrine may preserve an existing privilege between parties who share a common legal interest, but it does not create one. The pendency of litigation does not convert ordinary internal emails into privileged communications. Internal emails are not presumptively privileged simply because they were sent during the pendency of this action. To the extent Plaintiff withholds any documents on privilege grounds, Plaintiff must establish an independent basis for privilege as to each withheld communication. If Plaintiff's position is that its internal documents concerning the alleged access are categorically privileged litigation material, then Plaintiff is representing to the Court that it possesses no non-privileged contemporaneous evidence of the very conduct it continues to allege.

**D. Relief Requested**

Defendants respectfully request that the Court: (1) order Plaintiff to run the "Church" term from September 1, 2024 through the present, excluding communications to or from the murphyorlando.com domain; and to complete its review and production of the results by a date certain, with privilege review and logging as the ESI Protocol provides (or, in the alternative, order Plaintiff to run the term through the full extent of the data it has already collected and loaded, with

production by the same date certain, and to supplement its collection for this term through a final cutoff date to be set by the Court); and (2) order Plaintiff to run the platform-notification terms Defendants agreed to forgo as part of a package resolution that did not conclude the matter – *(Sentry OR Matrix OR Synapse OR Element OR Secureframe OR "New Relic" OR NewRelic OR Datadog OR Semaphore OR Heroku) /25 (access* OR log* OR account* OR credential* OR permi* OR audit* OR token*)* – from January 1, 2020 to June 10, 2025 against its existing collection, with review and production by the same date certain.

*  *  *

The parties thank the Court for its attention to this matter.

Respectfully submitted,

Amanda K. Baker

Amanda K. Baker, Esq.

cc: All counsel of record via ECF