Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
201.489.3000 201.489.1536 fax
—
New York
—
Delaware
—
Maryland
—
Texas
—
Florida
—
Washington, DC

COLE SCHOTZ P.C.

Rachel A. Mongiello
Member
Admitted in NJ and NY

Reply to New Jersey Office
Writer's Direct Line: 201.525.6222
Writer's Direct Fax: 201.678.6222
Writer's E-Mail: rmongiello@coleschotz.com

October 27, 2026

**Via ECF**
Hon. Cari Fais, U.S.M.J.
United States District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street Room 4015
Newark, New Jersey 07101

Re: *Loop HQ, Inc. v. Church et al.*, Civil Action No. 2:25-cv-12562-JKS-CF

Dear Judge Fais:

As the Court is aware, we represent Defendants Jeremiah Church and Tres Comma Compliance, Inc. ("Defendants") in the above-referenced matter. The parties respectfully submit this joint letter related to several outstanding discovery issues.

**Defendants' Introduction:**

These issues have been the subject of extensive meet and confers – most recently on September 17, 2026 (approximately 90 minutes), October 1, 2026 (approximately 75 minutes), and October 15, 2026 (approximately 45 minutes) – and months of correspondence. Many of the issues addressed in this letter are the same issues that Defendants referenced in prior letters filed with the Court over the last several months. (*See, e.g.*, Dkt. 79, July 27, 2026 Letter, at p. 2 & Ex. A (reporting that Plaintiff had not responded to counsel's July 6, 2026 email detailing many of these same issues); Dkt. 85, August 13, 2026 Letter, at p. 6 (Plaintiff "is unable or unwilling to provide . . . complete, native versions of the access logs of Loop's various applications."); Dkt. 86, August 13, 2026 Letter, at p. 10 (noting that as of August 13, 2026, Plaintiff still had not fully responded to the issues raised in Defendants' July 6, 2026 and July 21, 2026 emails – which are largely the same issues set forth in this letter); Dkt. 90, September 30, 2026 Letter, at p. 3 (reporting that Plaintiff had refused to confirm the parties' understanding following the meet and confer and had failed to respond to the issues set forth in this letter). Over the last few months, Plaintiff has attempted to delay resolution of these issues by refusing to provide a response as to its position, notwithstanding numerous meet and confers on these very issues. These issues must be resolved sooner rather than later, particularly in light of the entered scheduling order and the fact that several

issues – such as the resolution of the search term dispute (*see* Dkt. 85) – are dependent on what Plaintiff does or does not provide in response to the issues set forth below. [1]

Plaintiff's contention that the parties' agreed-upon February 15, 2027 substantial completion deadline obviates the need for interim deadlines is simply wrong. The substantial completion deadline was designed to address the custodial documents that are being reviewed pursuant to search terms. The issues in this letter fall outside of the search term requests – and the Court previously ordered the parties to complete the production of collected documents that are not in dispute by June 30, 2026. (*See* Dkt. 69). Moreover, since the last conference, Plaintiff has not moved this case forward in any respect: it has produced zero documents, and even though the vast majority of the issues in this letter were percolating for months before that conference, Plaintiff still has not provided responses. What is produced in response to these requests will also dictate what other discovery is needed – most obviously, whether the search term "Church" must be run in order to capture materials that Plaintiff does not dispute are relevant. Plaintiff's proposal to leave these items open-ended indefinitely would push all of this to the eve of depositions.

[1] Defendants do not wish to burden the Court with a dispute about the drafting process itself, and they respond only briefly to Plaintiff's footnote 3. Plaintiff's accusation of "gamesmanship and abuse of the process" is baseless, and Defendants take strong exception to it. Defendants have done nothing more than try to bring long-pending issues before the Court in an orderly way. Defendants first circulated this letter more than a month ago, on September 25, 2026. Plaintiff understood throughout that the goal was to file it before tomorrow's conference. Indeed, Plaintiff's counsel assured Defendants on October 19, 2026 that the letter would be ready to file in advance of the conference, and Plaintiff never objected to that timing until today. Each later version was prompted by new positions in Plaintiff's inserts. Plaintiff's October 26, 2026 inserts, for example, raised a new, outright objection to producing its current source code, a new offer regarding its share ledger, and a new explanation for the deficiencies in Plaintiff's prior Matrix log export. Defendants' October 27, 2026 revisions responded to those new positions. Nor did Defendants intend to file this joint letter unilaterally. When Plaintiff indicated this morning that the letter would not be finalized before tomorrow's conference, Defendants intended only to give the Court a short explanation of the issues that need to be discussed, so that the conference could be productive. The letter's length is not a sign of any abuse of the joint letter process. It reflects the number of issues that remain open, many of them for months, and Plaintiff's delay in resolving them. Defendants regret that, under those circumstances, the Court's page-limit preference could not be met. They have endeavored to present the issues as concisely as possible and respectfully refer the Court to the prior letters cited herein for additional detail. Defendants are prepared to supplement should the Court require further information or briefing. Defendants have sought firm dates for one reason: efficiency. Since the September 2, 2026 conference, Plaintiff has not produced a single document and has given no date for any of the items it has agreed to provide. Defendants' only goal is to move these issues forward and to make tomorrow's conference productive.

Nor do Plaintiff's additions to this letter clarify where things stand. Although Plaintiff repeatedly states that it has "agreed" to produce materials, it does not commit to a date for any item, and many of its commitments are qualified or vague – it will produce "whatever information exists," "once complete," or "forthwith," but "cannot represent what information outside of the report itself, will be provided." Where Plaintiff does not agree, its position appears to be that the requests are not relevant but that it will nonetheless get back to Defendants. Defendants have been hearing the same open-ended assurances since July. A date certain is the only way to convert them into actual productions.

**Plaintiff's Introduction:**

Plaintiff's counsel met with defense counsel in good faith on September 17, 2026, for nearly two hours over roughly 70 issues raised by defense counsel, including 21 document requests and 50 follow up emails that were the product of informal requests made by Defendants. After much back and forth between the parties, the outstanding issues culminated in the September 17 meet and confer which addressed each item. During this meet and confer, Plaintiff's counsel confirmed it would get back to defense counsel on many items, defense counsel agreed and sent a follow-up email that they would like a response to certain issues in two weeks and several others in three. Nonetheless, defense counsel then served this dispute letter, ignoring the conversations that took place during the meet and confer and completely undermining it. When Plaintiff's counsel raised these concerns with defense counsel and informed defense counsel that Plaintiff was out for a week due to the Jewish holidays, defense counsel disregarded Plaintiff's position and informed counsel that the dispute letter would be filed regardless, but then ultimately held off filing immediately.

The parties subsequently met and conferred on October 2, 2026, and October 15, 2026. In advance of the October 15 meet and confer, at defense counsel's request, Plaintiff's counsel even summarized Plaintiff's starting positions for the upcoming meet and confer and addressed at the meet and confer all of Defendants' outstanding issues with Plaintiff's intent to de-designate certain documents, set a date certain for a substantial completion of discovery, produce certain documents, provide access logs and retention policies for all systems requested, provide native documents for certain produced documents, provide additional information related to produced access logs, confirm redacted material on previously produced documents, and agree to supplemental interrogatories.

Defendants now request that the Court impose specific deadlines on everything Plaintiff stated it would do / produce that are not tied to any substantial need and that are not practical given the sheer number of requests Plaintiff has committed to in good faith, as is evident from the length and subject matter of this dispute letter. Plaintiff continues to be responsive to the ever-incoming voluminous requests that Defendants send on a regular basis, many of which are completely irrelevant to the claims and defenses in this action, to further cooperation and minimize the need for Court intervention. Because of these efforts, few disputes come before the Court and false deadlines for certain requests may appear reasonable. However, these disputes together with the

actions Plaintiff has already committed to in good faith render these deadlines impractical.[2] Furthermore, these deadlines are unnecessary because Plaintiff is well within the discovery period and has agreed to a February 15, 2027, deadline for the production of documents not subject to privilege review, assuaging Defendants' previously expressed concern that Plaintiff would wait until the close of discovery to make a substantial production. The Court's intervention is unnecessary given the actions Plaintiff has agreed to and the stage of discovery.

Furthermore, Plaintiff has attempted to keep its responses brief so to keep this Letter within the Court's previously ordered page limit. Plaintiff will provide more detailed responses and brief any items if the Court so wishes.[3]

---

[2] Notably, more than half of this letter refers to disputes not connected to any specific discovery request but arise from the barrage of requests and follow-up requests from Defendants via email. Despite the irrelevance of many of Defendants' requests, Plaintiff continues to respond in good faith and in due course within the discovery period. Nothing further is required of Plaintiff and Plaintiff reserves its right to seek a protective order should Defendants continue to circumvent the scope of permissible discovery.

[3] While Plaintiff has tried to abide by the Court's preferences, including its preference for joint letters, the numerous iterations of this dispute letter, which largely deals with Defendants' desire to place arbitrary deadlines on Plaintiff constitutes gamesmanship and abuse of the process. Through abusing your Honor's preference for joint letters, Defendants have continued to waste time and resources by requiring multiple versions and rounds of edits to every single document produced to Your Honor. The sheer number of disputes and inability to stay within the Court's stated 5-page limit is representative of Defendants practice of inappropriately emailing demand after demand and purported deficiencies after every good faith effort to resolve. For example, the original dispute letter was provided to Plaintiff's counsel on September 25. Defense counsel responded on October 5. An updated version of the letter was provided to Plaintiff's counsel on October 15 with Defense counsel giving Plaintiff a deadline for any changes by October 16. Plaintiff provided its changes on October 22. Defense counsel provided a new version of the letter on October 23 and gave Plaintiff a deadline of Monday, October 26 to respond. Despite Ms. Rydarowski preparing and attending an ongoing trial in Mercer County, Plaintiff's counsel was able to oblige Defendants' Monday deadline as requested. On Tuesday, October 27, Defendants sent Plaintiff a new version of the letter yet again. When Plaintiff's counsel informed Defense counsel that it would not be able to review the new changes to the letter, Defense counsel asked if Plaintiff consented to the filing of the letter without Plaintiff addressing any of the changes, which Plaintiff declined. In response, Defense counsel informed Plaintiff that if they did not receive Plaintiff's insert by 2:30 p.m., they would file a unilateral letter to the Court.

**1. Plaintiff's Responses to Defendants' Second Set of Document Requests**[4]

**Defendants' Position:**

Plaintiff served blanket boilerplate objections to all 21 requests on July 27, 2026 – asserting irrelevance, disproportionality, and "not reasonably accessible" without identifying any specific system, burden, or cost – and, apart from pointing to two previously produced SOC 2 reports, made no new production. Defendants request the Court compel Plaintiff to produce documents in response to the following:

**(a) *Platform and Website Analytics (Requests 1–13).*** These requests seek analytics relating to external engagement with Loop's products and services from Loop's third-party cloud-based (SaaS) platforms and from Loop's own domains (loophqcompliance.com and loophq.com – which Loop has published through its account with Webflow), as well as plan/retention information relating to those accounts/platforms. Loop distributes marketing and investor materials through shortened links and data rooms hosted on these platforms. The analytics – including visitor counts, unique viewers, click-throughs, downloads, and sharing activity – bear directly on the commercial viability of Loop's product and its claimed damages. If virtually no one is engaging with Loop's materials, that bears on the value of what Defendants allegedly misappropriated. Indeed, Plaintiff itself has relied on this data, and therefore has access to it. In its verified answer to Interrogatory No. 24 (repeated in its Second and Third Amended answers), Plaintiff states that its Compliance one-pager "was accessed about five times after September 9, 2024." Whatever the subject of the interrogatory, that sworn access count had to come from analytics data. Defendants asked Plaintiff to produce the data supporting that statement (*see* Ex. B, described *infra*), but Plaintiff has not responded. Plaintiff's claim that it lacks "the type of data plan" to respond to Requests 1-8 is likewise inconsistent with that sworn answer and, in any event, too vague to evaluate. Plaintiff has not identified which platform or plan it means or what data is unavailable, and its agreement to produce DocSend and Loom analytics confirms that responsive data exists. Nor can Plaintiff avoid production by declining Church's offer to pay for an upgrade.

In an effort to narrow the dispute as to these Requests, Defendants have offered to limit the requested information – namely visitor analytics exports and plan/retention information – to the following platforms/repositories: Dropbox, DocSend, Loom, and Webflow. Plaintiff has agreed to produce analytics for Loom and DocSend (a Dropbox product) but has not committed to providing the requested information with respect to Dropbox[5] or Webflow. Contrary to Plaintiff's

---

[4] Plaintiff's July 27, 2026 Response to Defendants' Second Set of Requests for Production is attached hereto as **Exhibit A**.

[5] As to Dropbox, Defendants ask only that Plaintiff confirm whether any of its shortened links point to Dropbox files outside DocSend and, if so, produce those analytics.

characterization, Defendants seek visitor counts and engagement data, not individual users' complete browsing histories.

Defendants respectfully request that the Court order Plaintiff to produce the responsive information for DocSend, Loom, and Webflow, and to provide the Dropbox confirmation and any resulting analytics described in note 5, by a firm deadline. Any redaction of investor identities from those exports must preserve the ability to distinguish unique from repeat visitors and to segregate visits attributable to Church or defense counsel; Plaintiff may replace investor identities with consistent pseudonyms.

**Plaintiff's Position:**

Defendants initially requested these access logs to challenge Plaintiff's designation of marketing decks and investor information material. Now that the material has been de-designated, Defendants now purportedly seek these logs to somehow ascertain the commercial viability of a product and determine the damages based upon the number and identity of visitors to a website or document when no such representation has been made that these documents or sites are being used for those purposes is ridiculous.

The visitation logs for these documents and website are irrelevant to this case and the request for the Court to compel production of documents from Plaintiff is premature. The parties met and conferred on September 17, 2026, and discussed each of the twenty-one alleged deficiencies identified by Defendants. Defendants' supplemental document requests are of such an abstract and technical complexity that Defendant Church was present on the meet and confer call to assist his counsel in explaining what Defendants were even, in fact, requesting. During this meet and confer, Plaintiff's counsel stated that it would check the burden with Plaintiff for Requests 1-10 and then provide Defendants with a response. With respect to Requests 11-13, Plaintiff's counsel represented that it would present Defendants' arguments regarding the relevance of the Requests to Plaintiff and return with a response. Plaintiff's counsel subsequently met with Plaintiff and provided these responses at the October 15 meet and confer:

(a) **Request Nos. 1-13.** With respect to Requests 1-8, Plaintiff informed Defendants at the September 17 meet and confer that Plaintiff does not have the type of data plan that has the information Defendants seek. In response, Defendant offered to pay for an upgrade of the system, which Plaintiff's counsel proposed to Plaintiff, and Plaintiff declined. As such, the Requested information is not within Plaintiff's care, custody, or control. Despite disagreeing as to the relevancy of these requests, in order to satisfy Defendants' expressed need for these documents, Plaintiff agreed to provide analytics from Loom and Docsend (the latter of which Defendant Church stated is the "same thing" as Dropbox), which are the systems in which the documents reside that are accessed through the bitly links. Defendants, however, also want Webflow analytics, so they can analyze every single user and the complete history of each user's perusal of Plaintiff's Compliance and Consumer product websites.

Moreover, Defendants' inference above that Plaintiff's response to Interrogatory No. 24 supports their request for Plaintiff's analytics is misguided. The referenced Interrogatory sought information regarding Plaintiff's reference to Defendant Church as Plaintiff's employee and CTO after his resignation. The response provided by Plaintiff in no way relied on those analytics as evidence of marketing reach, investor/client interaction, nor value of Plaintiff or its products.

**Defendants' Position:**

**(b)** ***Litigation Hold and Preservation (Request 16).*** Plaintiff objected in writing to producing documents concerning whether it implemented a litigation hold for the analytics, access logs, and platform data at issue, but then agreed at the September 17, 2026 meet and confer that it would produce "whatever is non-privileged" – without agreeing to any date for the production. More than a month later, Plaintiff still will not even say whether a hold exists. Given Plaintiff's repeated claims that certain logs do not exist or are unavailable, whether and when it took steps to preserve this data is directly relevant. Plaintiff should be directed to produce these materials by a firm deadline.

**Plaintiff's Position:**

**(b) Request No. 16.** Plaintiff's counsel informed Defense counsel that it will produce whatever information exists that is non-privileged. This item is not appropriate for a dispute letter, as there is no ongoing dispute. Plaintiff is well within the appropriate discovery timeframe, is actively working on providing the requested information, and as such, no Court intervention or firm deadline is necessary.

**Defendants' Position:**

**(c)** ***Fragin Compensation Records (Request 17).*** Loop's board minutes reflect that CEO Greg Fragin was entitled to a "salary" of $300,000 per year starting as early as 2022 – yet Plaintiff repeatedly represented to the Court, in its Verified Complaint (which Fragin himself verified), and in verified interrogatory responses that Church was Loop's sole employee. Plaintiff's contention that these records are "not related to any claim or defense" is simply wrong; they bear directly on several claims and defenses that Loop itself has placed at issue – none of which Plaintiff addresses. *First*, Church's counterclaim alleges that Loop breached his Employment Agreement by failing to pay him for eighteen pay periods – approximately nine months – before his resignation. (Dkt. 26, Counterclaim ¶¶ 19, 42-45). In response, Loop has asserted that it "substantially performed," acted "in good faith . . . at all times," and that its performance was excused by "[i]mpossibility and impracticability." (Dkt. 28, Affirmative Defenses Tenth, Twenty-fourth, Thirty-fourth). If Loop was paying – or accruing a $300,000 salary for – its CEO and controlling stockholder while withholding Church's wages, then Loop's nonpayment of Church was a choice, not an impossibility, and Plaintiff's good-faith and substantial-performance defenses fail. *Second*, two weeks after Church resigned, Loop suddenly found the funds to pay his entire back salary in a

single lump sum. (Dkt. 26, Counterclaim ¶¶ 44-45). Fragin's compensation, payroll, and bank records will show whether those funds were available all along and were instead being directed to, or reserved for, Fragin. *Third*, Defendants contend that Loop's prior material breach of the Employment Agreement renders the non-compete – the centerpiece of Loop's contract claims – unenforceable. (Dkt. 26, Eighth, Fifteenth Separate Defenses). Whether Loop continued to compensate its CEO while failing to pay its only employee goes directly to the materiality and willfulness of that breach. *Fourth*, Plaintiff seeks punitive damages, alleges that Church owed fiduciary duties of "good faith, loyalty, due care, and candor" to Loop and its shareholders, and avers that Loop "dealt fairly with Church" in connection with its obligations under the Employment Agreement. (Dkt. 1, ¶¶ 136, 139, 154). Defendants, in turn, assert unclean hands. (Dkt. 26, Fourth Separate Defense). How Loop's board – controlled by Fragin and his family – treated Fragin's compensation compared with Church's is plainly relevant to those issues. *Fifth*, Plaintiff claims that its alleged trade secrets derive value from "the efforts expended by Loop to create the information" and seeks damages for actual loss, unjust enrichment, and lost profits. (Dkt. 1, ¶¶ 99, 106, 163). Loop's actual expenditures and obligations – including a $300,000 annual salary for its CEO – are central to Loop's true financial condition, the cost of developing its alleged trade secrets, and whether Loop could ever have realized the profits it claims to have lost. *Sixth*, these records bear on the credibility of Loop's sworn representations, and of Fragin as the verifying witness, given that Loop has now offered at least three inconsistent accounts of Fragin's status: a salaried CEO (per the board minutes), a non-employee never on payroll, and a "consultant." If Fragin was compensated, there should be payroll records, bank records, or corporate authorizations reflecting that. If he went without payment, there should be evidence that the accrued compensation is reflected as a payable on Loop's financial statements. Either way, responsive documents exist and should be produced. And if, as Plaintiff now claims, Fragin "was never an employee," has never been on payroll, and "was and continues to be a consultant," then any consulting agreement, invoices, tax-reporting records (*e.g.*, Forms 1099), and payment records are responsive and should be produced. Plaintiff's generic reference to financial statements – which, based on Defendants' review, do not contain this information – is not sufficient. If records addressing these precise issues were in fact produced, Plaintiff should direct Defendants to them by Bates number.

**<u>Plaintiff's Position:</u>**

(c) **Request No. 17.** Plaintiff maintains that the requested "compensation records" for Greg Fragin are not related to any claim or defense in this case. Additionally, Greg Fragin was never an employee of Plaintiff, rather, he was and continues to be a consultant. Plaintiff has already produced all relevant non-privileged financial documents.

**<u>Defendants' Position:</u>**

**(d) *Church Employment Characterization Records (Request 18).*** Loop has claimed in this action that Church was not simply its lead developer but its Chief Technology Officer – an officer-level position; Church disputes that he was ever formally Loop's CTO. Documents

concerning Loop's characterization of Church are therefore relevant and should be produced. Defendants requested very specific categories of documents, including Loop's Form 1125-E (Compensation of Officers) for each tax year, communications with Loop's accountants and tax preparers relating to its tax returns, and Loop's engagement materials and questionnaires with its accountants. Plaintiff's production from its own files to date consists of a mere 414 documents – none of which include any Form 1125-E or any communications or engagement materials with Loop's accountants or tax preparers. Plaintiff plainly has not produced everything responsive, which is why it will neither certify that it has done so nor address these categories head on. Plaintiff's response about Church's title misses the point. Request 18 does not ask the Court to resolve Church's title; it seeks the records showing how Loop actually treated Church for tax and accounting purposes, including its Forms 1125-E and its communications with its accountants. Moreover, Rule 34(b)(2)(C) requires Plaintiff to state whether it is withholding any responsive materials on the basis of its objections. Plaintiff has not done so. Plaintiff should be ordered to search for and produce these specific records by a firm deadline or, alternatively, to affirmatively state that they do not exist.

**<u>Plaintiff's Position:</u>**

(d) Request No. 18. Church's title is not genuinely in dispute. The Board appointed Church as Loop's Chief Technology Officer (P_083761, April 18, 2024 minutes), and Church held himself out as CTO, including in his June 24, 2024 letter to shareholders titled "A Message from Our CTO" (P_083784). Plaintiff has consistently represented that it has already produced any responsive documents to this request and has also informed Defense counsel that it would not certify that there are absolutely no records that exist that have not been produced, because Plaintiff cannot guarantee that there are no responsive documents that have not yet been discovered. Plaintiff's counsel will continue to fulfil its duty to produce responsive materials if any additional items are discovered.

**<u>Defendants' Position:</u>**

**(e) *Current and Former Source Code (Requests 19–20).*** These requests seek Loop's current source code and documents reflecting changes since September 10, 2024. This issue was the subject of the parties' August 13, 2026 joint discovery dispute letter (Dkt. 86, pp. 3-5), wherein Defendants set forth their position in detail. To summarize: Plaintiff must demonstrate that its alleged trade secrets have independent economic value, and whether and how the code has changed since Church's departure bears directly on that showing. (Dkt. 86 at 4 (citing 18 U.S.C. § 1839(3)(B); *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 771-72 (4th Cir. 2023); *Fox Sports Net N., LLC v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003); *Legacy Roofing Servs. LLC v. Fusco*, 710 F. Supp. 3d 553, 567-68 (N.D. Ohio 2024)).) Plaintiff's effort to distinguish these cases on their facts misses why they are cited: each stands for the undisputed principle that outdated information has no independent economic value. Indeed, Plaintiff's own description of *Fox Sports* confirms the point – the information there was obsolete because of what

came after it. Whether the code Church allegedly took has since been replaced is therefore central, and only the current code can answer that question.

Plaintiff's relevance arguments do not withstand scrutiny. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021), reversed a Rule 12(b)(6) dismissal based on pleaded allegations; it did not address discovery of later versions of code. And while Plaintiff correctly acknowledges that it must show its code was a trade secret at the time of the alleged misappropriation, the inquiry does not end there. Whether that code still derives independent economic value from its secrecy – or has since been superseded in Loop's current code – bears directly on whether Loop possesses a protectable trade secret, on its claimed damages, and on the relief it seeks. *See Fox Sports*, 319 F.3d at 336 ("obsolete information cannot form the basis for a trade secret claim because the information has no economic value"); *Legacy Roofing*, 710 F. Supp. 3d at 567-68 (same).

Plaintiff seeks a permanent injunction (Dkt. 1, ¶¶ 108-110 & Prayer ¶ f), and N.J.S.A. 56:15-3(a) – the very provision Plaintiff invokes – requires that such an injunction "be terminated when the trade secret has ceased to exist," subject only to a reasonable additional period to eliminate any resulting commercial advantage. *MicroStrategy, Inc. v. Business Objects, S.A.*, 661 F. Supp. 2d 548 (E.D. Va. 2009), shows why Loop's current code matters. Applying Virginia's materially identical provision, the court dissolved a trade secret injunction because the misappropriated version of the plaintiff's competitive-strategy document, although a trade secret when it was taken, had become "antiquated" given "the rapid pace at which the technology changes" – the plaintiff had since "updated and added to" the document, and the products it addressed had been "replaced with newer, different, and improved products." *Id*. at 552-55. The court reached that conclusion by examining how the plaintiff's products and the document itself had changed since the misappropriation. *Id.* The same inquiry is required here: whether the September 2024 code remains a trade secret, and how much of it remains in Loop's current product, bears on the scope and duration of the relief Plaintiff seeks as well as on the independent-economic-value element it must prove. 18 U.S.C. § 1839(3)(B). That comparison cannot be made without Loop's current code.

Plaintiff attacks an argument Defendants do not make. Defendants do not contend that the September 2024 code lacked value. Plaintiff seeks a permanent injunction, and N.J.S.A. 56:15-3(a) makes the secret's continued existence and any remaining commercial advantage relevant to the scope and duration of that relief. Plaintiff's assertion that it markets the "same compliance product" says nothing about whether the underlying code has changed – which is precisely what only the current code can show.

At the September 2, 2026 conference, the Court directed the parties to meet and confer based on Plaintiff's representation that there was in fact a reason to meet and confer again on this. The parties have done so but unsuccessfully; while Plaintiff has agreed to produce its source code

as of September 2024 pursuant to a protocol,[6] Plaintiff still will not agree to produce its current source code or documents reflecting changes to its source code since September 2024. Plaintiff now objects outright to producing its current code and threatens to seek a protective order "if a motion were brought" – overlooking that this letter is that motion. The time for resolution is now. Defendants respectfully request the Court compel production of Plaintiff's current code, its code as of September 2024, and repository history reflecting changes to Plaintiff's source code between September 2024 and the present. Plaintiff's assertion that Church "cannot be trusted" is no basis to withhold relevant discovery – and misses the mark in any event, because the contemplated source code protocol would sharply restrict access to the code and would bar Church himself from viewing it.

**Plaintiff's Position:**

(e) **Request Nos. 19-20.** Plaintiff agreed to produce its source code as it existed at the time of the misappropriation in September 2024 subject to an appropriate protocol that will be finalized once Plaintiff retains the appropriate expert, which it has taken steps to do. Plaintiff has not agreed to produce its current code and objects to doing so; any request to compel its production is disproportional to the needs of the case, and if a motion were brought Plaintiff would seek a protective order. The relevant trade secret acts measure misappropriation by the defendant's acts of acquisition, disclosure and use, 18 U.S.C. § 1839(5); N.J.S.A. 56:15-2, and New Jersey's statute expressly contemplates that a trade secret may later "cease[] to exist" — providing that the consequence is the duration of injunctive relief, which may continue "to eliminate commercial advantage" derived from the misappropriation — not the loss of liability or damages. N.J.S.A. 56:15-3. Furthermore, the Third Circuit has made clear that "trade secret misappropriation is harm": a trade secret's value derives from its secrecy and "depreciates or is eliminated altogether" when a competitor obtains and uses it without consent, whether or not the competitor has yet launched a competing product. Oakwood Labs LLC v. Thanoo, 999 F.3d 892, 913–14 (3d Cir. 2021). The injury here was complete when Church took Plaintiff's code in September 2024. Plaintiff's current code is therefore irrelevant to whether the code Church took in September 2024 was a protectable trade secret. Defendants' demands that Plaintiff also produce its current code are nothing more than a veiled attempt to get their hands on more of Plaintiff's trade secrets. As the Court will recall, after telling the Court in a certification that he did not have any of Plaintiff's data, Defendant Church's attorney, Cole Schotz P.C., submitted a letter notifying Plaintiff that Defendant Church's agent had returned a zip file containing nearly three gigabytes of Plaintiff's

[6] Defendants provided Plaintiff with a draft of a proposed source code protocol on July 22, 2026. Now, more than three months later, and despite obtaining additional time beyond the Court's October 2 deadline to obtain its expert's feedback (Dkt. 90), Plaintiff still has not responded to Defendants' draft and instead advised on October 15, 2026 that it still has not retained an expert. Defendants respectfully request that the Court set a new deadline for submission of the protocol or dispute letters concerning it.

proprietary data including the compliance product's source code without having received any authorization. Accordingly, Defendant Church cannot be trusted with such sensitive materials.

Moreover, while Defendants cite cases, those cases do not say what Defendants purport them to. Not only are the cases cited by Defendants not instructive or controlling, but they are also not even persuasive as they deal with completely different issues that are not analogous to the instant case and any reliance on them by Defendants is misplaced. To the extent that Defendants rely on cases such as Synopsys, Inc. v. Risk Based Sec., Inc., 70 F.4th 759, 771-72 (4th Cir. 2023); Fox Sports Net N., LLC v. Minn. Twins P'ship, 319 F.3d 329, 336 (8th Cir. 2003), Legacy Roofing Servs. LLC v. Fusco, 710 F. Supp. 3d 553, 567-68 (N.D. Ohio 2024) and MicroStrategy, Inc. v. Business Objects, S.A., 661 F. Supp. 2d 548 (E.D. Va. 2009),those cases are not only not binding on this Court, but the facts in those cases are clearly distinguishable from those in the instant matter.

In Synopsys, Inc. v. Risk Based Sec., Inc., the Court was tasked with determining whether there was any economic value from items identified as trade secrets where the owner of those purported trade secrets failed to show any evidence that the "trade secrets" had value because they remained secret. Defendants have not made that argument, because they cannot, and as such, this case is irrelevant to the analysis regarding Plaintiff's current source code.

Similarly unsupportive of Defendants' case is Fox Sports, which deals with a former General Manager of a baseball team who possessed knowledge of the team's financial agreements while he was with the team. The information was never considered or marked as "confidential" nor was it immediately used by the former General Manager to get a head start. The former General Manager's knowledge of the finances was deemed "obsolete" and "not trade secret[s]" because by the time the information was used, it was outdated due to subsequent financial agreements that were entered into by the team once the General Manager left, which meant that the information possessed by the former General Manager did not have any independent economic value. 319 F.3d at 336. In that case, the information was obsolete when it was used – here, Defendant Church misappropriated Plaintiff's current code as of September 2024 and immediately began setting up his own competitive company using that code.

Defendants next rely on Legacy Roofing Servs. LLC v. Fusco, which dealt with a preliminary injunction. 710 F. Supp. 3d, 553, 567-68 (N.D. Ohio 2024). There, the Court was comparing information related to bids (the alleged trade secrets) that a roofing company provided to specific customers. Id. In its decision, the Court noted that each roofing job in question required significantly different scopes of work, including the built-in costs of materials, the market demand, and geographic issues. Id. These differences meant that "roofing proposals for one project are inherently not transferable to other roofing projects." Id. at 568. Again, this case does not support Defendants' argument that they are entitled to Plaintiff's current source code.

Finally, Defendants offer MicroStrategy, Inc. v. Business Objects, S.A., purporting it to confirm their arguments that Plaintiff's code at the time that it was misappropriated by Defendant

Church had no value then, or alternatively, that even if it had value when it was taken, it no longer has any value. The facts in MicroStrategy are not analogous to the instant matter, though. See 661 F. Supp. 2d 548 (E.D. Va. 2009). There, MicroStrategy argued that a "playbook" it created that outlined strategies for how to counter business from its competitor, Business Objects. The court there held that the "playbook" that MicroStrategy created was a trade secret at one point, but it subsequently lost its value because the products that the "playbook" addressed were no longer sold on any market by Business Objects. Id. at 555. Because the products that the playbook was created to address were no longer sold, the playbook itself became obsolete. Those facts are nowhere near similar when looking at what is truly in dispute in this case.

Here, Plaintiff spent millions of dollars developing a code for its Compliance Product. That code was misappropriated by Defendant Church. At the time of that misappropriation, the code was a trade secret which had independent value that Defendant Church immediately benefitted from by utilizing it to jump start his own competitive product. The source code that Plaintiff created is not analogous to the "playbook" at issue in MicroStrategy and neither is the requested relief. Plaintiff seeks damages for the harm that Defendant Church caused when he misappropriated Plaintiff's source code. Furthermore, unlike MicroStrategy, Plaintiff's source code is and always has been contemplated for its Compliance Product. Id. ("[N]ot only are the Business Objects and MicroStrategy products referenced in the Competitive Recipe obsolete, they have been replaced with newer, different, and improved products, not contemplated by the Competitive Recipe."). In fact, Plaintiff continues to market the same compliance product that was contemplated when Defendant Church took Plaintiff's code in September 2024.

**Defendants' Position:**

***(f) Materials Related to SOC Reports (Request 21).*** In its written response (Ex. A), Plaintiff claimed to have produced all responsive materials. However, as confirmed during the September 17, 2026 meet and confer, additional responsive materials exist, which Plaintiff agreed to produce. Plaintiff has agreed to produce the April–June 2026 SOC 2 Type II report and produced an earlier version of the report, but Request 21 also expressly covers the auditor communications, management assertions, and exception responses relating to those reports, none of which Plaintiff has agreed to produce. Plaintiff's statement that it "cannot represent what information outside of the report itself, will be provided" is no answer. These materials exist independently of the final reports – for both the most recent report and the prior report – yet Plaintiff has neither produced them nor acknowledged their existence. Plaintiff should be compelled to do so by a firm deadline.

**Plaintiff's Position:**

(f) **Request No. 21.** Plaintiff stated it will produce the report. The remaining items were not discussed on the meet and confer and because Plaintiff has only just received this report from the vendor, it cannot represent what information outside of the report itself, will be provided.

**2. Fragin's "Ledger Spreadsheet"**

**Defendants' Position:**

Defendants have sought Loop's cap table and records of Loop's ownership and Church's equity interest since October 2025. What Plaintiff has produced is, by its own counsel's admission at the September 17, 2026 meet and confer, not a cap table but a share ledger in PDF format – one that does not even reflect Church's 8,704 shares referenced in Plaintiff's interrogatory responses. Defendants have identified these deficiencies for months. In a June 25, 2026 email, Defendants described what Plaintiff had produced as "a summary of share purchases or a price tier roll up," not a cap table, and sent Plaintiff a sample cap table showing "shares per holder, by security class, with outstanding vs. fully-diluted shares, prices, vesting, and ownership percentage." Contrary to Plaintiff's claim, Defendants have specified *exactly* what they seek.

Plaintiff has conceded that what it produced is a "summary spreadsheet" that it "created" for this litigation – not a document kept in the ordinary course. Plaintiff's counsel further admitted at the September 17, 2026 meet and confer and thereafter that CEO Greg Fragin maintains a "ledger spreadsheet" – apparently different from the ledgers Plaintiff has produced – that he regularly updates. Plaintiff has since called that document a "general ledger" and now calls it Mr. Fragin's "personal working file." Plaintiff keeps changing its description of the document, but it has never denied that the document exists. Plaintiff's arguments with respect to this document keep shifting as well. Plaintiff first argued that it had already "produced all of the relevant info," that the spreadsheet is unlike Defendants' sample cap table, and that Defendants should themselves "create" what they need from Plaintiff's other productions. Plaintiff now confirms that the ledger it relies on was "prepared" for this litigation and offers only to re-produce it in native form, while still withholding the one document Mr. Fragin actually keeps.

None of these arguments has merit. Loop itself has made Church's status as a shareholder central to its claims, alleging that Church breached the Shareholder Agreement and owed fiduciary duties to Loop and his "fellow shareholders" (Dkt. 1, ¶¶ 33-35, 136, 149-151), and Church's contractual rights as a shareholder – including his right to participate in any sale of shares in an institutional financing – turn on Loop's capitalization. The ledger spreadsheet is the only document that reflects Loop's own, contemporaneous understanding of Church's equity. It will also reflect shares issued to insiders, including shares issued in exchange for insider notes and loans (*see* Section 4(c), *infra*), and the capital Loop actually raised – which bears directly on Loop's claimed damages, the purported value of its alleged trade secrets, and Defendants' position that Loop was never adequately capitalized. Plaintiff's confidentiality concerns are fully addressed by the Discovery Confidentiality Order and by Defendants' offer to accept the document with other investor names redacted, so long as it includes Church's and all insiders'/officers' holdings.

Plaintiff's remaining objection contradicts itself: Plaintiff concedes that Mr. Fragin's workbook "contains a range of other material," yet calls it "duplicative" of what Plaintiff has produced. It cannot be both. If the workbook contains information beyond Plaintiff's litigation

summary, it is not duplicative; and any confidentiality concern is addressed by the Discovery Confidentiality Order and Defendants' offer to accept redactions of non-party investor names. Nor does Rule 26(b)(2)(C)(i) apply: it permits limiting discovery obtainable from a more convenient source, and a summary Plaintiff created for this litigation is no substitute for the record Loop actually keeps. Neither Plaintiff's suggestion that Defendants reconstruct a cap table from other productions nor its offer to re-produce its litigation ledger in native form relieves Plaintiff of its obligation under Rule 34 to produce an existing, responsive document as it is kept in the ordinary course – in native format, so that the formulas and the history of entries relating to Church and Loop's insiders are preserved. *See Green v. Monarch Recovery Mgmt., Inc.*, 2014 WL 1631825, at *3 (S.D. Ind. Apr. 24, 2014) ("One of the unique strengths of Excel software is the ability to implement calculations and formulae that are not evident in a PDF version, so merely a PDF imprint of the surface information is not sufficient").

Accordingly, Defendants request that the Court compel production of Greg Fragin's ledger spreadsheet or, at a minimum, direct Plaintiff to submit it to the Court for *in camera* review.

**Plaintiff's Position:**

At the June meet and confer, Defendants explained that they seek information sufficient for Church to value his shares: the total shares sold or awarded, the purchase price and date of each issuance, outstanding options and warrants, and total shares outstanding on both a current and fully diluted basis. No document kept in the ordinary course contains only that information, so at Defendants' request Plaintiff prepared and produced a ledger of every share issuance, which reflects Church's 3,704 shares purchased August 13, 2020 and his 5,000-share grant, the 8,704 shares stated in Plaintiff's interrogatory responses, together with a capitalization summary (P_001268). Plaintiff will produce that ledger in its native Excel form, identifying by name the holdings of Church and of Loop's officers, directors and insiders, with only non-party investor identities redacted. The internal workbook Mr. Fragin maintains is not limited to that information. It contains a range of other material, would require extensive redaction to protect non-party investors and unrelated information, and once redacted would provide no information beyond what Plaintiff has already produced. Plaintiff therefore objects to producing it as duplicative and disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(1), (b)(2)(C)(i).

**3. Access Logs, Retention Settings, and Related Discovery**

**Defendants' Position:**

This issue connects directly to the search term dispute addressed at Dkt. 85 and the parties' discussions with Your Honor at the conference on September 2, 2026, where the Court directed the parties to explore tailored alternatives to running "Church" as a search term beyond October 14, 2025. To pursue that path, Defendants need Plaintiff's cooperation on access-related discovery that Plaintiff has not provided:

**(a)** ***Amended Responses to Document Request Nos. 50–51.*** Defendants have requested that Plaintiff amend its responses to identify, for each of the 26+ systems at issue: (1) whether an access log has been produced (and the Bates number); (2) the retention settings and periods for the logs; and (3) a statement that no log is available, when Plaintiff first attempted to preserve it, and why it is unavailable. To date, Plaintiff has produced access logs for only a handful of the 26+ systems and maintains that it has produced all access logs that exist – a position difficult to square with its own SOC 2 report, which describes "automated logging and monitoring tools" across its systems. Defendants have been seeking this information since the inception of discovery more than a year ago. While Plaintiff has agreed to provide this, it has offered no date by which it will do so. Plaintiff should be directed to provide these amended document request responses, as described above, by a firm deadline.

**Plaintiff's Position:**

(a) **Request Nos. 50-51.** Plaintiff agreed to amend its Responses to Defendants' Document Requests to provide the requested information. As noted by Defense counsel, these requests involve responses to multiple items as they relate to more than 26 individual systems. Plaintiff is actively working on this voluminous request and will produce the amended responses once complete.

**Defendants' Position:**

**(b)** ***AWS Billing and Cost Management Reports.*** Defendants have requested Loop's current AWS billing and cost management report and have agreed to allow Plaintiff to redact any irrelevant, confidential information. The AWS bill is a monthly, service-by-service statement that Amazon Web Services keeps for every account; Loop simply needs to download it. The 2024 report, which Plaintiff has now agreed to produce, will show which logging and log-storage services (for example, CloudTrail, CloudWatch Logs, and S3) Loop was being billed for when Church left. The current report, which Plaintiff refuses to produce, will show whether Loop is still being billed for those services. If a logging or storage charge that appears in the 2024 report is missing from the current report, that would suggest that Plaintiff stopped paying for that service at some point after Church left. Defendants are entitled to learn when that occurred – as Plaintiff's duty to preserve attached no later than the filing of this action in July 2025 and its own SOC 2 report describes "automated logging and monitoring tools" across its systems. Plaintiff has refused to provide the current report in light of its agreement to amend its responses to Document Request Nos. 50-51 as set forth above. Defendants never agreed that amended responses to Document Request Nos. 50–51 would render these reports moot; Defendants stated only that the amended responses might affect the parties' approach to Defendants' Document Request No. 14 in Defendants' Second Set of Document Requests (*see* n.7, *infra*). And given that Defendants have been waiting more than a year for the information sought in Document Request Nos. 50–51, Defendants have little confidence that Plaintiff's amended responses will be complete. These reports are indisputably relevant to the critical issue of Plaintiff's access log retention and any changes thereto, they exist, and Plaintiff has offered no legitimate reason to withhold them. An

amended written response does not negate the need for production of responsive and relevant documents. Nor are Defendants required to accept, in place of the current report, Plaintiff's unverified representation that "every logging and log-storage service billed in September 2024 remains active and billed today" – particularly given Plaintiff's shifting accounts throughout this litigation of what it does and does not maintain. The current report will show the facts directly. Any concern about Plaintiff's current infrastructure is fully addressed by the Discovery Confidentiality Order and Defendants' agreement to redactions; Defendants seek only the logging and log-storage line items. Plaintiff should be ordered to produce both its 2024 report and its current report by a firm deadline.

**Plaintiff's Position:**

**(b) AWS Billing and Cost Management Reports.** Plaintiff will produce the portions of its September 2024 AWS bill reflecting its logging and log-storage services, designated Confidential under the Discovery Confidentiality Order, and will amend its responses to Document Request Nos. 50–51 to state that every logging and log-storage service billed in September 2024 remains active and billed today. Production of the current bill would further provide Defendant with insights into Plaintiff's current infrastructure and AWS usage and is inappropriate and unnecessary.

**Defendants' Position**:

**(c) *Corrected Matrix/Synapse Log Export.*** The Matrix/Synapse logs Plaintiff produced (P_097441) are deficient. The export was filtered to search only the "user_id" column and entirely omitted the "puppets_user_id" column – the column that records when a server administrator uses the system's built-in "Login as a User" feature to log in as another user. If anyone at Loop used the administrative impersonation feature to log in as Church, that activity would be invisible in the current production. Defendants have requested a corrected re-export including all non-credential columns and a broadened search filter covering both the "user_id" and "puppets_user_id" fields for all of Church's accounts, as well as the records supporting the Matrix IP address and device identifier cited in Plaintiff's Third Amended Answer to Interrogatory No. 11. Plaintiff now states that it has completed a corrected export addressing many of these deficiencies, but it has not produced it or committed to a date. Plaintiff's new explanation for the empty "user_ips" table also requires support. The standard Synapse configuration retains those records for 28 days, not five minutes, and the server runs in Loop's own AWS account and is managed by Loop's third-party Matrix support vendor; Church did not install or configure it. A vendor's statement about its default does not establish the configuration actually in effect on Plaintiff's server; Plaintiff should produce the etke.cc confirmation and the retention configuration actually in effect, and identify when it took effect. In addition, because the "devices" table records only each device's most recent use, Plaintiff should explain how that table establishes a November 16, 2025 sign-in if the device was used afterward. Nor does Plaintiff's export include a server log; the six listed items are database tables. Synapse's default request logging records the source IP address and, when authenticated or supplied, the local user for each request. Plaintiff's June 29, 2026 assertion that

Matrix "does not provide a log" does not answer whether those request logs exist or existed for the relevant periods. Plaintiff should state whether they do and produce any responsive logs under Document Request No. 50.

Without this cooperation, the Court's suggested approach to the "Church" search term dispute cannot be implemented. Defendants request the Court compel Plaintiff to provide the amended responses and corrected logs within fourteen days.[7]

**<u>Plaintiff's Position:</u>**

(c) **Matrix/Synapse Log Export.** Plaintiff has completed a corrected re-export of Church's Matrix records and will produce. The export was run as a single read-only query against Plaintiff's production database on October 22, 2026. It filters on both "user_id" and "puppets_user_id" across all four of Church's accounts and produces all seven outputs of that query: the access_tokens, devices, user_daily_visits, user_ips, device_auth_providers and account-settings tables, together with a record of the time of export, and the query itself, which identifies the source tables, filters and fields selected. This export supersedes Plaintiff's August 17, 2026 production (P_097441–P_097442). It includes the device records Defendants refer to as file "001," and it supplies the IP address and device identifier cited in Plaintiff's Third Amended Answer to Interrogatory No. 11. The export reflects no "login as user" session involving Church's accounts. The device_auth_providers table is empty because Plaintiff's server has never offered third-party sign-in. The user_ips table is empty because Plaintiff's hosting provider, etke.cc, configures the servers it hosts to delete those records five minutes after creation. etke.cc has confirmed in writing that this is its default for all customers and was in place from the day Plaintiff's server was installed, and Plaintiff will produce that confirmation. The IP address and device for Church's November 16, 2025 sign-in are preserved in the devices table.

**4. Outstanding Financial and Corporate Records**

**<u>Defendants' Position:</u>**

Despite months of requests and meet and confers (*see* Dkt. 79), the following categories of documents remain outstanding and should be compelled:

**(a)** ***Board Minutes and Meeting List.*** Defendants have identified missing minutes for a meeting referenced in other minutes but never produced (July 13, 2021), and there are no minutes at all for the period between June 25 and December 11, 2024. Plaintiff has neither produced these minutes nor offered any explanation for their absence. Defendants also requested a complete list

---

[7] The parties have agreed to await the outcome of these items to determine how they will approach their dispute concerning Defendants' document request no. 14, which touches upon access-related issues.

of all board meetings so that they can determine whether all minutes have been produced. While Plaintiff has agreed to provide this, it has offered no date by which it will do so. Plaintiff should be directed to provide these materials by a firm deadline.

**Plaintiff's Position:**

(a) **Board Minutes and Meeting Lists.** Plaintiff stated it would produce and now Defendants want a deadline. Plaintiff has already produced the Board Minutes from July 17, 2025, as Defendants' themselves reference below as bates number P_083902 as well as the minutes from December 21, 2021 as P_083908, the minutes from January 25, 2022 as P_083910, and the minutes from May 1, 2023 as P_083916. Plaintiff refers to its previous position on the inappropriateness of a deadline.

**Defendants' Position:**

**(b)** ***Documents Referenced in Board Minutes.*** Numerous term sheets, purchase agreements, warrant agreements, advisory agreements, option agreements, promissory notes, and loan documents referenced in and ordered filed with the board minutes have not been produced, including: the Church Continuation of Employment exhibit and cash-position schedule (June 25, 2024 minutes, P_083757); the transaction spreadsheet, Resolutions D & E, and deferred Agenda Item 2(c)(iii) (July 17, 2025 minutes, P_083902); the Schedule I, Term Sheet, Unit Purchase Agreement, and Warrant Agreement (2025 minutes, P_083918); and the note referenced in the December 11, 2024 minutes. Plaintiff has refused to provide these documents without any meaningful explanation. Plaintiff now says only that it "believes" all board minutes have been produced, but it has neither provided the promised meeting list needed to test that assertion nor addressed the missing minutes Defendants identified. Plaintiff likewise dismisses "the requested note" as being "from 2019," when the note at issue is referenced in the December 11, 2024 minutes. These responses reflect a lack of care and diligence in Plaintiff's efforts to locate and produce this information. Given the relevance to Church's shareholdings (as set forth in Section 2 above) and the broader theme that has emerged – that Loop never got off the ground, has never been adequately capitalized, and did not suffer any actual damages (even assuming it can prove its allegations of wrongdoing, which Defendants dispute) – Plaintiff must be directed to produce those materials.

**(c)** ***Loan Receivable Records.*** Loop's tax returns report a six- to seven-figure "Loan receivable" asset for years 2023-2025. But the only loans Loop has documented are two option-exercise notes totaling far less than the loan receivable balances. The balance is unexplained. Defendants request the loans receivable subledger and general ledger detail, as well as documents evidencing the six-figure amount described as "paid down" in 2024. As set forth above in Section 4(b), these documents are relevant and should be produced.

**(d)** ***Interest Workpapers.*** Loop's tax returns report interest income for years 2023-2025, but the 2023 figure predates both produced notes. Defendants request the Line 18 interest

workpaper (or general ledger interest detail) for 2023-2025. As set forth above in Section 4(b), these documents are relevant and should be produced.

**Plaintiff's Position:**

Plaintiff provided explanation. Plaintiff provided its financials and stated it would provide any draft agreement for the continuation of Church's employment. The requested note was from 2019. The remainder of these documents are not related to any claims or defenses in this case and Defendants' position fails to state how they are or provide any legal authority to support such a claim. Plaintiff believes all Board Minutes have already been produced, but will produce any relevant minutes if hereafter discovered.

**5. The June 2026 Penetration Test**

**Defendants' Position:**

The SOC 2 Type II audit report records as an exception that no penetration test was performed during the audit period, but Loop's public security page states that a penetration test was completed on June 22, 2026. Defendants are not conflating anything: they seek one document, the June 22, 2026 penetration test identified on Loop's own security page. Plaintiff now says its forthcoming production will include "the penetration test relevant to that period," but does not say whether that is the June 22, 2026 test, and commits to no date. Plaintiff should be directed to produce the June 22, 2026 penetration test by a firm deadline.

**Plaintiff's Position:**

Again, Defendants mischaracterize their request by conflating multiple tests and reports. Plaintiff has already confirmed that it will produce the current SOC 2 Type II Report including the penetration test relevant to that period. The SOC 2 Type II report was provided to Plaintiff this past week and will be produced forthwith.

**6. Production Formatting Issues**

**Defendants' Position:**

**(a) *P_000001 Through P_000066.*** Plaintiff produced P_000001 through P_000066 as a single combined PDF attached to its interrogatory responses. However, the combined document contains materials from multiple distinct sources: Gusto-generated paystubs (P_000001–064), a letter from Prescient Assurance on its own letterhead dated August 20, 2025 (P_000065), and what appears to be a social media screenshot (P_000066). These originate from different sources and should be produced as separate original source documents.

**(b)** ***P_097297 (Secureframe export).*** P_097297 was produced in PDF format, but the underlying document is an Excel spreadsheet and the produced PDF is not legible. Defendants request the original Excel file.

Because Plaintiff notes that it is willing to produce native versions of these documents, Defendants respectfully request that the Court impose a deadline by which the production shall be made.

**Plaintiff's Position:**

Plaintiff has agreed to produce the documents requested. As previously set forth, there is no dispute for Court intervention and a deadline is inappropriate and unnecessary.

**7. Amended Interrogatory Responses**

**Defendants' Position:**

As the Court may recall from the September 2, 2026 conference, Plaintiff was directed to produce amended interrogatory responses by September 16, 2026. Plaintiff did so, but those responses were still deficient in several material respects and did not address many of the issues previously raised by Defendants, which Plaintiff had agreed to address. On September 21, 2026, Defendants served Plaintiff with a 6-page letter detailing the deficiencies. That letter is attached hereto as **Exhibit B**. To date, Plaintiff has failed to respond whatsoever to that letter. Instead, Defendants learned for the first time on October 22, 2026 – through Plaintiff's additions to this letter – that Plaintiff's position is that these deficiencies should be addressed through supplemental interrogatories. That position is wrong; the deficiency letter addresses Plaintiff's failure to fully answer the interrogatories already served. Raising it for the first time a month later, in a draft dispute letter, reflects an absence of good faith. And in the same breath, Plaintiff states that it "will continue to amend its interrogatory responses" and now, for the first time, that it will respond to the deficiency letter – more than a month after receiving it – but again offers no date. Plaintiff should be directed to address those deficiencies by a firm deadline. To the extent Plaintiff contends any item is a "new" request, those items should be deemed as additional interrogatories under Agreed Issue 2 below, with responses due within the time provided by Rule 33(b)(2).

**Plaintiff's Position:**

To the extent appropriate and required under the Federal Rules of Civil Procedure, Plaintiff will continue to amend its interrogatory responses. However, to the extent that Defendants claim that Plaintiff's responses are deficient because they do not address newly-asserted or more technical inquiries from Defendants that attempt to cast a net far beyond the original requests made by Defendants, Plaintiff is not obligated to amend what are essentially new/additional interrogatories. There are more appropriate venues for these requests by Defendants, namely, Plaintiff has agreed to additional supplemental interrogatories and Defendants are free to depose whoever they believe will be able to provide whatever it is they are seeking. Notwithstanding these

objections, Plaintiff anyway offered to schedule another meet and confer in which to discuss the "deficiency" letter. Plaintiff will respond to the September deficiency letter, identifying which items will be answered via amendment and which Plaintiff considers to be new requests.

**8. Explanation for Redactions**

**<u>Defendants' Position:</u>**

Plaintiff significantly redacted many of the board minutes that it has produced to date. Defendants understood that the redactions were to be limited to non-insider investor names, but it appears that the redactions on several of the documents go far beyond investor names. Plaintiff agreed in August to provide an explanation for the redactions on P_083749, P_083753, P_083756, P_083889, P_083897, P_083900, P_083902, P_083906, P_083912, P_083922, and P_083925 but has failed to do so. Plaintiff should be ordered to provide its explanations by a firm deadline.

**<u>Plaintiff's Position:</u>**

Plaintiff agreed to provide an explanation for the redactions. Plaintiff maintains that no Court-imposed deadline is required as discovery is ongoing and Plaintiff is well within the appropriate timeframe.

**9. Confidentiality Designations on iConect Files**

**<u>Defendants' Position:</u>**

Plaintiff agreed to remove the confidentiality designation from several gif files that it had originally provided to Defendants through the iConect platform. Further, Plaintiff agreed to remove the AEO designation on three documents (P_031596, P_030828 and P_030833) that Plaintiff had relied upon in its amended interrogatory responses as evidencing wrongful conduct by Defendants. However, Defendants are unable to download any of those documents based on the settings in iConect. Because the remainder of the files in iConect are designated AEO, Defendants have requested downloads of those files in order to share the files with Church. Unfortunately, Plaintiff has proposed additional restrictions on Defendants' use of them – restrictions that are inconsistent with the treatment of "Confidential" material under the Discovery Confidentiality Order. Nothing in the ESI Protocol supports Plaintiff's position. Section C.1(A) provides only that these materials "may be produced via Data room" and are treated as AEO "in the first instance." It does not require a non-downloadable format. Having agreed to re-designate these three documents, Plaintiff can simply provide copies on the terms the Order sets for Confidential material. Defendants request that the Court enter a firm deadline by which Plaintiff will provide those revised gif files and downloads of P_031596, P_030828 and P_030833 for dissemination to Church, re-designated as Confidential under the Discovery Confidentiality Order and without use restrictions beyond those the Order imposes on Confidential material.

**<u>Plaintiff's Position:</u>**

Plaintiff agreed to de-designate several gif files and to de-designate the documents listed above from AEO to Confidential so that Defendant Church could view them, but these documents are in the Data Room and were, per the ESI protocol, AEO and produced in a format that is not downloadable. While Plaintiff agreed to modify the designation, Plaintiff did not agree to modify the ESI Protocol and allow the documents be downloadable. Plaintiff expressed this concern to defense counsel and explained that it emailed its vendor to see how it could be addressed. Defendants responded they need to be able to download files and Plaintiff's counsel said they would discuss with Plaintiff and respond but this dispute nonetheless inappropriately appears in this letter.

**Relief Requested by Defendants:**

Defendants respectfully request that the Court enter an order compelling Plaintiff, within fourteen days, to: (1) substantively respond to, and produce documents responsive to, Request Nos. 1–13 and 16–21 of Defendants' Second Set of Document Requests; (2) produce, in native format, the ledger spreadsheet maintained by its CEO Greg Fragin, not a document created for this litigation; (3) provide the amended access log discovery (including the amended responses to Document Request Nos. 50–51, the AWS billing reports, corrected Matrix/Synapse logs, the Synapse retention configuration in effect and when it took effect, and the records underlying Plaintiff's sworn Matrix IP address and device assertions); (4) produce the outstanding financial and corporate records identified above; (5) produce the June 22, 2026 penetration test; (6) produce the documents identified in Section 6 in proper format; (7) provide amended interrogatory responses addressing the issues outlined in Exhibit B, with any items Plaintiff contends are new requests deemed served as additional interrogatories under Agreed Issue 2; (8) provide an explanation for the redactions on P_083749, P_083753, P_083756, P_083889, P_083897, P_083900, P_083902, P_083906, P_083912, P_083922, and P_083925; (9) provide the revised gif files referenced above and downloads of P_031596, P_030828 and P_030833; and (10) respond to Defendants' July 22, 2026 draft source code protocol, with any remaining disputes submitted by joint letter within seven days thereafter.

***

The parties have reached an agreement as to two discrete issues.

1. **Entry of a Substantial Completion Deadline for Document Productions.** Pursuant to the Amended Pretrial Scheduling Order (Dkt. 81), the fact discovery deadline is May 3, 2027. In order to ensure that there is adequate time to review the documents produced in advance of depositions, the parties have agreed to the entry of a substantial completion deadline for document productions of February 15, 2027. "Substantial completion" is defined as the production of all responsive documents other than those being withheld or further reviewed for legitimate privilege concerns or for the purpose of preparing a privilege log. The parties respectfully request that the Court enter an order reflecting this additional deadline.

**2. Additional Interrogatories.** At the outset of discovery, the parties agreed to a maximum of thirty-five interrogatories per side. Both sides have largely used all thirty-five interrogatories to date. However, as discovery has progressed in what has become a highly technical case, numerous technical and factual issues have arisen that could be efficiently addressed through interrogatories. The parties have agreed that they may each serve an additional ten interrogatories and that subparts will be treated in accordance with Rule 33(a) and the relevant case law governing the same. The parties respectfully request that the Court enter an order granting the parties leave to serve an additional ten interrogatories each.

As always, the parties thank the Court for its time and attention to this matter.

Respectfully submitted,

COLE SCHOTZ P.C.

*/s/ Rachel A. Mongiello*

Rachel A. Mongiello

CC: All Counsel of Record via ECF

# EXHIBIT A

**MURPHY ORLANDO LLC**
Jason F. Orlando, Esq. (#016482000)
Debra R. Rydarowski, Esq. (#004582007)
Amanda K. Baker, Esq. (#534262025)
494 Broad Street, 5th Floor
Newark, NJ 07102
(201) 451-5000
*Attorneys for Plaintiff, Loop HQ, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LOOP HQ, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JEREMIAH CHURCH and TRES COMMA COMPLIANCE INC.,<br><br>Defendants. | Civil Action No. 2:25-CV-12562-JKS-CLW<br><br>**PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' SUPPLEMENTAL REQUEST FOR THE PRODUCTION OF DOCUMENTS** |

To: **COLE SCHOTZ P.C.**
Rachel A. Mongiello, Esq.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800

**COUNSEL:**

In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 33.1, Plaintiff Loop HQ, Inc. ("Plaintiff") hereby objects and responds to Defendants' Supplemental Request for the Production of Documents.

**MURPHY ORLANDO LLC**
*Attorneys for Plaintiff*

By: *__/s/ Debra Rydarowski__*
Debra Rydarowski, Esq.

Dated: July 27, 2026

**OBJECTIONS AND LIMITATIONS**

The following objections apply to each request and are hereby incorporated in each specific response that follows.

A. Plaintiff objects to each request to the extent that it seeks information which is neither relevant to the subject matter of the action nor reasonably calculated to lead to the discovery of admissible evidence.

B. Plaintiff objects to each request to the extent that it is overbroad as to time and/or in scope.

C. Plaintiff objects to each request to the extent that it seeks information that is protected from discovery by the attorney-client privilege or the work-product doctrine or which constitutes or discloses the mental impressions, conclusions, opinions or legal theories of an attorney in this or any other litigation or legal matter, or which is protected from disclosure by any other privilege or immunity. Inadvertent disclosure of such documents shall not constitute a waiver of any privilege or other ground for objecting to discovery with respect to such documents, nor shall such inadvertent disclosure waive the right of Plaintiff to object to the use of any such documents in any proceeding.

D. Plaintiff objects to each request to the extent that it is not proportional to the needs of the case.

E. Plaintiff objects to each request to the extent that it is unreasonably cumulative.

F. Plaintiff objects to each request to the extent that it is duplicative.

G. Plaintiff objects to each request to the extent that it can be obtained from some other source that is more convenient, less burdensome, or less expensive.

H. Plaintiff objects to each request to the extent that Defendants have had ample opportunity to obtain the information by discovery in the action.

I. Plaintiff objects to each request to the extent that it is outside the scope permitted by Fed. R. Civ. Pro. 26(b)(1).

J. Plaintiff objects to each request of electronically stored information to the extent that the source of the information is not reasonably accessible because of undue burden or cost.

K. Plaintiff objects to each request to the extent that it is vague and ambiguous.

L. Plaintiff objects to each request to the extent that it seeks information that is neither in the possession nor the control of Plaintiff.

M. Plaintiff objects to each request to the extent that it seeks information that is already in the possession of the Defendants.

N. Plaintiff objects to each request to the extent that it calls for a legal conclusion.

O. Plaintiff objects to each request to the extent that it purports to seek confidential and proprietary information that is not customarily disclosed to third parties or that is prohibited by agreement from being disclosed to third parties.

P. Any document produced or otherwise attached hereto or referenced herein is not to be considered an adoptive admission of any fact/opinion contained therein, nor is the attachment/reference a certification or affirmation of the truth or accuracy of any facts/opinions contained therein. Documents are supplied as a possible source of hearsay information and as a good faith response to these requests.

Q. In the event that Plaintiff has inadvertently failed to respond or object to any of these requests, it reserves the right upon being promptly notified of such failure to supply the response or to restate its objections, if any, to the request as interpreted by Defendants.

R. In response to certain requests, Plaintiff may restate or cite to one or more of the foregoing common objections. A failure to make specific reference to any objection set forth herein shall not constitute a waiver of any objection in that each of the foregoing objections is applicable to each request.

S. Plaintiff reserves the right to amend and/or supplement these objections and responses as warranted by continuing investigation and the ongoing course of discovery.

## OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

1. For each Short Link and any other bit.ly or similar shortened URL created, used, or distributed by Loop, its principals, officers, employees, agents, or any marketing or agency account acting on Loop's behalf that points to Loop marketing, investor, product, compliance, or shareholder materials: the actual file, page, video, or other content to which the link resolves or resolved, in complete, unredacted, native form, including (a) the version of the content that was live at the time the link was in active use or distribution, (b) all subsequent versions, and (c) if the link destination was changed, redirected, or taken down, documents sufficient to reflect the date of each such change and the current destination URL or status. For the avoidance of doubt, this Request includes each such link in its full form (with protocol and any query parameters), and any alias, QR code, UTM-tagged variant, or archived, expired, or deactivated version of it; any such link created, used, or distributed through a personal, agency, contractor, or officer account used for Loop business; and any such link distributed to investors, prospective customers, shareholders, lenders, board members, or event or campaign participants.

**Response:**

**Plaintiff objects to this request on the grounds that it is disproportionate to the needs of the case, seeks information that is not relevant to any claim or defense in this action, seeks ESI from sources that are not reasonably accessible because of undue burden or cost, and is duplicative of prior, responded to requests. Plaintiff further objects that it is ambiguous, vague, compound and confusing. Plaintiff will meet and confer.**

2. All Bitly analytics, metadata, and export data for each link identified in response to Request No. 1, including but not limited to: total clicks; clicks by time period; referrers and referring domains; geographic data (country and city); device type; any CSV, API, or raw click-log export available under Loop's Bitly plan; creation date; creator identity; custom back-half or slug; original and current destination URL; all redirect edits and destination-URL changes; any UTM parameters, campaign tags, or associated QR codes; and archived, expired, or deactivated status.

**Response:**

**See Response to No. 1.**

3. For each document or data room hosted on DocSend and linked through any URL identified in response to Request No. 1: the full visitor analytics export, including visitor name and email address (where captured), visit date and time, visit duration, page-by-page view data, downloads, prints, and completion percentage; any data-room audit log; any forwarded-access events tracked by the platform; and the link settings and full history of changes to those settings, including email-capture (on/off), passcode protection, NDA or agreement gate, download-permitted status, and expiration date.

**Response:**

**See Response to No. 1.**

4. For each video hosted on Loom and linked through any URL identified in response to Request No. 1: all Viewer Insights, Engagement Insights, and workspace activity-log exports, including viewer name and email address (where captured), anonymous view counts, view timestamps, watch completion data, comments, reactions, CTA clicks, and downloads; and the privacy and access setting for the video (public, anyone-with-link, workspace-only, password-protected, or email-capture) and the full history of changes to that setting.

**Response:**

**See Response to No. 1.**

5. For each file hosted on Google Workspace (including Google Slides and Google Drive) and linked through any URL identified in response to Request No. 1: all Drive log events from Loop's Google Admin Console or security investigation tool, including views, downloads, copies (including "Source Copy" events), shares, and visibility or permission changes, together with the actor identity (or external/anonymous flag), IP address and ASN (where available), prior and new visibility settings, file owner, and resource ID and title; the file's sharing setting and complete history of changes to that setting (restricted, anyone-with-link, or published-to-web); and for any file that is now deleted or returns a "page not found" or similar error (including without limitation the Google Drive file formerly accessible at bit.ly/LoopOverview), the file itself as preserved in Drive, Trash, Google Vault, backup, or any other source, together with all Drive log events still available for that file.

**Response:**

**See Response to No. 1.**

6. For each file or folder hosted on Dropbox and linked through any URL identified in response to Request No. 1: all shared-link analytics and team or admin activity data available, including identified viewers (where captured), anonymous or external view counts, downloads, dates and times of access, and shared-link creation, modification, or deletion events; and the link settings and history of changes to those settings, including audience (anyone-with-link, team-only, or invited-only), password protection, download-disabled status, and expiration.

**Response:**

**See Response to No. 1.**

7. For the Vimcal scheduling or booking-page link identified in response to Request No. 1: the page content and configuration; its public or private status and URL history; all calendar and event records created through the page, including invitee names, email addresses, and timestamps; all cancellations and reschedules; and any page-visit or booking analytics available through the Vimcal platform.

**Response:**

**See Response to No. 1.**

8. For each link, file, document, video, data room, or booking page identified in response to Request Nos. 1 through 7: the identity of the account or workspace in which it resides; the account owner; all account administrators; and the person who created the link or owns the content, including the identity of any outside marketing firm, consultant, or agency that created or managed the link or content on Loop's behalf.

**Response:**

**See Response to No. 1.**

9. For Loop's Webflow account(s) and any other platform used to build, host, or publish Loop's websites or landing pages (including loophq.com, loophqcompliance.com, and stresslesstour.com): all site and page version and publish history, collaborator and user access logs and role-change history, form and lead submissions, CMS collection exports, custom-code and embed history, domain and DNS publishing records, and audit or activity logs; together with documents sufficient to identify every person, employee, contractor, or outside agency with access to each such account during the Time Period.

**Response:**

**See Response to No. 1.**

10. The content of Loop's websites and landing pages relating to Loop's marketing, investor, product, compliance, or shareholder materials, regardless of hosting platform, including loophqcompliance.com, stresslesstour.com, the "Stress Less Tour" pages and sign-up forms, and any landing page linked from the materials described in Request No. 1, in complete and unredacted form, including the version that was live during the Time Period, all subsequent versions, and, for any page now removed or returning an error, the page as preserved in any backup, archive, or version history.

**Response:**

**See Response to No. 1.**

11. Documents sufficient to show each distribution, transmission, or publication of each Short Link and of each item of Loop marketing, investor, product, compliance, or shareholder material described in the foregoing Requests, including the message or content distributed, the date, the sending account, the recipient list or audience, and any available send, open, click, or bounce analytics, including by way of example any mail-merge exports, recipient or distribution lists, CRM records, and campaign analytics from any email, campaign, or CRM platform used by Loop (such as Mailchimp, HubSpot, SendGrid, Customer.io, Postmark, or Google Workspace or Google Groups).

**Response:**

**See Response to No. 1.**

12. All account information and all traffic, engagement, and attribution exports from any web- or marketing-analytics platform used by Loop for its websites, landing pages, or the destinations of the Short Links, including Google Analytics, Google Search Console, and Google Tag Manager, and any Meta, LinkedIn, X/Twitter, or other advertising, campaign, or QR-code platform, together with documents sufficient to identify the account, property, owner, and administrators.

**Response:**

**See Response to No. 1.**

13. For each platform identified in response to the foregoing Requests (including Bitly, DocSend, Loom, Google Workspace, Dropbox, Vimcal, Webflow, and any email, CRM, advertising, or analytics platform): documents sufficient to show the subscription plan or tier, the data-retention and export limits applicable to that plan, administrator permissions, and whether more granular analytics, logs, or exports are available through an upgrade, the platform's API, an enterprise or administrator export, or a support request.

**Response:**

**See Response to No. 1.**

14. Documents sufficient to describe Loop's migration of its systems from Heroku to Amazon Web Services and the design and operation of the "AWS S3 archive" referenced in Loop's shareholder and investor communications, including architecture and data-flow diagrams, product and technical descriptions, and storage, search, and retrieval specifications for the communications archive, together with the documents used to describe that archive, and Loop's integrations, scale, and compliance functionality, to investors, customers, vendors, auditors, or partners. This Request does not seek AWS access, authentication, CloudTrail, IAM, or credential logs, which are the subject of Defendants' prior requests.

**Response:**

**See Response to No. 1.**

15. All documents supporting, underlying, or concerning the revenue, customer, subscription, and growth representations and projections in Loop's shareholder and investor communications, including the projection of "$13.2mm" in second-year revenue in the January 11, 2024 update, the representation that a "$46 billion" private-equity fund was a signed enterprise customer at "$40/user/month," the representations regarding paid subscriptions, users, contacts, and the "Stress Less Tour," and the description of any RSM US distribution partnership or Schulte

Roth referrals, together with the customer, pricing, and pipeline assumptions, financial models, forecasts, board materials, and related communications with any accountant, investor, or prospective investor.

**Response:**

**Plaintiff objects to this request on the grounds that it is disproportionate to the needs of the case, seeks information that is not relevant to any claim or defense in this action, and is duplicative of prior, responded to requests. Plaintiff further objects that it is ambiguous, vague, compound and confusing. Plaintiff will meet and confer.**

16. All documents and communications sufficient to show whether Loop, its principals, or any person acting on Loop's behalf has issued or implemented a litigation hold, preservation notice, or other directive to preserve the analytics, access logs, visitor data, sharing settings, and setting-change histories maintained by Bitly, DocSend, Loom, Google Workspace, Dropbox, and Vimcal for the links, files, and content identified in response to the foregoing Requests, including documents sufficient to show the date any such hold was implemented and the identity of the custodian or administrator responsible for each platform. This Request further extends to Webflow and to any email, CRM, campaign, advertising, or web-analytics platform identified in response to the foregoing Requests, and includes all records reflecting the deletion, modification, expiration, or unavailability of any such analytics, logs, links, content, or settings on or after July 1, 2025, all communications with any such platform or vendor concerning preservation or export, and the identity of the administrator or custodian responsible for each platform.

**Response:**

**Plaintiff objects to this request on the grounds that it is disproportionate to the needs of the case, seeks information that is not relevant to any claim or defense in this action, is duplicative of prior, responded to requests, and seeks the production of privileged information. Plaintiff further objects that it is ambiguous, vague, compound and confusing. Plaintiff will meet and confer.**

17. All documents and communications concerning Fragin's status as a Loop employee, officer, independent contractor, or in any other compensated capacity, including but not limited to: his personnel file and any updates thereto; any employment agreements, confidentiality or nondisclosure agreements, offer letters, or compensation arrangements; all corporate records addressing his appointment, election, or service as an officer or executive of Loop, including board resolutions, written consents, corporate minutes, and bylaws provisions establishing or authorizing the position and its compensation; all records of compensation paid or payable to Fragin in any form, including salary, bonuses, commissions, draws, distributions characterized as compensation, equity grants, profit interests, deferred compensation, expense reimbursements, benefits, and any other remuneration; all payroll records, pay stubs, W-2s, 1099s, and K-1s issued to or reflecting payments to Fragin; all general ledger entries, journal entries, and chart-of-account records reflecting compensation, management fees, or any other payments to Fragin; and all documents and communications concerning Loop's representations to any third party — including Church, 16 69945/0001-53446947v3 investors, lenders, taxing authorities, or regulatory bodies —

regarding the number of Loop's employees, the identity of Loop's compensated personnel, or whether Fragin received compensation from Loop. This Request further includes all documents concerning Fragin's purchases of Loop stock, his loans to or other funding of Loop (including any promissory notes), the consideration he paid, any equity or notes issued to him, the board approvals therefor, and the treatment of the foregoing on Loop's capitalization table.

**Response:**

**Plaintiff objects to this request on the grounds that it is disproportionate to the needs of the case, seeks information that is not relevant to any claim or defense in this action, is duplicative of prior, responded to requests, and seeks the production of privileged information. Plaintiff further objects that it is ambiguous, vague, compound and confusing. Plaintiff will meet and confer.**

18. All documents and communications concerning the classification, designation, characterization, or reporting of Church as an employee, officer, independent contractor, or in any other capacity on or in connection with any federal, state, or local tax return, tax form, payroll filing, or information return filed by or on behalf of Loop, including but not limited to the determination of whether to report Church's compensation as officer compensation, and including without limitation:

(a) payroll setup records, HR or payroll software entries, and any other records reflecting Church's job title, classification code, or tax treatment; board resolutions, employment agreements, or offer letters establishing Church's role as an officer or employee; corporate minutes or written consents reflecting the election, appointment, or non-appointment of Church as an officer; and organizational charts, officer certifications, or annual reports filed with any secretary of state listing or omitting Church as an officer;

(b) all emails, messages, memoranda, or other communications between or among Loop personnel (including Church), Loop's accountant or CPA, Loop's tax preparer, or Loop's payroll provider discussing how to classify or report Church's compensation, including any communications with outside tax advisors or attorneys regarding whether Church should be reported as an officer on Loop's tax returns, and any correspondence with the IRS or any state taxing authority concerning Church's classification;

(c) tax preparer work papers, engagement letters, and questionnaires, including any preparer requests to identify officers and their compensation and Loop's responses thereto; and trial balance or general ledger entries categorizing Church's pay as officer compensation, salaries and wages, or any other classification.

(d) Form 1125-E (Compensation of Officers) for each tax year 2021 through 2025; all drafts of Loop's federal and state returns and of any Form 1125-E; all officer-compensation schedules, computations, and payroll-to-return reconciliations or mappings; and all communications with Loop's accountant, CPA, tax preparer, or payroll provider concerning the reporting or non-reporting of Church as an officer or the classification of his compensation, for the period 2021 through 2025.

**<u>Response:</u>**

**Plaintiff objects to this request on the grounds that it is disproportionate to the needs of the case, seeks information that is not relevant to any claim or defense in this action, is duplicative of prior, responded to requests, and seeks the production of privileged information. Plaintiff further objects that it is ambiguous, vague, compound and confusing. Plaintiff will meet and confer.**

19. Loop's source code for the Compliance Product as it currently exists, including all branches, repositories, commit history, build and configuration files, and related technical documentation.

**<u>Response:</u>**

**Plaintiff objects to this request on the grounds that it is disproportionate to the needs of the case, seeks information that is not relevant to any claim or defense in this action, seeks ESI from sources that are not reasonably accessible because of undue burden or cost, and is duplicative of prior, responded to requests. Plaintiff further objects that it is ambiguous, vague, compound and confusing. Subject to these objections, Plaintiff responds that it has already produced its source code at the time of Defendants' misappropriation of same. Its current source code is completely irrelevant to the claims and defenses in this action. Plaintiff will meet and confer.**

20. All documents and communications that address, relate to, describe, or evidence all changes made to Loop's source code for its Compliance Product since September 10, 2024.

**<u>Response:</u>**

**See Response to No. 19.**

21. All SOC 2 reports concerning Loop (including any SOC 1, SOC 2, or SOC 3 and any Type I and Type II reports), together with all related documents and communications, including any management assertions and system/control descriptions, any bridge or gap letters, any noted exceptions and management responses, all drafts, and all communications with the auditing or attesting firm concerning such reports.

**<u>Response:</u>**

**Plaintiff objects to this request on the grounds that Plaintiff has already produced all responsive documents and refers Defendants to documents beginning with bates stamps P_097241 and P_097306. Plaintiff reserve the right to supplement or amend this Response as discovery progresses.**

**MURPHY ORLANDO LLC**
494 Broad Street, 5th Floor
Newark, New Jersey 07102
(201) 451-5000
*Attorneys for Plaintiff, Loop HQ, Inc.*

By: *__/s/ Debra Rydarowski_____*
Debra Rydarowski, Esq.

Dated: July 27, 2026

# **EXHIBIT B**

Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
201.489.3000 201.489.1536 fax
—
New York
—
Delaware
—
Maryland
—
Texas
—
Florida
—
Washington, DC

COLE SCHOTZ P.C.

Rachel A. Mongiello
Member
Admitted in NJ and NY

Reply to New Jersey Office
Writer's Direct Line: 201.525.6222
Writer's Direct Fax: 201.678.6222
Writer's E-Mail: rmongiello@coleschotz.com

September 21, 2026

**Via E-Mail**
Jason F. Orlando, Esq.
Debra R. Rydarowski, Esq.
Murphy Orlando LLC
494 Broad Street, 5th Floor
Newark, NJ 07102

**Re:** ***Loop HQ, Inc. v. Church et al.*****,**
**Civil Action No. 2:25-cv-12562-JKS-CLW**

Dear Counsel:

As you are aware, this firm represents Defendants Jeremiah Church ("Church") and Tres Comma Compliance Inc. ("TCC," and together with Church, "Defendants") in the above-referenced matter. We write to address deficiencies in Plaintiff Loop HQ, Inc.'s ("Loop") Third Amended Responses and Objections to Defendants' First Set of Interrogatories (the "Third Amended Responses"), served September 16, 2026. Many of the issues we raised in our May 8, 2026 letter remain unresolved despite Loop's agreement to amend, and new deficiencies have emerged in the amended responses. We address the specific deficiencies below and request a conference regarding the same.

The following Third Amended Responses are deficient and require further amendment and/or supplementation:

- **Interrogatory No. 5** asks that Loop identify its total revenue and gross profit for each year between 2021 and the present. Loop agreed to amend its response to this Interrogatory in response to our May 8, 2026 deficiencies letter (which identified the same deficiencies set forth herein), yet the Third Amended Response remains substantively unchanged from the prior version. The response still merely refers to Loop's tax returns for 2023 and 2024 (and ignores Loop's tax returns from 2021, 2022, and 2025) without providing a clear, complete sworn answer as to Loop's total revenue and gross profit for each year. Defendants are entitled to a clear and complete answer in a sworn interrogatory response, not a bare cross-reference to Loop's tax return. Please provide a complete, substantive response.

- **Interrogatory No. 7** asks Loop to describe how it has advertised, promoted and marketed the Compliance Product, including (iii) the total dollar amounts spent on a monthly and annual basis, and to attach all advertising, promotional and marketing materials. The Court's July 29, 2026 Order (dkt. 80) directed Loop to supplement this response. The supplemental response describes word of mouth, networking, demonstrations, Loop's website and "tweets," and states that Loop "does not advertise through paid advertising with third parties," but it does not state the dollar amounts spent by month or year, even if that figure is zero, and it attaches only a single screenshot of a tweet rather than all of the marketing materials the Interrogatory calls for. Please amend to state the amounts spent (or to state affirmatively that no amounts were spent) for each year from the first such expenditure to the present, and attach or identify by Bates number all advertising, promotional and marketing materials for the Compliance Product, including the decks and one-pager the response references.

- **Interrogatory No. 9**[1] asks Loop to identify with specificity the inventions, innovations, designs, developments, devices, software, algorithms, tools, methods, processes, know-how, technology and infrastructure underlying, comprising, or used to develop the Compliance Product. Loop's Third Amended Response presents a few distinct deficiencies:

    1. Loop's amended response describes its "authorized-endpoint capture method" as comprising an off-the-shelf message bridge plus two "Loop-built" components—a service layer and a provisioning layer. The response references "the specific Loop repositories in which each resides" but does not identify which repository each Loop-built component resides in. This information is necessary for Defendants to evaluate the trade secret claims and prepare for source code review. Please amend to identify the specific repository for each component.

    2. The same gap exists for the other components the response identifies: the contact matching algorithm, the "business vs personal classification module," the "business-versus-personal identity-graph and classification logic," and the "other unique, non-public complex integrations." Loop states that the repositories in which each resides were among the seven repositories in the Zip File, but does not say which. Please amend to

[1] Because Loop's response to Interrogatory No. 10 simply refers to its response to Interrogatory No. 9, these deficiencies apply equally to Interrogatory No. 10.

identify, for each of these components, the repository and the module or files in which it resides.

3. Please also identify by name and source the "off-the-shelf message bridge" that Loop states it "uses without modification and does not claim as a trade secret," so that the claimed trade secret can be distinguished from the public component.

4. Loop's response states that the "uskape" reflog records "370 entries and 291 separate fetch operations across 103 days." However, the document Loop cites in support (P_031596) is a FETCH_HEAD file, which is a single-snapshot artifact that Git by default overwrites on every fetch and does not contain historical entries or operation counts. The claimed statistics must have been derived from a different source that has not been produced. Please identify and produce the document or log from which the "370 entries and 291 separate fetch operations across 103 days" figure was derived, or explain how the claimed count was obtained from P_031596.

- **Interrogatory No. 11** asks Loop to identify and describe its efforts to revoke Church's access to Loop's systems and data following his resignation and to collect any confidential information or proprietary data or materials from him. Loop's Third Amended Response presents multiple deficiencies:

1. Loop's amended response references costs incurred in "responding to, assessing and remediating" Church's post-resignation access but does not identify any harm that required remediation, describe what response or remediation was required and what costs were associated, quantify any costs, or identify any supporting documentation. Please amend to provide this information and identify and produce all documents relating to same.

2. Loop's response now states the Matrix IP address (108.174.105.84), a device ID (KPHTJSYXYN), and identifies the device as "element.loophq.com: Edge on Windows," and states that records "have been produced." However, the two CSV files actually produced (P_097441 and P_097442) do not contain the IP address or device name fields cited in the response. If these data points were derived from the CSVs, please identify the specific columns. If they were derived from another source (such as the June screenshot referenced in prior correspondence), please identify that source and produce it. In either event, Loop's response should identify the records by Bates number.

3. Given your implication that Church was behind the November 16, 2025 access, please identify the individual who set the Matrix password, and whether and when that password was ever changed and, if so, by whom.

4. Loop's response does not state what Church allegedly accessed or did once logged into the Matrix system, beyond stating he "could see server status and the infrastructure of Loop's products." If Loop contends Church took any specific action during the November 16, 2025 access, it must say so.

5. Loop states it removed Church's Matrix access on June 1, 2026 and deleted the AWS user, access keys, and MFA device on June 2, 2026. The response does not address what steps were taken to preserve data or logs before those removal and deletion actions. Please state what preservation steps, if any, were taken prior to the June 1 and June 2, 2026 removal and deletion actions.

- **Interrogatory No. 12** asks Loop to identify each "security personnel" referenced in Paragraph 65 of the Complaint, provide their last known address and contact information, and describe all instances of their receiving alerts for suspicious or unauthorized activity and their responses. We raised the deficiencies in this response in our December 8, 2025 letter. The Third Amended Response names Church, Zev Spilman and Simon Adler, but provides no contact information, describes no alert, and states only that Loop "will produce any alerts and responses thereto to the extent it [sic] exists." Please amend to provide the requested contact information, to state whether any alert for suspicious or unauthorized activity was received in connection with any of the access Loop alleges, and, if so, to describe each alert and the response to it and identify the related documents by Bates number, or to state affirmatively that no such alert exists.

- **Interrogatory No. 14** asks Loop to state whether Church possessed access to any system used by Loop after October 1, 2024, and for each system for which the answer is anything other than "No," to identify seven categories of information. Loop's Third Amended Response remains deficient. Rather than providing the system-by-system response we requested in our May 8, 2026 letter—addressing each of the seven categories of information for each system—Loop's response largely refers Defendants to Church's own interrogatory response and to Loop's response to Interrogatory No. 11, while objecting that a complete response requires forensic imaging.

As we stated in our May 8, 2026 letter, Loop's own NewRelic response demonstrates that Loop has the technical capability to produce system-level audit and account metadata. The deficiency is that Loop has not applied that same methodology to the remaining systems. Loop must provide a system-by-system response addressing each of the seven categories we identified: (1) account identifier; (2) SSO/SCIM provisioning and MFA configuration; (3) role/permissions; (4) first and last UTC login or token-based authentication after October 1, 2024; (5) date and time of access removal and the person responsible; (6) shared/service-account status and credential rotation; and (7) Bates citations supporting each answer.

- **Interrogatory No. 17** asks for the full factual basis for the allegations in Paragraphs 128, 165 and 166 of the Complaint. Loop's Third Amended Response relies on the same three documents (P_031596, P_030828 and P_030833) addressed above in connection with Interrogatory No. 9, and states that the Matrix logs "have been produced," the same statement addressed above in connection with Interrogatory No. 11. The deficiencies identified there, including what P_031596 does and does not show and the identification of the Matrix records by Bates number, apply equally to this response, and Loop's amendment should address them here as well.

- **Interrogatory No. 19** asks Loop to identify all employees, consultants, and vendors who are subject to confidentiality agreements with Loop and the dates of those agreements. Loop agreed to amend this response and to specifically list out the employees, consultants, and vendors, although Loop would not agree to list out the associated documents. Putting aside the propriety of Loop's objection to listing the specific documents, Loop did not even follow through on its agreement to list out the particular individuals. While the Third Amended Response now states that "every single employee, contractor, and vendor who has access to Loop's proprietary information is subject to a confidentiality agreement" and refers generally to its production, it still does not provide the requested list of employees, consultants, and vendors with the dates of their agreements. A general assertion and cross-reference to an unspecified production is not a complete answer. Please provide the requested list.

- **Interrogatory No. 22** seeks information relating to the "first customer" and the thirteen private equity funds referenced in Paragraph 50 of the Complaint. Loop agreed to amend this response to address Fortress. The Third Amended Response now lists Fortress among the thirteen private equity funds, but states only "(i) No demo; (ii) N/A; (iii) no; (iv) N/A." Paragraph 50 of the Complaint, however,

specifically suggests that all thirteen private equity funds received a demo. If that is not the case with respect to Fortress, please clarify Fortress's relationship with Loop—*i.e.*, in what capacity did Fortress participate and what was the nature of the interaction referenced in Paragraph 50 of the Complaint. Additionally, please confirm in the amended response that Onex was Loop's "first customer" as referenced in Paragraph 50 of the Complaint, as previously requested.

- **Interrogatory No. 24** asks whether Loop's marketing materials and website referenced Church between September 9, 2024 and July 14, 2025. Loop's response states that the one-pager referencing Church "was accessed about five times after September 9, 2024." This claim derives from some log, analytics report, or other record, yet Loop has not produced those records despite Defendants' outstanding requests for website and link-related access records. Please produce whatever log, record, or data source yielded the "about five times" figure, or identify by Bates number where such records appear in Loop's production.

For the avoidance of doubt, the above deficiencies in Loop's Third Amended Responses are non-exhaustive, and Defendants reserve the right to identify new and additional deficiencies as their investigation and discovery in this matter continue.

We look forward to your response on these issues and we are available to meet and confer at your convenience.

Sincerely,

*/s/ Rachel A. Mongiello*

Rachel A. Mongiello